**STATE OF MINNESOTA**                          **DISTRICT COURT**

**COUNTY OF BELTRAMI**                     **NINTH JUDICIAL DISTRICT**

                                                      **CASE TYPE: DISCRIMINATION**

---

Jane Doe 1, by and through her parents and
natural guardians, Mother Doe 1 and Father
Doe 1,  and Jane Doe 2, by and through her
parent and natural guardian, Mother Doe 2,

       Plaintiffs,                          Case No.

v.

Independent School District 31 d/b/a/          **SUMMONS**
Bemidji Area Schools,

       Defendant.

---

THIS SUMMONS IS DIRECTED TO THE ABOVE-NAMED DEFENDANT.

     1.     **YOU ARE BEING SUED**. The Plaintiffs have started a lawsuit against you. The Plaintiffs' Complaint against you is attached to this summons.  Do not throw these papers away. They are official papers that affect your rights.  You must respond to this lawsuit even though it may not yet be filed with the Court and there may be no court file number on this summons.

     2.     **YOU MUST REPLY WITHIN 20 DAYS TO PROTECT YOUR RIGHTS**. You must give or mail to the person who signed this summons **a written response** called an Answer within 20 days of the date on which you received this Summons. You must send a copy of your Answer to the person who signed this summons located at:

     **Nichols Kaster, PLLP**
     **Rebekah Bailey**
     **4600 IDS Center**
     **80 South Eighth Street**
     **Minneapolis, MN  55402**

     3.     **YOU MUST RESPOND TO EACH CLAIM.** The Answer is your written response to the Plaintiffs' Complaint. In your Answer you must state whether you agree or disagree with each paragraph of the Complaint. If you believe the Plaintiffs should not be given everything asked for in the Complaint, you must say so in your Answer.

**EXHIBIT**
**3**

4.      **YOU WILL LOSE YOUR CASE IF YOU DO NOT SEND A WRITTEN RESPONSE TO THE COMPLAINT TO THE PERSON WHO SIGNED THIS SUMMONS.** If you do not Answer within 20 days, you will lose this case. You will not get to tell your side of the story, and the Court may decide against you and award the Plaintiffs everything asked for in the complaint. If you do not want to contest the claims stated in the complaint, you do not need to respond. A default judgment can then be entered against you for the relief requested in the complaint.

5.      **LEGAL ASSISTANCE.** You may wish to get legal help from a lawyer. If you do not have a lawyer, the Court Administrator may have information about places where you can get legal assistance. **Even if you cannot get legal help, you must still provide a written Answer to protect your rights or you may lose the case**.

6.      **ALTERNATIVE DISPUTE RESOLUTION.** The parties may agree to or be ordered to participate in an alternative dispute resolution process under Rule 114 of the Minnesota General Rules of Practice. You must still send your written response to the Complaint even if you expect to use alternative means of resolving this dispute.

Dated: December 19, 2019

NICHOLS KASTER, PLLP

Matthew H. Morgan, MN Bar No. 304657
Rebekah L. Bailey, MN Bar No. 0389599
Nicole Schladt, MN Bar No. 0400234
4600 IDS Center
80 South 8th Street
Minneapolis, MN 55402
Telephone (612) 256-3200
Fax (612) 338-4878
morgan@nka.com
bailey@nka.com
nschladt@nka.com

**ATTORNEYS FOR PLAINTIFFS**

**STATE OF MINNESOTA**                    **DISTRICT COURT**

**COUNTY OF BELTRAMI**                **NINTH JUDICIAL DISTRICT**

                                      **CASE TYPE: DISCRIMINATION**

---

Jane Doe 1, by and through her parents and
natural guardians, Mother Doe 1 and Father Doe
1,  and Jane Doe 2, by and through her parent
and natural guardian, Mother Doe 2,

       Plaintiffs,                         Case No.

v.

Independent School District 31 d/b/a/              **COMPLAINT**
Bemidji Area Schools,                      **(JURY TRIAL DEMANDED)**

       Defendant.

---

    Plaintiffs, by and through their attorneys, bring this action against Defendant Independent

School District 31 d/b/a/ Bemidji Area Schools ("ISD 31" or "Defendant") for violations of their

rights under Title IX of the Education Amendments of 1972 ("Title IX"), 20 U.S.C. § 1681, et

seq., violations of their rights to equal protection of the laws under the Fourteenth Amendment to

the U.S. Constitution, pursuant to 42 U.S.C. § 1983, and violations of state law.

## PRELIMINARY STATEMENT

    1.    This is a civil rights action brought by two minor female students who were preyed

upon and sexually exploited by their Assistant Principal while attending Bemidji Middle School

in ISD 31.

    2.    Defendant's former Assistant Principal Brandon Bjerknes victimized at least 55

girls and boys, many of whom he personally knew by virtue of his position at Bemidji Middle

School and other teaching positions in ISD 31.

    3.    From at least as early as 2014 until March 20, 2017, Bjerknes posed as an underage

boy he called "Brett Larson," and used various social media profiles, including Facebook and Snapchat, to contact and sexually exploit female minors, including Plaintiffs.

4.      Bjerknes used personal information that he obtained by virtue of his Assistant Principal position and elementary school teaching position to lure victims, learn their interests, gain their trust, capitalize on their vulnerabilities, and sexually exploit minors. By way of example, Bjerknes:

> a)      Pressured and dared children to send him photographs, which were sexual in nature, of their various body parts.
>
> b)      Dared minor victims to watch sexually explicit content, including porn and a Snapchat of himself masturbating.
>
> c)      Enticed minor victims to send naked photographs and videos of themselves and provided specific instructions on what he wanted the photographs to depict.
>
> d)      Engaged in sexually explicit conversations.
>
> e)      Sent photographs of his penis to victims.

5.      Bjerknes's communications with minors exceeded 15,000 pages in length.

6.      In some circumstances, Bjerknes even distributed the sexually explicit content to other minor classmates without victims' permission or even knowledge.  Many victims shared these photographs with the trust and understanding that the pictures would be destroyed within the SnapChat application; Bjerknes violated that trust by taking screenshots of the graphic material, as well as recording the material using the camera and recording device on a second phone.

7.      Not only did Bjerknes use information he obtained as Assistant Principal to identify his own middle-school students to prey upon, but he also used school property to solicit, transmit, collect, and create the sexually explicit content.

8.      Bjerknes also openly exhibited troubling behavior at school.

9.      For example, Bjerknes initiated meetings with female students during and after

2

school hours in his office (often with the door shut), providing them with candy and other free food as part of his grooming technique.

10.     During these odd encounters, Bjerknes helped female students with their phones and convinced them to leave their phones charging in his office during class. Upon information and belief, Bjerknes learned students' social media handles from his exposure to their phones.

11.     Forensic evidence demonstrated that Bjerknes was logged into the "Brett Larson" accounts during all hours of the day, including school days, and for lengthy periods of time.

12.     Despite having an Internet & Device Usage Policy that prohibited the transmission of sexual content and despite Defendant's express representation that it would monitor online activities, Defendant failed to monitor its system and enforce said policy to ensure the safety of its students.

13.     What is more, Defendant ignored a report made by Plaintiff Doe 1's parents in September 2016 that Bemidji students were being targeted, engaged, and sent sexually explicit content, including pictures of an adult penis, by a "Brett Larson" on social media—the very same tip the Beltrami Police Department acted upon to initiate an investigation that ultimately led to Bjerknes's arrest six months later.

14.     Defendant ignored and failed to investigate the concerns raised by Plaintiff Doe 1's parents. During the time between their complaint and Bjerknes's arrest, other students continued to be victimized by him.  In fact, Plaintiff Doe 2 was initially contacted by Bjerknes on social media **after** Plaintiff Doe 1's parents' complaint to the school.

15.     This is not the first time Defendant has ignored reports of sexual exploitation of its students. In fact, as recent as 2013, Defendant was sued by several minors, alleging that their physical education teacher had sexually abused them at school.

3

16.     Defendant has repeatedly failed to investigate reports of sexual exploitation of its students and has not properly trained staff or students in an effort to prevent or stop further exploitation of their student community.

17.     After Bjerknes's arrest Defendant's policies and practices continued to revictimize Plaintiffs and other minor victors. By way of example:

  a)     Students bullied and blamed Bjerknes's victims, including Plaintiffs, for Bjerknes's arrest and sending *him* sexually explicit content. Defendant refused to address the bullying and educate students on what really happened and the dangers of social media and sexting despite notice of such and complaints from parents;

  b)     Defendant failed to train teachers on how to respond to reports of sex exploitation of its students;

  c)     Even after the litigation in 2013, Defendant admitted it did not monitor Internet use despite written representations that it would. On information and belief, Defendant still does not properly monitor Internet use;

  d)     Defendant penalized victims for truancy even if they were absent as a result of dealing with Bjerknes's crime, and;

  e)     Defendant failed to support victims and families through the use of services such as crisis response teams.

18.     As a direct result of Defendant's negligence and violations of the U.S. Constitution and federal law, Plaintiffs have been repeatedly victimized while attending school in the District and have suffered and will continue to suffer severe emotional distress.

## JURISDICTION AND VENUE

19.     Venue is proper in Beltrami County because Defendant resides in Beltrami County, and because a substantial portion of the events giving rise to this Complaint occurred in Beltrami County.

20.     This Court has general jurisdiction over the claims set forth herein.

## PARTIES

21.     Plaintiffs re-allege and incorporate by reference the preceding paragraphs as if fully set forth herein.

22.     Plaintiff Jane Doe 1 (hereinafter, "Doe 1"), a minor, by and through her parents and natural guardians Mother Doe 1 and Father Doe 1, is a former student of Bemidji Middle School and a current student at Bemidji High School, who resides in Beltrami County, Minnesota.

23.     Plaintiff Jane Doe 2 (hereinafter, "Doe 2"), a minor, by and through her parent and natural guardian Mother Doe 2, is a former student of Bemidji Middle School and a current student of Bemidji High School, who resides in Beltrami County, Minnesota.

24.     Defendant ISD 31 a/k/a Bemidji Area Schools is a State of Minnesota public school district, that was and continues to be a non-profit governmental organization authorized to conduct business and conducting business in the State of Minnesota with its headquarters and activities located at 502 Minnesota Avenue, NW, City of Bemidji, State of Minnesota.  Defendant is in receipt of federal funds. Defendant is responsible for Bemidji Middle School.  It employed and directly supervised at relevant times Assistant Principal Brandon Bjerknes.

## FACTUAL BACKGROUND

***Bemidji Area School District***

25.     ISD 31 consists of ten schools, including eight elementary schools, one middle school, and one high school.

26.     The following relevant actors, though not parties in their individual capacity, work or worked for Defendant:

      a)     Dr. James Hess was the Superintendent from approximately 2004 until 2018 and was the Superintendent during the relevant time period.

      b)     Timothy Lutz is the current Superintendent for the Bemidji Area School District.

      c)     Drew Hildenbrand is the Principal of Bemidji Middle School and held this position during the relevant time period.

      d)     Andra Vaughn is the Dean of Students at Bemidji Middle School and held this position during the relevant time period.

      e)     Travis Zachman is a Counselor at Bemidji Middle School and held this position during the relevant time period.

      f)     Officer Hunt was the School Resource Officer at Bemidji Middle School and held this position during the relevant time period.

      g)     Steve Sneide is a science teacher and track coach at Bemidji Middle School and held this position during the relevant time period.

***Sexual Abuse in ISD Was Foreseeable***

27.     In 1998, the U.S. Supreme Court stated, "[t]he number of reported cases involving sexual harassment of students in schools confirms that harassment unfortunately is an all too common aspect of the educational experience." *Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 292 (1998).

28.     The US Department of Education further stated that "[p]reventing and remedying sexual harassment in schools is essential to ensuring a safe environment in which students can learn," and that "schools need to ensure that employees are trained so that those with authority to address harassment know how to respond appropriately.[1]

---

[1] Office for Civil Rights, Revised Sexual Harassment Guidance, *U.S. Dep't of Educ., Revised Sexual Harassment Guidance: Harassment of Students by School Employees, Other Students, or*

29.     The State of Minnesota has acknowledged the dangers of students to fall victim of sexual abuse at the hands of school faculty in 1975 by passing a child protection law that "require[d] the reporting of suspected physical or sexual abuse of children." Minn. Stat. § 626.556.

30.     Defendant was aware that such an experience is all too real for students in its school district.

31.     In 2013, several students sued Defendant alleging a former longtime Bemidji teacher John Wangberg sexually abused them between 2008 and 2011 and that Defendant knew or should have known about the abuse described by the children, and that it failed to act.

32.     Additionally, Defendant was accused of negligent behavior for allowing Wangberg to continue working at Central Elementary School, where he was a physical education teacher until he resigned in March 2011.

33.     Wangberg was accused of sexually abusing one of the children in his school office, and law enforcement later found child erotica on his work computer.

34.     Upon information and belief, Defendant did not implement appropriate training procedures following the Wangberg incident so to prevent students from future sexual abuse.

35.     These failures allowed Bjerknes to exploit minors at Bemidji Middle School for more than three years and created a serious risk of sex discrimination and assault, in violation of Plaintiffs' federal, civil, and constitutional rights.

### Sexual Abuse Via Social Media Was Foreseeable

36.     Sexting has become an epidemic among America's youth in the information age.

37.     Social media and sexting have provided child predators with further opportunities

---

*Third Parties* (2001), *available at* https://www2.ed.gov/about/offices/list/ocr/docs/shguide.html (last visited October 18, 2019).

to prey on unsuspecting minors.

38.     In 2012, a twenty-six-year-old female student teacher sent sexts to a minor male student in the Twin Cities.[2]

39.     In 2014, a Minneapolis South teach was accused of sexting a student.[3]

40.     In 2015, an Inver Grove Heights lunch lady sent nude photos to a high school boy.[4]

41.     There can be significant psychological consequences from sexting, particularly when pressure is exerted or if it results in violation of trust.[5]

42.     A 2014 study in *Pediatrics* recommends that "[s]exting and associated risks should be considered for inclusion in middle school sex education curricula."[6]

43.     The Minnesota Department of Education defines cyberbullying as including "sexting—the sending and receiving of sexually explicit messages or photos electronically," acknowledging that this behavior "can cause disruption and emotional pain to a child or youth's health and spirit."[7]

44.     The School Superintendents Association, AASA, recommends districts include

---

[2] Marino Eccher, "Ex-Simley High Student Teacher Who Sent Nude Photo to Student Is Sentenced," *Pioneer Press* (Nov. 7, 2015), www.twincities.com.

[3] Steve Brandt, "Minneapolis South Teacher Accused of 'Sexting' Student," *Star Tribune* (Nov. 17, 2014).

[4] Ben Johnson, "Krista Muccio, Inver Grove Lunch Lady, Charged with Sexting with 15-Year-Old Boy," *City Pages* (Apr. 3, 2015).

[5] "FAQ on 'Sexting' and 'Sextortion,'" *ConnectSafely.org*, *available at* https://www.connectsafely.org/faq-on-sexting-and-sextortion/ (last visited Nov. 4, 2019).

[6] Eric Rice, *et al.* "Sexting and Sexual Behavior Among Middle School Students," *Pediatrics: Official Journal of the American Academy of Pediatrics* (July 2014), *available at* https://pediatrics.aappublications.org/content/134/1/e21 (last visited Nov. 4, 2019); *see also* Sheri Madigan, *et al.*, "Prevalence of Multiple Forms of Sexting Behavior Among Youth: A Systematic Review and Meta-Analysis," *JAMA Pediatrics* (Apr. 2018).

[7] Minnesota Dep't of Ed., "Ensuring Safe and Supportive Schools," *available at* https://education.mn.gov/MDE/dse/safe/034035 (last visited Nov. 4, 2019).

"sexting and safety on social networking sites" in policies and training on cyberbullying and computer/internet safety.[8]

45.     In 2010, the National Law Review distributed its education law newsletter with some basic tips for principals and teachers in responding to sexting abuse and incidents, including in part that the school develop a policy that "explicitly prohibits sexting, and make it clear in such a policy that school administrators may search cell phones if they have reasonable suspicion that a search will reveal violation of school rules."[9]

46.     Schools should also create a sexting crisis plan and team; verbally share its sexting policies and crisis response plan with staff, students, and parents; educate students about the dangers and long-term consequences of sexting; and collaborate with local law enforcement about its sexting policy and response plan.[10]

47.     Mel Riddile, a former high school principal and associate director of high school services for the National Association of Secondary School Principals (NASSP), asserts that "schools must lead in sexting prevention and protection efforts." According to Riddile, schools are the "first line of defense" against this inappropriate and harmful conduct. Schools should "set and enforce their own sexting policies."[11]

---

[8] "Sexting," *AASA*, *available at* https://www.aasa.org/content.aspx?id=3390 (last visited Nov. 4, 2019); *see also* Morgan J. Aldridge, *et al.*, "Is Your School Prepared for a Sexting Crisis?" *Principal Leadership* 12 (May 2013), *available at* https://ecommons.udayton.edu/cgi/viewcontent.cgi?article=1015&context=edc_fac_pub (last visited Nov. 4, 2019).
[9] Jason S. Long, "Tips for School Administrators on How to Handle 'Sexting,'" *Nat'l Law Rev.* (Mar. 6, 2010).
[10] Aldridge, *supra* note 8. The authors provided their recommendations in collaboration with the National Association of School Psychologists and the School Social Work Association of America.
[11] Mel Riddile, "Schools Must Take Responsibility for Preventing Sexting," *in Sexting* 90, 90 (2013) (Lauri S. Scherer, ed.).

48.     At relevant times, Defendant did not have a policy against sexting or addressing social media abuses at Bemidji Middle School, nor did it have a sexting response protocol, an action plan, or a crisis team established to deal with the dangers of sexting.

49.     Defendant's anti-bullying policy addresses cyberbullying generally but says nothing about sexting specifically.

50.     At relevant times, Defendant did not train its staff, students, or parents about the dangers of sexting.

51.     Upon information and belief, Defendant did not address sextting in middle school sex education.

52.     Defendant's Equipment Transfer & Use Policy, however, did forbid personnel from using school equipment "during or after school hours for personal gain or convenience." The District further puts personnel on notice that it may enter, search, and review computers "at any time, without notice."

53.     From August 2015 until September of 2017, Defendant did have a "School Properties – Internet Acceptable Use Policy (hereinafter, "Internet & Device Usage Policy" or "the Policy"), prohibiting a wide array of unacceptable behavior.

54.     With this Policy, Defendant affirmatively undertook the following responsibility:

> The school district will monitor the online activities of both minors and adults and employ technology protection measures during any use of such computers by minors and adults. The technology protection measures utilized will block or filter Internet access to any visual depictions that are: 1. Obscene; 2. Child pornography; or 3. Harmful to minors.

55.     The school district also puts employee, students, and parents on notice that "[r]outine maintenance and monitoring of the school district system may lead to a discovery that a user has violated this policy, another school district policy, or the law." Further, the district vows to engage in an "individual investigation or search . . . if school authorities have a reasonable

10

suspicion that the search will uncover a violation of law or school district policy."

56.    The Policy further states

School district employees should be aware that the school district retains the right at any time to investigate or review the contents of their files and e-mail files. In addition, school district employees should be aware that data and other material in files, maintained on the school district system may be subject to review, disclosure, or discovery under Minn. Stat. Ch. 13 (the Minnesota Government Data Practices Act).

57.    With its anti-bullying policy, Defendant has also affirmatively taken responsibility to investigate, respond to, and remediate inappropriate interactions among students, teachers, or administrators, such as cyberbullying "regardless of whether such act is committed on or off school district property and/or without the use of school district resources."

58.    With its Internet & Device Usage Policy, the school district has also undertaken the responsibility to "educate students about appropriate online behavior, including interacting with other individuals on social networking websites and in chat rooms and cyberbullying awareness and response."

59.    Beyond the publication of the above-referenced school policies, Plaintiffs are not aware of any attempt by the school to train school district personnel or students on the stated prohibitions during the relevant time period.

60.    Further, the Plaintiffs are not aware of Defendant educating or training students about the dangers of social media, sexing, cyberbullying, or harassment during their tenure in the ISD 31.

61.    Plaintiffs are further not aware of Defendant actually monitoring internet or device usage or employing the technology protective measures referenced in its district policies.

***Bjerknes Used His Position as Assistant Principal and Defendant's School Property to Victimize Students.***

62.    Brandon Bjerknes was the Assistant Principal of Bemidji Middle School at relevant

11

times.

63.     His primary duties included discipline, student supervision after hours, and acting

as a point of contact for families.

64.     His office was located in an office area directly next to administrative personnel,

including Principal Hildenbrand, the School Resource Officer, the dean of students, and the school

secretary. His office was also near the staff breakroom and copy machine.

65.     Minor female students frequented Bjerknes's office before, during, and after

school.

66.     Bjerknes enticed minor female students to hang out with him in part with candy

and snacks.

67.     It was not uncommon for Bjerknes to close his office door while meeting with

young female students, including Doe 2.

68.     Further, it was not uncommon for students, the majority of whom were female

students, to sit on chairs outside Bjerknes's office door waiting to meet with him throughout the

course of the day.

69.     Bjerknes used these interactions and candy as part of his grooming technique,

learning the idiosyncrasies of each child.

70.     He further allowed minor female students to use his office to charge their phones

while they were at class.

71.     Bjerknes was accused of inappropriate encounters with students at school. By way

of example:

        a)     Bjerknes was caught looking down a female student's shirt.

        b)     A parent reported to Defendant that Bjerknes inappropriately
grabbed his daughter's butt, but no meaningful action was taken.

12

      c)     On information and belief, Bjerknes told a fifth-grade female student that she was sexy.

72.     On March 20, 2017, the Beltrami County Sheriff's Department executed a search warrant of Bjerknes's home.

73.     Law enforcement seized a number of electronic devices, including his school work phone and at least one work computer.

74.     Investigations revealed that Bjerknes was allowed to sexually exploit minors, including several of Defendant's students, for more than three years.

75.     Bjerknes confessed to creating the "Brett Larson" social media profiles on Facebook and Snapchat.  Bjerknes said he originally created the Facebook profile to monitor activities at the Bemidji Middle School, such as fights, drugs, and other issues among students, in his official capacity.

76.     Bjerknes subsequently used the platforms to engage in sexually explicit communications with minors, including receiving and sending explicit photographs and videos with minors.

77.     Bjerknes further admitted that many of the minors who he contacted on social media were Bemidji Middle School students with whom he was familiar because of his role as Assistant Principal and elementary school teacher.

78.     Bjerknes admitted that he used multiple electronic devices to access the "Brett Larson" social medial accounts, including his personal iPhone, work iPhone, and personal and work computers.

79.     Bjerknes used his work iPhone to create a permanent record of sexually-explicit snapchat messages from at least three minor victims.

80.     Bjerknes later acknowledged that the Snapchat account that was used was installed

13

on a school district-owned phone.

81.  According to the time and date stamps on the accounts, much of Bjerknes activity was undertaken during school hours and at the school.

82.  Bjerknes also confessed that he had naked pictures of a 20-year old babysitter taken when she was approximately eighteen years old, as well as one of Defendant's employees, with whom he regularly sexted.

83.  Bjerknes was arrested on March 23, 2017 and arraigned in Bemidji State Court on March 24, 2017.

84.  Bjerknes resigned from Bemidji Middle School on April 17, 2017.

85.  Bjerknes plead guilty on September 28, 2017, in federal court to one count of coercion and enticement of a minor and one count of production of child pornography.

86.  Bjerknes then plead guilty on October 4, 2017, in state court to four counts of engaging in electronic communication relating to or describing sexual conduct with a child.

87.  Bjerknes is serving a twenty-five (25) year sentence in federal prison.

*Plaintiff Doe 1*

88.  Plaintiff Doe 1 currently attends high school in ISD 31.

89.  At the time of the incidents in question, Doe 1 was approximately thirteen and attending middle school.

90.  Doe 1 was previously diagnosed with a disorder that makes it difficult for her to communicate effectively in social settings.

91.  Doe 1 was at relevant times on an Individual Education Plan ("IEP").

92.  Bjerknes personally attended an IEP meeting for Doe 1 and was fully aware of her vulnerabilities. Before interacting with Doe 1 as her Assistant Principal, he previously taught at

14

Doe 1's elementary school as well.

93.     In the summer of 2016, Doe 1 opened a Facebook account, which her parents hoped would help her better communicate with peers.

94.     In late August or early September 2016, Doe 1's mother discovered sexually explicit content on Doe 1's phone between her daughter and a "Brett Larson"—Bjerknes—who was allegedly a teenage boy from Duluth.

95.     Bjerknes led Doe 1 to believe he was her boyfriend and capitalized on her innocence, vulnerability, and desire for friendship for his benefit.

96.     Curiously, Doe 1's mother noted that, despite the fact that "Brett Larson" allegedly attended school in Duluth, he was friends on Facebook with many girls from the Bemidji School District.

97.     Doe 1's mother also noticed to her horror that this alleged minor was sending her daughter pictures of an *adult* penis.

98.     Doe 1's parents were extremely concerned and contacted the Beltrami Police Department on September 8, 2016.

99.     The next day, Doe 1's parents attended an unrelated meeting for their daughter with Andra Vaughn, the Dean of Students, and Travis Zachman, the School Counselor.

100.    At the meeting, Doe 1's mother notified Vaughn and Zachman about the sexually explicit content they found in their daughter's social media account, as well as her suspicions that they were sent by an adult. Doe 1's mother informed Vaughn and Zachman that the police had opened a case related to their concerns.

101.    Doe 1's mother told them that the roster of children that "Brett Larson" was Facebook friends with were predominately female students from Bemidji Middle School, which

seemed to indicate that the problem related to Bemidji Middle School. She recognized many of the names from her previous involvement at Northern Elementary School.

102.    Doe 1's mother encouraged Vaughn and Zachman to look into the situation and talk to the students at Bemidji Middle School.

103.    Doe 1's mother reported her findings with the intent to help protect other minor female students at Bemidji Middle School.

104.    Despite this report, Vaughn and Zachman never followed up with Doe 1's parents, and upon information and belief, never undertook independent investigations of the information she provided.

### *Plaintiff Doe 2*

105.    Doe 2 currently attends Bemidji High School.

106.    In or about Fall 2016 around the time of Doe 1's parents' report, Doe 2 was twelve years old and attending Bemidji Middle School.

107.    At the time, Doe 2 maintained good grades, held leadership positions in school, and participated in extracurricular school activities.

108.    Doe 2 and other female students would meet before and after school with Bjerknes in his office, eat candy, and talk on a nearly daily basis.

109.    Bjerknes would also call Doe 2 down to his office during the school day to simply sit in his office and eat candy.

110.    Bjerknes told Doe 2 on multiple occasions that he would write her a "pass" so that she could stay in his office and talk during class hours.

111.    Doe 2 recalls often seeing Hildenbrand in his office when she was visiting Bjerknes.

112.    Doe 2 often left her phone in Bjerknes office to charge at his suggestion. Bjerknes

had a drawer full of chargers that he offered up to students.

113.    Bjerknes also helped students, including Doe 2, with their phones and social media. Through these interactions, Bjerknes learned Doe 2 and other students' social media handles.

114.    In or about, November 2016, Bjerkness (under the alias of "Brett Larson"), friended Doe 2 on Facebook.

115.    Notably, this was about two months *after* Doe 1's parents notified Defendant about "Brett Larson" and his connection to Defendant's students.

116.    Doe 2 and Bjerknes initially talked about sports and other benign topics.

117.    Thereafter, "Brett Larson" requested that they switch to Snapchat.

118.    Bjerknes began sending Doe 2 photographs of his face, and then eventually his penis.

119.    Thereafter, Bjerknes asked Doe 2 for nude photographs and encouraged and instructed her to send pictures of her vagina.

120.    Bjerknes escalated the sexual nature of his communications with Doe 2.

121.    Doe 2 blocked Bjerknes on social media on numerous occasions.

122.    Bjerknes communicated with Doe 2's friends on social media, coaxing them to convince Doe 2 to unblock him.

123.    On one occasion after leaving her phone in Bjerknes's office during school, Doe 2 recalls Bjerknes telling her that she had a lot of "Snaps" notifications, which she discovered upon reviewing were from "Brett" (him).

124.    Bjerknes engaged in inappropriate conversations and media exchanges with Doe 2 on Facebook and Snapchat from approximately November 2016 on and off until his arrest in March 2017.

17

***Defendant Turns a Blind Eye to Bjerknes's Conduct***

125.    In response to Bjerknes's arrest, Defendant did not speak directly to teachers or parents in detail regarding what happened. In fact, one teacher admitted that she learned about what happened from the news.

126.    Defendant merely sent a mass message from Principal Hildenbrand to parents that Bjerknes was arrested and to contact him with questions.

127.    Defendant did nothing to educate or train students or staff about the dangers of social media, sexting, cyberbullying, or further how to protect their students from exploitation by staff and administration while entrusted in their care.

128.    Defendant's lack of leadership during this time lead to inaccurate rumors and caused minor victims and their parents to be harassed, bullied, and revictimized at the hands of other students, parents, administration, and faculty.

129.    Mother Doe 2 repeatedly requested that Defendant conduct an assembly to address misinformation and students' concerns, but Defendant refused and offered no other options to address what had happened with students and staff.

130.    Defendant hoped instead the problems would go away on their own.

131.    Defendant continued its existing relationship with a company owned by Bjerknes, which supplied school spirit apparel such as sport team t-shirts, in the face of parents' avid objections.

132.    Unsupported in their school environment, victims, including Does 1 and 2, experienced severe absenteeism and tardiness.

133.    Victims had difficulty during these absences obtaining assignments and making up tests.

134.    Defendant did not accommodate victims during this difficult time, an in fact,

18

penalized them for absences related to recovering from the trauma of their exploitation.

135.    Victims' grades suffered, including Does 1 and 2, and their social lives were ruined.

136.    During this time, multiple victims, including Doe 2, left Bemidji Middle School.

137.    Some victims attempted suicide or engaged in self harm or dangerous conduct.

138.    Many others sought professional help.

139.    Plaintiffs and their families were extremely distraught by the horrific events in question and reached out to a Minnesota non-profit, Civil Society, for victim support.

140.    Plaintiffs and their parents were deeply saddened and outraged by Defendant's complete failure to take any steps to address how this happened, why this happened, and Defendant's lack of initiative to determine how was going to prevent this from happening again.

***Defendant's Deliberate Indifference Caused Plaintiffs to Suffer Severe Emotional Distress***

### Doe 1

141.    Following Bjerknes's arraignment, Doe 1's mother went to Bemidji Middle School and attempted to speak with Bemidji Middle School Principal, Drew Hildenbrand. Hildenbrand walked right past her and told her something to the effect of, "I'm busy, talk to Officer Hunt."

142.    Doe 1's mother then spoke to Officer Hunt and Counselor Travis Zachman.

143.    When Doe 1's mother saw Officer Hunt she said something to the effect of, "What have you done?!" referring to Bjerknes's illegal conduct.

144.    Officer Hunt said something sarcastically to the effect of "we don't teach this stuff until eighth grade."

145.    Thereafter, Doe 1's parents called Superintendent Dr. James Hess and later met with him on March 28, 2017.

146.    During this meeting, Doe 1's parents expressed their concerns about their daughter's safety after being victimized by Bjerknes, her identity being kept confidential, and also

19

that they did not want anyone speaking to her unless they were present.

147.   Doe 1's parents also reported to Hess that they were troubled that Hildenbrand would not meet with them the following week to discuss Bjerknes.

148.   Hess suggested that Doe 1's family include him on any future emails regarding concerns about their daughter's education as the solution.

149.   Hess offered no additional solutions or proposed training to protect Doe 1 or Defendant's other students.

150.   Thereafter, Doe 1's father emailed Hess and teachers multiple times, but they did not respond.

151.   Doe 1 experienced excessive tardies, resulting in both lunch detention and in-school detention. Doe 1's science teacher, Steve Sneide, remained unsympathetic, and Doe 1's inability to complete makeup assignments in his class negatively impacted her grades.

152.   Doe 1's identity was not properly protected, and some students discovered she was a victim of Bjerknes.

153.   Doe 1 has experienced severe emotional distress as a result of Bjerknes's conduct as well as the bullying she has endured at school during the fallout.

154.   She has very low-self-esteem and has engaged in self-harm and dangerous behaviors.

155.   Doe 1 had never experienced this level of attention before and thought "Brett Larson" was her boyfriend.

156.   This experience has distorted Doe 1's understanding of healthy relationships and has impacted her ability to form healthy relationships and maintain appropriate boundaries with males online.

20

157.   Doe 1's parents had to take away her access to personal devices for an extended period of time, despite Defendant's frequent requirement that students use Google Classroom and Google Docs applications and encouragement of the use of personal devices in the classroom.

158.   Doe 1 was unable to safely use this technology to her advantage and her grades have suffered.


**Doe 2**

159.   In the Spring of 2017, Doe 2 was called down to the school office during class over the loud speaker where she was interviewed by police without her mother present in connection with her interactions with "Brett Larson." During this interview, Doe 2 learned for the first time she was really targeted by an adult male.

160.   Later that day, the school called her down to the office again so that the investigator could confiscate her phone, causing her alarm.

161.   Doe 2 returned to class crying, which was noticed by her peers. Soon thereafter, Bjerknes was arrested and many students, parents, and faculty made the connection that Doe 2 was one of the victims.

162.   When Doe 2 and her mother were informed "Brett Larson" was really Bjerknes, they were devastated.

163.   Doe 2 and her mother had placed trust in Bjerknes and Defendant to keep Doe 2 safe and that trust had been broken beyond belief.

164.   Despite the fact that Defendant knew Doe 2 was a victim, they did not initiate any meeting or conversation with Doe 2 or her mother to address what had transpired or how to move forward.

165.    On or about March 24, 2017, Doe 2's mother arrived at Bemidji School and insisted on a meeting with Hildenbrand.

166.    She looked at Hildenbrand and said something to the effect of "what the hell is going on, what did you let happen?!"

167.    Hildenbrand appeared dismissive of her concerns, so she continued to press him, stating something to the effect of, "How did you not know?"

168.    Hildenbrand said something to the effect of "we don't monitor that" implying that Defendant did not monitor employee's internet usage despite its representations in school policies.

169.    In response, Doe 2's mother said something to the effect of, "well, are you going to?!"

170.    Hildenbrand did not respond.

171.    On information and belief, Officer Hunt and Andra Vaughn heard this conversation.

172.    Doe 2's mother also reached out to Superintendent Hess, but he never got back to her.

173.    Students bullied Doe 2 and blamed her for sending photos of herself to Bjerknes.

174.    Doe 2's social network crumbled.

175.    Doe 2's mother again reached out to Hildenbrand requesting that the school educate the students regarding what happened and the dangers of social media and sexting and suggested a school assembly as one example.

176.    Hildenbrand refused and said something to the effect of "we need to stop talking about it and it will go away."

177.    Doe 2's grades dropped, and her attendance suffered. She underwent an enormous change in her emotional state, resulting in her inability to continue her participation in her

22

leadership activities and other activities.

178.    She experienced excessive absenteeism and limited endurance resulting in decreased stamina and decreased ability to maintain her performance at school.

179.    Doe 2 experienced diminished alertness, resulting in an impaired ability to manage and organize materials and complete classroom assignments within routine timeliness, and impaired ability to follow directions or initiate and complete a task.

180.    Doe 2's mother quickly obtained an assessment of Doe 2 by North Homes Children and Family Services.

181.    At one point, Defendant represented they would pay for Doe 2's services at North Homes, but later refused to pay and directed the bills instead be sent to Doe 2's mother.

182.    Doe 2 became isolated from her friends and school activities and became too emotionally disturbed to attend school frequently.

183.    The problems became so severe that eventually she had to withdraw from Bemidji Middle School for a period of time.

**CAUSES OF ACTION**

**COUNT I**
**Discrimination in Violation of Title IX**
**20 U.S.C. § 1681 *et seq*.**

184.    Plaintiff incorporates all preceding paragraphs into this Count by reference as though fully stated herein.

185.    Title IX provides in part that "No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a)

186.    Defendant receives federal financial assistance.

23

187.    Defendant should have known of Bjerknes's sexual exploitation and harassment of students, including Doe 1, when Doe 1's parents alerted Defendant of the problem on or around September 8, 2016, and had actual knowledge of the same related to Doe 1 and Doe 2 following the arrest of Bjerknes on March 20, 2017.

188.    Doe 1 and Doe 2 continued to suffer after being identified as victims of sex harassment and exploitation at the hands of other students, families, and faculty in the District.

189.    Defendant had actual knowledge of the hostile educational environment Doe 1 and Doe 2 endured after Bjerknes's arrest.

190.    Defendant was obligated to address the sex discrimination and the subsequent hostile environment to which Plaintiffs were subjected.

191.    Through its actions and inaction, Defendant was deliberately indifferent to the sexual exploitation and continued discrimination Plaintiffs suffered, and proximately caused severe injuries to both Plaintiffs.

192.    Through its actions and inaction, Defendant created a climate in which sex discrimination was tolerated, thus encouraging other students' harassment, torment, and bullying against Plaintiffs, and proximately caused severe injuries to Plaintiffs.

193.    As a result of Defendant's deliberate indifference, Plaintiffs were subjected to additional sex discrimination by Defendant's students.

194.    The sex discrimination inflicted on Plaintiffs was severe, pervasive, and objectively offensive, and effectively barred Plaintiffs access to educational opportunities and benefits.

195.    By its actions and inaction, Defendant acted with deliberate indifference toward the rights of Plaintiffs to a safe and secure education environment, thus materially impairing their ability to pursue their education at the District in violation of the requirements of Title IX.

24

196.    As a direct and proximate result of Defendant's violation of Plaintiffs' rights,

Plaintiffs have suffered and continues to suffer losses of educational opportunities and benefits,

along with injuries, damages and losses, including, but not limited to: emotional distress, fear,

anxiety and trauma, and expenses for past and future medical and psychological care.

## COUNT II
### Failure to Supervise and Train in
### Violation of Plaintiff's Constitutional and Federal Rights
### 42 U.S.C. § 1983, *et seq.*

197.    Plaintiffs re-allege and incorporate by reference the preceding paragraphs as if fully

set forth herein.

198.    Sexual harassment is a form of unlawful sex discrimination that may violate the

Equal Protection Clause of the 14th Amendment to the U.S. Constitution.

199.    Plaintiffs' Equal Protection rights were violated when they suffered sexual

harassment and discrimination at the hands of Defendant's employee, Brandon Bjerknes.

200.    Plaintiffs' Equal Protection rights were further violated when they were bullied and

harassed by students in the District following Bjerknes's arrest and by Defendant's utter failure to

alleviate this harm.

201.    The violation of Plaintiffs' constitutional and federal rights was caused by acts,

policies customs and practices maintained and endorsed by Defendant, including but not limited

to:

      a)    Failure to train District personnel regarding the proper investigation
of child sexual discrimination and exploitation allegations and the dangers of social
media and sexting;

      b)    Systemic failure to conduct, or to ensure that proper and thorough
investigations of child abuse and retaliation allegations, including but not limited
to those made by Plaintiffs' parents;

c)      Failure to terminate Bjerknes, despite the fact that Defendant knew or should have readily known that he was engaged in a longstanding pattern of abusing or harassing female students;

d)      Deliberate indifference to the complaints of parents and students, including but not limited to Plaintiffs, regarding Bjerknes's conduct and harassment as well as bullying Plaintiffs endured by the student body following Bjerknes's arrest;

e)      Systemic failure to protect female students from sexual abuse by Bjerknes and/or other District personnel; and

f)      Failure to monitor Internet and computer device despite representations to do so.

202.    These acts, policies, customs, and practices were carried out and maintained in arbitrary, reckless, and deliberate indifference to the rights and well-being of Plaintiffs and other minor victims.

203.    Defendant failed to adequately train its administrators, staff, students, and parents, and thereby prohibit or discourage foreseen conduct and retaliation, despite the clearly established and well-known dangers of sexual harassment, social media, sexting, and violence faced by students in U.S. public schools, and thereby was deliberately indifferent.

204.    As a direct and proximate result of Defendant's violation of Plaintiffs' rights, Plaintiffs have suffered and continues to suffer losses of educational opportunities and benefits, along with injuries, damages and losses, including, but not limited to: emotional distress, fear, anxiety and trauma, and expenses for past and future medical and psychological care.

**COUNT III**
**NEGLIGENCE**

205.    Plaintiffs re-allege and incorporate by reference the preceding paragraphs as if fully set forth herein.

206.    Defendant has a duty to exercise ordinary care to prevent foreseeable misconduct.

207.    By establishing and operating public schools; accepting the enrollment of the

minors in these schools; establishing anti-bullying policies that include prohibitions against cyber

bullying; prohibiting use of Defendant's internet and devices to transmit unacceptable and sexually

explicit content both during and after school; affirmatively representing that it would monitor

internet and device usage; and by holding the school out to be a safe environment for Plaintiffs to

study and learn—Defendant entered into an express and/or implied duty to properly supervise and

care for the minor Plaintiffs and provide a reasonably safe learning and social experience.

208.    In implementing these policies and practices, Defendant assumed the duty to

protect students both within the school walls and online.

209.    The sexual exploitation and abuse of Defendant's students by staff is a well-known

hazard, particularly whereas here, prior similar incidents recently occurred within Defendant's

district.

210.    Sexual abuse of minor students online is foreseeable.

211.    The harms experienced by Plaintiffs were foreseeable.

212.    Defendant breached its duties to Plaintiffs when its Assistant Principal targeted

and sexually exploited them.

213.    Defendant failed to take appropriate precautions, such as drafting appropriate

policies about the dangers of social media and texting, discussing sexting in sexual education

courses, and/or training faculty, students, and parents about the dangers of sexting and social

media.

214.    Defendant failed to effectuate its Internet & Device Usage Policy or otherwise

monitor as promised its staffs' inappropriate use of its Internet and devices for illegal and harmful

purposes.

215.    Defendant failed to investigate Doe 1's mother and father's complaint that an adult

27

male was praying on minor female student's online.

216.     Defendant failed to protect Plaintiffs from the predatory behavior of Assistant Principal Brandon Bjerknes, as well as repeated peer bullying and harassment following the arrest of Bjerknes even though Defendant was on direct notice of the bullying and harassment of Plaintiffs.

217.     As a direct result of Defendant's negligence, Plaintiffs have suffered and continues to suffer losses of educational opportunities and benefits, along with injuries, damages and losses, including, but not limited to: emotional distress, fear, anxiety and trauma, and expenses for past and future medical and psychological care.

## COUNT IV
## NEGLIGENT SUPERVISION

218.     Plaintiffs re-allege and incorporate by reference the preceding paragraphs as if fully set forth herein.

219.     At all times material, Bjerknes was employed by Defendant School District and was under Defendant School District's direct supervision, employ, and control when he committed several of the wrongful acts alleged herein.

220.     Bjerknes engaged in the wrongful conduct while acting in the course and scope of his employment with Defendant School District and accomplished the unlawful conduct by virtue of his job-created authority, including using school time, school property, and school records to identify, contact, groom, and victimize minor victims.

221.     As Bjerknes's employer, Defendant had a duty to supervise and monitor his conduct.

222.     Defendant further had a duty to implement its Internet & Device Usage Policy that expressly represented that it would monitor its employees' online and device activities.

28

223.    By virtue of enacting this Policy, Defendant foresaw in part the employees may use its Internet or devices for improper purposes, including using the school district system to access, review, upload, download store, print, post, receive, transmit, or distribute:

      a)    pornographic, obscene, or sexually explicit material or other visual depictions that are harmful to minors;

      b)    obscene, abusive, profane, lewd, vulgar, rude, inflammatory, threatening, disrespectful, or sexually explicit language.

224.    The Policy also states that users will not:

      a)    Use the school district system to engage in any illegal act or violate any local, state, or federal statute or law.

      b)    Use the school district system to engage in any illegal act or violate any local, state, or federal statute or law.

      c)    Use the school district system to engage in bullying or cyberbullying in violation of the school district's Bullying Prohibition Policy.

225.    The prohibitions include using any technology or other electronic communication off school premises to the extent that student learning or the school environment is substantially and materially disrupted.

226.    Defendant further foresaw the dangers of its employees' preying on minor children because another employee sexually assaulted children a few years prior.

227.    Defendant has repeatedly failed to investigate reports of sexual exploitation of its students and has not properly trained staff or students in an effort to prevent or stop further exploitation of their student community.

228.    Despite having an Internet & Device Usage Policy that purportedly prohibits the transmission of sexual content as described herein and despite having a duty as an employer to monitor Bjerknes's improper actions on school time and devices, Defendant failed to monitor its system to ensure the safety of its students despite Defendants express representation that it would.

29

229.    Defendant School District failed to exercise ordinary care in supervising Bjerknes in his position as an Assistant Principal at Bemidji Middle School, a school in Defendant School District and it failed to prevent the foreseeable misconduct of its agent, Bjerknes, from causing harm to others, including the Plaintiffs herein. By way of example:

a)    Bjerknes initiated meetings with female students during and after school hours in his office (often with the door shut), providing them with candy and other free food as part of his grooming technique.

b)    During these encounters, Bjerknes helped female students with their phones and convinced them to leave their phones charging in his office during class. Upon information and belief, Bjerknes learned students' social media handles from his handling of their phones.

c)    A parent complained Bjerknes inappropriately touched their daughter's buttocks but Defendant failed to take any meaningful action.

d)    Plaintiff Doe 1's parents in September 2016 that Bemidji students were being targeted, engaged, and sent sexually explicit content, including pictures of an adult penis, by a "Brett Larson" on social media—the very same tip the Beltrami Police Department acted upon to initiate an investigation and ultimately led to Bjerknes's arrest six months later. Defendant, on the other hand, ignored and failed to investigate the concerns raised by Plaintiff Doe 1's parents.

230.    As a direct result of Defendant's negligent conduct, Plaintiffs have suffered and continues to suffer losses of educational opportunities and benefits, along with injuries, damages and losses, including, but not limited to: emotional distress, fear, anxiety and trauma, and expenses for past and future medical and psychological care.

## COUNT V
## NEGLIGENT RETENTION

231.    Plaintiffs re-allege and incorporate by reference the preceding paragraphs as if fully set forth herein.

232.    Defendant became aware, or should have become aware, of problems indicting that Bjerknes was an unfit employee with dangerous and exploitive propensities, yet Defendant failed to take any action to investigate or ultimately discharge Bjerknes.

233.   Defendant failed to investigate Bjerknes's peculiar interactions with minor girls before, during, and after school often in closed office, which were particularly noteworthy because these interactions were outside of the scope of his job as Assistant Principal.

234.   Defendant failed to take appropriate actions concerning complaints that Bjerknes inappropriately touched, looked at, and commented about minor girls.

235.   Through its failure to implement its own Internet & Device Usage Policy, Defendant failed to identify Bjerknes's illegal exploitation of minor children, or his inappropriate texting with a teenage babysitter and/or a school teacher.

236.   On information and belief, Defendant ignored Doe 1's parents report that a suspicious adult male predator was targeting minor girls at Bemidji Middle School online.

237.   Furthermore, Bjerknes was often meeting with young female students for unusual amounts of time during the day and with his office door shut.

238.   Defendant failed to properly monitor or investigate Bjerknes and as a result, Bjerknes continued his predatory behavior for years and ultimately victimizing Plaintiffs.

239.   Bjerknes only resigned upon his arrest—an arrest that was predicated on the same tips from Doe 1's parents, which Defendant ignored.

240.   As a direct result of Defendant School District's negligent conduct, Plaintiffs have suffered and continues to suffer losses of educational opportunities and benefits, along with injuries, damages and losses, including, but not limited to: emotional distress, fear, anxiety and trauma, and expenses for past and future medical and psychological care.

**<u>REQUEST FOR RELIEF</u>**

**WHEREFORE**, Plaintiffs request relief as follows

      a) For an Order adjudging the practices of Defendant complained of herein to be in violation of the rights guaranteed to Plaintiffs under Federal and Minnesota State law;

b) Issue a permanent injunction that directs Defendant to comply with Federal and State law;

c) Leave to add additional plaintiffs or claims by motion or any other method approved by the Court;

d) For an award to Plaintiffs against Defendant of all relief available under Title IX, 42 U.S.C. § 1983, state law, with interest on such amounts;

e) For an award of Plaintiffs' compensatory damages in an amount to be determined at trial, but not less than $75,000.00 for mental anguish, severe emotional distress, serious mental injury, injury to reputation, past and future economic loss, deprivations of due process, loss of educational opportunities, loss of future career prospects, and other injuries proximately caused by the wrongful conduct of Defendant;

f) For an award of punitive damages in an amount to be determined at trial;

g) For an award to Plaintiffs of their attorney's fees, disbursements, and the costs of this action, and;

h) For such other and further relief as the Court deems just and equitable

## JURY TRIAL

241. Plaintiffs demand a trial by jury on all claims.

Dated: December 19, 2019

**NICHOLS KASTER, PLLP**

Matthew H. Morgan, MN Bar No. 304657
Rebekah L. Bailey, MN Bar No. 0389599
Nicole Schladt, MN Bar No. 0400234
4600 IDS Center
80 South 8th Street
Minneapolis, MN 55402
Telephone (612) 256-3200
Fax (612) 338-4878
morgan@nka.com
bailey@nka.com
nschladt@nka.com

**ATTORNEYS FOR PLAINTIFFS**

## ACKNOWLEDGMENT REQUIRED BY

## MINN. STAT. § 549.211

I hereby acknowledge that, pursuant to Minn. Stat. § 549.211, costs, disbursements, and reasonable attorney and witness fees may be awarded to the opposing party or parties in this litigation if the Court should find I acted in bad faith, asserted a claim or defense that is frivolous and that is costly to the other party, asserted an unfounded position solely to delay the ordinary course of the proceedings, or to harass, or committed a fraud upon, the Court.

Rebekah L. Bailey

# EXHIBIT A

**Format for the Production of Documents**
**Including Electronically Stored Information**

Federal Rule of Civil Procedure 34(b)(1)(C) provides that a party requesting documents "may specify the form or forms in which electronically stored information is to be produced." Pursuant to Rule 34(b)(1)(C), documents and Electronically Stored Information ("ESI") should be produced in the forms described below.

**A.     Production Formats**

As a general rule, the production format for all paper documents and ESI shall be single-page Group IV TIFF files with corresponding text and load files, as set forth in detail in Part C below ("the Default Rule").

However, spreadsheets, presentation files, word processing files, digital images, audio/video files, and other file types that do not render to image well should be produced in their Native format ("Native Productions"). Native Productions shall be produced as they are maintained, with all formulas, redlines, comments, links, and metadata intact. Native Productions should include all ESI metadata fields set forth below in the load file.

It may sometimes be appropriate to produce partial or exported data, such as with information housed in applications, mobile devices, cloud services, social media sites, or databases containing more information than is relevant to the case.  In these instances, the parties should confer and agree on an ESI protocol early on concerning the scope of, and methodology for, extracting the relevant data.

**B.     Handling of Paper Documents**

Paper documents shall be scanned and produced according to the Default Rule.  The documents should be unitized (not merged into a single record).  The load file for paper documents shall contain the following fields, described in Section C.3 below:

| | |
|---|---|
| BegBates | ProdVolume |
| EndBates | Record Type |
| BegAttach | Confidential |
| EndAttach | Redacted |
| Custodian | Extracted Text |
| Pgcount | |

**C.     Default Rule: Specific Protocols for the Form of Production**

The following specific protocols should be used for productions:

## 1.  IMAGES:

A placeholder image that conforms to the TIFF specifications detailed below should be provided for Native Productions.  The placeholder should contain the confidential designation, Bates number, and text stating that the document has been produced in native format.

Records not provided in native format should be as single-page, Group IV, 300 DPI, 1-bit, black-and-white TIFF images.  If color is requested or necessary to understand the meaning of a document[1], the document should be produced as a single-page, 300 DPI, minimum quality level of 75, 24-bit color JPG images.  An Images folder on the production deliverable should contain a separate TIFF or JPG file named with the corresponding Bates number. Images should show all information visible using native software.  For example, images of email messages should include the BCC and Attachments lines.

## 2.  LOAD FILES:

| Load File | Format |
|---|---|
| Image Load File | Opticon .opt |
| Database Load File | Delimited .dat with field header information on the first line of the file.  Concordance default delimiters should be used. |

## 3.  METADATA FIELDS:

| Field Name | Description |
|---|---|
| BegBates | First Bates number |
| EndBates | Last Bates number |
| BegBatesAttach | First Bates number of the first document of a family |
| EndBatesAttach | Last Bates number of the last document of a family |
| Custodian[2] | Custodian of a file when collected |
| PgCount | Number of pages of a document |
| ProdVolume | Name of an export volume |
| RecordType | Indicates type of ESI ("E-Mail", "E-Mail Attachment", "E-Doc", etc.) or "Hard Copy" for paper documents |
| Filesize | Size in bytes of the native file |
| MD5HashValue | MD5 hash value assigned to a document |

---

[1] If a producing Party may rely on a color version of a document it produces, the color version will be provided.  In addition, a receiving Party may request a color replacement of an image when the loss of color detracts from the usability or limits the ability to interpret information.

[2] **All Custodians**, a field that identifies all custodians of a document, shall be provided when the producing party incorporates deduplication in their production workflow.

| Field Name | Description |
|---|---|
| **ExtractedText** | Relative file path to the produced extracted text or OCR file of the document. A Text folder on the production deliverable should contain a separate text file for each document named with the corresponding BegBates. If a party OCRs documents for its own benefit, that OCR will be provided here. OCR text files shall be provided for documents with redactions. |
| **Confidential** | Populated for all documents with a confidentiality designation pursuant to any applicable Protective Order in addition to stamping of production images |
| **Redacted** | "Has Redactions" or "Yes" populated for all redacted documents |
| **FileName** | Original file name of a document |
| **NativePath** | Relative file path to the produced native file. A Natives folder on the production deliverable should contain a separate native file for each document named with the corresponding BegBates. |
| **Title** | Extracted title of a non-email document |
| **Author** | Extracted author of a non-email document |
| **TimeZone** | Time zone used for processing the data |
| **Date/Time Created** | Date and time the document was created |
| **Date/Time Last Modified** | Date and time the document was last modified |
| **LastSavedBy** | Last saved or modified by property of a document, representing the last user to save the document |
| **From** | Name (when available) and email address of the sender of an email message |
| **To** | Name (when available) and email address(es) of the recipient(s) of an email message |
| **CC** | The name(s) (when available) and email address(es) of the recipient(s) of the CC or Carbon Copy of an email message |
| **BCC** | The name(s) (when available) and email address(es) of the recipient(s) of the BCC or Blind Carbon Copy of an email message |
| **EmailSubject** | Subject of an email message |
| **Date/TimeReceived** | Date and time an email message was received |
| **Date/Time Sent** | Date and time an email message was sent |
| **EmailFolder** | Folder in which an email was stored within a custodian's mailbox |
| **AttachmentList** | File names for all attachments to an email message or child items in a family group |
| **AttachCount** | Number of files attached to an email message or parent document |