## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| Jane Doe 1, by and through her parents and natural guardians, Mother Doe 1 and Father Doe 1, and Jane Doe 2, by and through her parent and natural guardian, Mother Doe 2; | Case No. 20-cv-226 (SRN/LIB) |
| Plaintiffs, | **MEMORANDUM OPINION AND ORDER** |
| v. | |
| Independent School District 31 d/b/a/ Bemidji Area Schools, | |
| Defendant. | |

Matthew H. Morgan, Nicole Jean Schladt, and Rebekah L Bailey, Nichols Kaster, PLLP, 80 S. 8th St., Ste 4600, Minneapolis, MN 55402, for Plaintiffs.

Jeffrey M Markowitz, and Sarah E. Bushnell, Arthur, Chapman, Kettering, Smetak & Pikala, PA, 81 S 9th St Ste 500, Minneapolis, MN 55402, for Defendant.

SUSAN RICHARD NELSON, United States District Judge

## I.    INTRODUCTION

This matter comes before the Court on Defendant Independent School District 31 d/b/a Bemidji Area Schools' (the "District") Motion to Dismiss the Complaint ("Motion to Dismiss") [Doc. No. 8] for failure to state a claim.  *See* Fed. R. Civ. P. 12(b)(6).  Plaintiffs commenced this action against the District alleging violations of Title IX of the Education Amendments of 1972, 86 Stat. 373, as amended, 20 U.S.C. § 1681 *et seq.* ("Title IX"), 42 U.S.C. § 1983, the Civil Rights Act of 1871 ("§ 1983" or "Section 1983"), as well as

1

common law negligence, negligent supervision, and negligent retention.  For the reasons set forth below, the Court denies Defendant's motion.

## II.   FACTUAL AND PROCEDURAL BACKGROUND[1]

### A.   Allegations of Middle School Assistant Principal Bjerknes' Sexual Exploitation of Middle School Students

Plaintiffs allege that Brandon Bjerknes ("Bjerknes"), the Assistant Principal at Bemidji Middle School, sexually exploited middle school students, including Plaintiffs Jane Doe 1 and Jane Doe 2 from early 2014 through March of 2017.  (Compl. [Doc. No. 1-1] ¶¶ 3-4, 73-78.)  Specifically, Bjerknes posed as a twelve- to fifteen-year-old underage boy, "Brett Larson," and targeted Plaintiffs and other victims on social media platforms. (*Id*. ¶¶ 3-4, 73-79.)  For three years, he dared his victims on these platforms to send sexual photographs, watch sexual videos, and engage in sexual conversations.  (*Id*.)  It is alleged that he sexually abused more than fifty-five students during his time in leadership.  (*Id*. ¶ 2.)

To communicate with these middle schoolers, Plaintiffs allege that Bjerknes used District-owned devices, including a "school-work phone and at least one work computer." (*Id*. ¶¶ 73, 78.)  He obtained personal information about students by virtue of his position, "capitalizing on their vulnerabilities [to] sexually exploit" them.  (*Id*. ¶ 4.)  For instance, he would lure students into his office by offering them "candy" or a place to "charge their

---

[1]      On a motion to dismiss under Rule 12(b)(6), the Court accepts as true the factual allegations in the complaint and construes all reasonable inferences arising therefrom most favorably to Plaintiffs.  *Hager v. Ark. Dep't of Health*, 735 F.3d 1009, 1013 (8th Cir. 2013) (citing *Gross v. Weber*, 186 F.3d 1089, 1090 (8th Cir. 1999)).

phones." (*Id.* ¶¶ 9-10, 108-13, 229.)  After convincing female students to leave their phones in his office to charge during class, he would search through their devices to learn of their "social media handles," thereby expanding his network of minors to abuse.  (*Id.* ¶ 10.)  His online communications with Bemidji students, as "Brett Larson," ultimately exceeded 15,000 pages in length. (*Id.* ¶ 5.)  Separate and apart from these communications, it was reported to the District that Bjerknes "inappropriately grabbed [a female student's] butt" at school.  (*Id.* ¶¶ 71, 229, 234.)  It is alleged that the District learned that he inappropriately looked "down a female student's shirt."  (*Id.* ¶¶ 71, 229, 234.)  He also allegedly commented that a fifth-grade female student was "sexy." (*Id.* ¶¶ 71, 234.)  In response to these complaints of sexual exploitation of female students, Plaintiffs allege that the District failed to take any meaningful action against Bjerknes.  (*Id.*)

In the fall of 2016, Plaintiffs allege that Jane Doe 1's ("Doe 1") mother discovered sexually explicit content on her daughter's phone, including graphic conversations between Doe 1 and "Brett Larson." (*Id.* ¶ 94.)  Because she believed that "Brett Larson" was sending photos of an adult penis to her daughter, and was therefore unlikely to be a child himself, she began scrutinizing his profile on the social media website, Facebook.  (*Id.* ¶ 97.)  To her horror, she observed that "Brett Larson" was "friends" on Facebook with many other minor females from Bemidji.  (*Id.* ¶¶ 96-97.)  Consequently, she contacted the Beltrami Police Department on September 8, 2016.  (*Id.* ¶ 98.)  The following day, she notified Andra Vaughn, the Bemidji Middle School Dean of Students, and Travis Zachman, the School Counselor, that she believed an adult male was victimizing District middle schoolers like her daughter.  (*Id.* ¶ 100.)  Despite her report to the school, it is alleged that

the District did not investigate the sexual abuse in its middle school community or follow up with Doe 1's parents. (*Id.* ¶ 104.)

Two months later, it is alleged that Bjerknes reached out to Doe 2 on Facebook. (*Id.* ¶ 114.) Bjerknes sent Doe 2 photos of his adult penis and instructed her to send pictures of her vagina. (*Id.* ¶¶ 118–119.) Their conversations grew increasingly graphic. (*Id.* ¶ 120.) Bjerknes and Doe 2 communicated from November 2016 until Bjerknes's arrest in March 2017. (*Id.* ¶ 124.)

On September 28, 2017, Bjerknes pled guilty in federal court to one count of coercion and enticement of a minor and one count of production of child pornography. (*Id.* ¶ 85.) On October 4, 2017, Bjerknes pled guilty in state court to four counts of engaging in electronic communications relating to or describing sexual conduct with a child. (*Id.* ¶ 86.) He is now serving a 25-year sentence in federal prison. (*Id*. ¶ 87.)

### B.    Plaintiffs' Allegations Against the District

The District, according to Plaintiffs, knew or should have known, that Bjerknes was an "unfit employee" with a "longstanding pattern of abusing or harassing female students." (*Id*. ¶¶ 187, 201 (b)-(c), 232.) Nonetheless, Plaintiffs allege that the District failed to investigate or ultimately terminate him. Plaintiffs accuse the District of a "systemic failure to conduct . . . proper and thorough investigations of child abuse and retaliation allegations . . ." (*Id*. ¶¶ 201 (b)-(c), 203.) Plaintiffs further allege that the District failed to train its personnel, students, and parents on, *inter alia*, the "dangers of sexual harassment, social media, [and] sexting," and failed to train teachers on how to "respond to reports of sex exploitation of its students." (*Id*. ¶¶ 17, 201, 203.) And, although the District represented,

4

in its own express written policy, that it would "monitor the online activities of both minors and adults and employ technology protection measures . . . [that] will block or filter Internet access to any visual depictions that are 1. Obscene; 2. Child pornography, or 3. Harmful to minors[,]" Plaintiffs allege that the District never monitored its internet and computer devices. (*Id.* ¶¶ 17(c), 54, 201.) Moreover, following Bjerknes' arrest, Plaintiffs allege that the District revictimized Plaintiffs and others, failed to protect the identities of Doe 1 and Doe 2, and created a "hostile educational environment" by tolerating other students' "harassment, torment, and bullying against Plaintiffs." (*Id.* ¶¶ 152, 160-161, 189, 192.)

Based on these allegations, Plaintiffs assert five counts against the District. Specifically, they assert three negligence-based causes of action, one cause of action under Title IX, and one cause of action under § 1983 for violations of their Fourteenth Amendment rights to equal protection. (Counts I-V.) The thrust of the negligence-based allegations are that the District disregarded its duty to (i) properly supervise its employees; (ii) investigate reports of employee misconduct; (iii) take appropriate action against "unfit employees," including but not limited to, discharging Bjerknes; (iv) protect minor students and provide a reasonably safe learning and social experience within "the school walls and online"; and (v) implement its express written policy to monitor its students' and employees' online and device activities. (*Id.* ¶¶ 207-208, 221-222, 232-233, 237-239.) By failing to do so, Plaintiffs allege that they suffered injuries, including "emotional distress, fear, anxiety, [] trauma, and expenses for past and future medical and psychological care." (*Id.* ¶¶ 217, 230, 240.)

As to the Title IX claim (Count I), Plaintiffs' allegations are two-fold. (*Id.* ¶ 187.)

First, Plaintiffs allege that the District effectively allowed Bjerknes to "sexually exploit[]" Plaintiffs because it acted with "deliberate indifference" when it knew or "should have known" about Bjerknes' misconduct. (*Id*. ¶¶ 187, 191, 193, 202.)  Second, Plaintiffs allege that, after Bjerknes' arrest, the District knowingly permitted other students to harass, torment, and bully Plaintiffs, creating a hostile educational environment.  (*Id*. ¶¶ 189, 192.) Due to the District's actions, Plaintiffs allege that they suffered injuries, including "losses of educational opportunities and benefits." (*Id*. ¶¶ 193, 196.)

Finally, Plaintiffs allege, under § 1983  (Count II), that the District violated their rights to equal protection under the Fourteenth Amendment, through its "policies, customs, and practices," including (1) its failure to investigate and act upon complaints of "child abuse and cyberbullying," including but not limited to, terminating Bjerknes; (2) its failure to train its employees to "identify child sexual discrimination;" (3) its failure to monitor the internet and device usage of students and employees despite express representations to the contrary; and (4) its failure to adequately address peer harassment following Bjerknes' arrest. (*Id*. ¶ 201.)

### C.    Procedural History

On January 13, 2020, Plaintiffs filed this lawsuit in Beltrami County District Court. (*See* Compl. [Doc. No. 1-1].)  The District immediately removed the lawsuit to federal court in light of Plaintiffs' federal claims including claims under Title IX and § 1983.  (*See* Notice of Removal [Doc. No. 1]; *see also* 28 U.S.C. § 1441 (allowing defendant to remove civil actions brought in a State court on the basis of federal question jurisdiction); 28 U.S.C. § 1367(a) (allowing the court to exercise supplemental jurisdiction over claims arising

under Minnesota state law if the claims are so related to the federal claim that they form part of the same case or controversy under Article III of the United States Constitution.) The District now brings this motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), arguing that Plaintiffs' Complaint fails to state a claim upon which relief can be granted.

## III.   DISCUSSION

### A.   The Law

Defendant moves to dismiss all Counts in the Complaint for failure to state a claim under Fed. R. Civ. P. 12(b)(6).  (*See* Defs.' Mem. at 4-35.)  When evaluating a motion to dismiss under Fed. R. Civ. P. 12(b)(6), the Court assumes the facts in the complaint to be true and construes all reasonable inferences from those facts in the light most favorable to the plaintiff.  *Hager v. Ark. Dep't of Health*, 735 F.3d 1009, 1013 (8th Cir. 2013).  In doing so, however, the Court need not defer to legal conclusions or "formulaic recitation[s] of the elements of a cause of action."  *Lustgraaf v. Behrens*, 619 F.3d 867, 873 (8th Cir. 2010).

To survive a motion to dismiss under Fed. R. Civ. P. 12(b)(6), a complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Neubauer v. FedEx Corp.*, 849 F.3d 400, 404 (8th Cir. 2017) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) and *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  Facial plausibility exists when "the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 556).  While the plausibility standard is "not akin to a probability requirement," it necessarily requires a

complaint to present "more than a sheer possibility that a defendant has acted unlawfully." *Id.*

When considering a motion to dismiss under Rule 12(b)(6), "the court generally must ignore materials outside the pleadings." *Porous Media Corp. v. Pall Corp.*, 186 F.3d 1077, 1079 (8th Cir. 1999). Courts may, however, "consider the pleadings themselves, materials embraced by the pleadings, exhibits attached to the pleadings, and matters of public record." *Illig v. Union Elec. Co.*, 652 F.3d 971, 976 (8th Cir. 2011) (citation omitted) (internal quotation marks omitted).

Here, the District has submitted one exhibit, which it represents to be its policy on reports of sexual abuse during the relevant time period. (*See* Declaration of Jeffrey Markowitz ("Markowitz Decl.") [Doc. No. 23], Ex. A.) Moreover, it cites to four other documents outside of the pleadings, including (1) its policy on the District's involvement with the police; (2) its policy on the search of student property, (3) a transcript of Bjerknes' federal criminal sentencing hearing, and (4) a report by the Department of Justice, dated April 2016, on "online sextortion." (Def.'s Mem. in Supp. of Mot. to Dismiss [Doc. No.10] ("Def.'s Mem.") at 10, 28, 35; Reply Mem. in Supp. of Def.'s Mot. to Dismiss [Doc. No. 22] ("Def.'s Reply") at 14.) Despite the fact that the District acknowledges its relevant policy on reports of sexual abuse is no longer publicly available, (Def.'s Reply at 13, n. 7), Defendant appears to contend that the Court may take judicial notice of all of these cited documents. (*Id.*)

The Court declines to do so here. Consideration of these self-selected documents would require the Court to impermissibly weigh evidence not embraced by the pleadings,

tending to disprove Plaintiffs' allegations, which the Court clearly may not do at this stage of the proceeding. These documents, if otherwise admissible, may be considered in the context of a full record at summary judgment or at trial.

### B.        Counts III-V – Negligence Claims

The Court considers Plaintiffs' negligence-based claims against the District together. (Counts III-V.) The parties appear to agree that Minnesota law applies to these claims. (Def.'s Mem. at 23, 32-35; *see also* Pls.' Mem. in Opp. to Def.'s Mot. to Dismiss [Doc. No. 18] ("Pls.' Opp'n") at 7-25.) Under Minnesota law, "[n]egligence is the failure to exercise the level of care that a person of ordinary prudence would exercise under the same or similar circumstances." *Doe 169 v. Brandon*, 845 N.W.2d 174, 177 (Minn. 2014) (citation omitted). "To recover on a claim of negligence, a plaintiff must prove: (1) the existence of a duty of care; (2) a breach of that duty; (3) an injury; and (4) that the breach of the duty was a proximate cause of the injury." *Id.* (citing *Lubbers v. Anderson*, 539 N.W.2d 398, 401 (Minn. 1995)). Minnesota also recognizes two other related, negligence-based causes of action—negligent retention and negligent supervision. *M.L. v. Magnuson*, 531 N.W.2d 849, 856 (Minn. 1995).

An employer is liable for negligent retention when (1) "during the course of employment, the employer becomes aware or should have become aware of problems with an employee that indicated his unfitness," and (2) "the employer fails to take further action such as investigating, discharge, or reassignment." *Yunker v. Honeywell*, 496 N.W.2d 419, 423 (Minn. App. 1993) (quotation omitted), *rev. denied* (Minn. Apr. 20, 1993). An employer is liable for negligent supervision when "(1) the employee's

[tortious] conduct was foreseeable; and (2) the employer failed to exercise ordinary care when supervising the employee." *C.B. ex rel. L.B. v. Evangelical Lutheran Church in Am.*, 726 N.W.2d 127, 136 (Minn. App. 2007) (quotations omitted).

### 1.      Duty of Care

"The existence of a duty of care is a threshold question because a defendant cannot breach a nonexistent duty." *Doe 169*, 845 N.W.2d at 177 (Minn. 2014) (citing *Gilbertson v. Leininger*, 599 N.W.2d 127, 130 (Minn.1999) ("In the absence of a legal duty, the negligence claim fails.")).

Generally, "a person does not owe a duty of care to another . . . if the harm is caused by a third party's conduct." *Fenrich v. The Blake Sch.*, 920 N.W.2d 195, 202 (Minn. 2018) (citing *Doe 169*, 845 N.W.2d at 177-78)).  There are two exceptions to this rule.  *Id*.  The first is "when there is a special relationship between a plaintiff and a defendant and the harm to the plaintiff is foreseeable."  *Id*. (internal citation omitted). The second is when "the defendant's own conduct creates a foreseeable risk of injury to a foreseeable plaintiff."  *Id*. (citing *Domagala v. Rolland*, 805 N.W.2d 14, 23 (Minn. 2011)).  If either of these exceptions apply, a defendant may be held liable to a plaintiff for harm caused by a third party.  The existence of a duty of care "depends heavily on the facts and circumstances of each case." *Doe 169*, 845 N.W.2d at 179.

The parties dispute whether the Complaint plausibly alleges a duty of care by the District to Plaintiffs under either exception.  (*Compare* Pls.' Opp'n at 9-14 *with* Def.'s Mem. at 31-35; Def.'s Reply at 14.)  As an initial matter, Bjerknes indisputably was employed by the District as Assistant Principal during the relevant time period.  Plaintiffs

10

appear to argue that the District owed them a duty of care for the harm caused by Bjerknes' misconduct—a duty that arose out of the District's " special relationship" with them and because the District's own conduct created a foreseeable risk of injury to them. (Pls.' Opp'n at 9-14.)  In response, Defendant argues that it had no legal duty to Plaintiffs to prevent this harm.

### a.   The District's "Special Relationship" with its Students

Under Minnesota law, there is a duty to protect another from harm caused by a third-party if "(1) there is a special relationship between the parties; and (2) and the risk is foreseeable." *Doe 125 v. Hoagland*, 2018 WL 3966437, at * 9 (Minn. Aug. 20, 2018).  In a special relationship, "[t]ypically the plaintiff is in some respect particularly vulnerable and dependent on the defendant, who in turn holds considerable power over the plaintiff's welfare." *Id*. (citing *Donaldson v. Young Women's Christian Ass'n of Duluth*, 539 N.W.2d 789, 792 (Minn. 1995)); *see*, *e.g.*, *Harper v. Herman,* 499 N.W.2d 472, 474 (Minn. 1993) (recognizing that a school may owe a duty of care to a kindergartener who becomes ill during the day) (citation omitted).  The existence of a special relationship may arise when, either "voluntarily or as required by law," a party has "custody of another person under circumstances in which that other person is deprived of normal opportunities of self-protection."  *Bjerke v. Johnson*, 742 N.W.2d 660, 665 (Minn. 2007) (internal citations omitted).

Here, Plaintiffs argue that a special relationship arose because the District took custody of Plaintiffs as "temporary guardians," or, "*in loco parentis*."  (Pls.' Opp'n at 10-11); *Doe YZ v. Shattuck-St. Mary's School,* 214 F. Supp. 3d 763, 783-784 (D. Minn. 2016)

(finding that private school owed students a legal duty based on their special relationship under, *inter alia*, an *in loco parentis* theory).[2]   In opposition, the District urges the Court to find, as a matter of law, that the District does not have a duty that arises from a "special relationship" with its students to support their negligence claims.

In certain circumstances, a special relationship may exist between a school district and its students. *See*, *e.g.*, *Doe v. University of St. Thomas*, 240 F. Supp. 3d 984, 995 (D. Minn. 2017) (finding that a "special relationship" between a student and university plausibly created a duty of care) (citing *Abbariao v. Hamline Univ. Sch. of Law*, 258 N.W.2d 108, 112-13 (Minn. 1977); *Rollins v. Cardinal Stritch Univ.*, 626 N.W.2d 464, 470 (Minn. App. 2001)); *see also Shattuck-St. Mary's School*, 214 F. Supp. 3d at 783-784 (finding that "record provides evidentiary support" that "[private school] owed students a legal duty based on their special relationship").   While the District argues that the Minnesota Supreme Court, in *Fenrich v. The Blake School*, 920 N.W.2d 195 (Minn. 2018),

---

[2]   Plaintiffs also argue that the District had a special relationship with its students "under a fiduciary duty."  (Pls.' Opp'n at 11) (citing Compl. ¶ 207).)   The Court is not persuaded by this argument.  While a special relationship under a "fiduciary" theory was recognized in *Doe 75 v. Diocese of St. Cloud*, No. 73-cv-9282 (Stearns Cty. Dist. Ct. May 5, 2016), it was supported by facts different than those alleged here.  In *Doe 75*, the court found that a student adequately pleaded a negligence claim against the Diocese for sexual abuse committed by a teacher, in part, because the Diocese had a fiduciary relationship with the student that was "differentiated from asserting an employment-related negligence claim against the Diocese based upon the actions [of the teacher]."  *Id*. at 11.  The plaintiff in *Doe 75* argued that a fiduciary relationship arose by virtue of the parents' payment of school tuition.  *Id*.; *see also Shattuck-St. Mary's Sch.*, 214 F. Supp. 3d at 783-784 (relying on *Doe 75* in finding that private boarding school owed students a legal duty based on its special relationship with students under, *inter alia*, a "fiduciary theory").  Here, Plaintiffs fail to cite to any authority for the proposition that taxpayer-funded public schools have a similar fiduciary relationship with their students.

ruled that no duty arises out of a special relationship "premised on an *in-loco-parentis* theory," (Def.'s Mem. at 31), the Court finds Defendant's reading of *Fenrich* too broad.

In *Fenrich*, the Minnesota Supreme Court declined to find the existence of a duty based on a special relationship under an *in-loco parentis* theory, under the limited facts unique to that case. The court did not rule that a special relationship can never exist between a school and a student. Rather, the court declined to establish a per se rule that a special relationship always exists. *Id*. at 202-203 (rejecting a "categorical exclusion" for schools "from liability" for injuries and conducting a fact-specific analysis of whether a "special relationship" existed). Specifically, the court found that the defendant, a private school, did not owe a duty of care to **non-students** who might be injured by the negligence of a student who was driving to an activity sponsored by the school. Because the record did not demonstrate that the school "generally assume[d] the obligations incident to the parental relation" under those unique facts, the *Fenrich* court found no special relationship existed in that case under an *in loco-parentis* theory. *Id*. at 202-203. [3] Thus, contrary to the District's argument, the *Fenrich* court did not categorically bar a finding that a duty

---

[3]     The Court also notes that the Minnesota Court of Appeals has previously acknowledged the *in loco-parentis* theory in a school-setting in an unpublished opinion. *Vistad v. Board. of Regents of the University of Minnesota*, No. A04-2161, 2005 WL 1514633, at *2 n.1 (Minn. App. June 28, 2005) ("Because a school district ordinarily is in *loco parenti*s with its minor students, its duty is greater than that of a university to its adult students.") (citing *Verhel v. Indep. Sch. Dist. No. 70*9, 359 N.W.2d 579 (Minn. 1984) (further citations omitted)); *Verhel*, 359 N.W.2d at 593 (Simonett, J., dissenting in part) ("Ordinarily, a school district's duty to supervise is based on the fact that parents have relinquished custody of their children to the school for school activities and, consequently, the school is charged with the duty of protecting the children while in its charge.").

can arise based on a special relationship under an *in-loco-parentis* theory in a school-setting.

Taking all reasonable inferences in Plaintiffs' favor, as the Court must at this stage of the proceeding, the Court finds that the Complaint includes sufficient facts to plausibly allege a duty of care arising from a special relationship between the District and Plaintiffs. At all relevant times, Plaintiffs were female students, all under 18 years old, who spent long hours at school without their parents. (*Id.* ¶ 73.)  And, unlike the facts in *Fenrich*, Plaintiffs plausibly allege that the District undertook a duty of care towards them—through its policies—by assuming responsibility for (i) monitoring its internet usage, (ii) prohibiting bullying and harassment, and (iii) imposing disciplinary consequences for failing to abide by these policies. (Compl. ¶¶ 49-58, 207-08.).  And, despite express written policies undertaking a duty to monitor internet usage, it is alleged that the District failed to monitor any such activities or enforce remedial measures.

Moreover, it is alleged that certain of this misconduct occurred during school hours and, in some instances, the cyber sexting occurred on District-owned devices. (*Id.* ¶¶ 9–10, 63, 108-13, 229.)  And, Plaintiffs further allege that they notified school officials—including the Dean of Students Andra Vaughn, School Counselor Travis Zachman, Superintendent James Hess, and Principal Drew Hildenbrand—of (1) the sexual harassment from "Brett Larson" and (2) ongoing harassment by students and district personnel after Bjerknes' arrest, and that their complaints fell on deaf ears. (*Id.* ¶¶ 49–58, 207–08.)  Taking into account allegations that the District was on clear notice, the egregiousness of the alleged sexual improprieties occurring on District-owned devices, and

the elevated statuses of the school officials, Plaintiffs have plausibly alleged that the District owed Plaintiffs a duty of care arising out of a special relationship.[4]

### b.   The District's Negligence Through its "Own Conduct"

Plaintiffs alternatively allege that Defendant's "own conduct" gives rise to a duty of care. (Pls.' Opp'n at 12 (citing Compl. ¶ 216).) A defendant owes a "general duty of reasonable care when the defendant's own conduct creates a foreseeable risk of injury to a foreseeable plaintiff." *Tholen v. Assist Am., Inc*., No. 17-cv-3919 (DWF/SER), 2019 WL 2396515, at *6 (D. Minn. June 6, 2019) (citing *Domagala*, 805 N.W.2d at 23)). Foreseeability of the risk of injury is adequately pleaded under Minnesota law when it is alleged that the specific danger was objectively reasonable to expect, not simply whether it was "within the realm of any conceivable possibility." *Id*. (internal citation omitted). The "precise nature and manner" of the injury to the plaintiff need not be foreseeable, but rather, courts ask "whether the possibility of an accident was clear to the person of ordinary prudence." *Id*. (internal citation omitted); *see also Gaudreault v. Elite Line Servs., LLC*, 22 F. Supp. 3d 966, 974 (D. Minn. 2014). The general duty imposed upon a defendant is

---

[4]     This position is further reinforced by *Restatement (Third) of Torts* § 40 that provides a list of non-exclusive "special relationships," which explicitly includes "a school with its students." *Id*. § 40 cmt. o. Although the District suggests that the *in-loco-parentis* special relationship applies only when "physical harm" is sustained by a plaintiff, (Def.'s Reply at 10) (citing *Restatement (Second) of Torts* § 314A)), Plaintiffs have in fact alleged physical injuries here. Specifically, they allege that Doe 1 attempted self-harm and that Doe 2 suffered physical manifestations of emotional distress, such as "limited endurance, decreased stamina, diminished alertness, and other physical manifestations." (Compl. ¶¶ 137, 153–154, 178–79, 182–83); *see also Johnson v. Sampson*, 208 N.W. 814, 816 (Minn. 1926) (finding that physical manifestations of emotional distress may give rise to negligence claims).

to "exercise the care commensurate with all known or reasonably foreseeable dangers." *Domagala*, 805 N.W.2d at 28. "Reasonable care" is defined as the "degree of care which a reasonably prudent person would exercise under the same or similar circumstances." *Id*.

Here, Plaintiffs argue that they plausibly allege that the District owed a duty of care to its students when it affirmatively undertook to monitor certain misconduct by (1) seeking to "restrict and monitor students' use of its [i]nternet",[5] (2) prohibiting students "from engaging in sex harassment and required investigations of allegations of the same;" and (3) drafting "policies designed to remediate and address bullying." (Pls. Opp'n at 13) (citing Compl. ¶¶ 53-56)).

In response, the District relies on *Doe v. Univ. of St. Thomas*, 368 F. Supp. 3d 1309, 1319 (D. Minn. 2019), *appeal filed*, No. 19-1594 (8th Cir. Mar. 21, 2019), to argue that its own internal policies do not impose a duty of care.[6] (Def.'s Mem. at 33-34.) However, in

---

[5]   In opposition, the District argues that it had no duty to conduct such surveillance because (i) it could not access unknown accounts that were "presumably password protected"; and (ii) surveilling private social media communications would constitute an unconstitutional search of "student communications" in violation of the Fourth Amendment. (Def.'s Mem. at 32-35.) These arguments, however, are premature. The application of the Fourth Amendment's prohibitions against unreasonable search and seizure in the context of a public-school setting is a fact intensive inquiry and thus not appropriate at this stage of the proceedings. *See Samuels ex rel. R.J. v. Indep. Sch. Dist. 279*, 57 F. Supp. 3d 1040, 1069-1070 (D. Minn. 2014) (finding genuine issue of material fact as to whether student's Fourth Amendment rights were violated under the circumstances); *A.C., ex rel. M.C. v. Indep. Sch. Dist. No. 152*, 2007 WL 1544507, at *6 (D. Minn. May 22, 2007) (finding genuine issue of material fact concerning circumstances of seizure for Fourth Amendment claim).

[6]   The two remaining decisions that the District relies on for the same proposition are readily distinguishable. (Def.'s Mem. at 34) (citing *Bevier v. Prod. Credit Ass'n of Se. Minn.*, 429 N.W.2d 287, 289 (Minn. App. 1988) and *In re: Tylenol (Acetaminophen) Mktg., Sales Practices, & Prod. Liab. Litig.*, No. 2:12-CV-07263, 2016 WL 4039271, at

*Univ. of St. Thomas,* the court found that, in certain circumstances, private universities do owe a duty of reasonable care to its students when imposing disciplinary actions based on student misconduct. *Id*. at 1319. The court in fact determined that the university's policies on "disciplinary actions" were relevant "when considering whether that duty has been breached." *Id*. at 1321. However, it is a fact-based inquiry. At summary judgment, the court ruled, based on a full record, that the university met its duty of care by carrying out a fair implementation of its policies. *Id.* (granting summary judgment where record evidence demonstrated the university met its duty by carrying out a reasonable and fair investigation).

In fact, it is instructive to consider the court's prior decision in *Univ. of St. Thomas*, denying defendant's motion to dismiss. 240 F. Supp. 3d 984, 995 (D. Minn. 2017). Importantly, at that stage of the proceedings, the court found that the complaint's characterization of the "plethora of errors" made during the university's disciplinary proceedings, including allegations that the university violated its own policy, gave rise to

---

*10 n.35 (E.D. Pa. July 28, 2016)). First, neither case arises in a public-school setting. For example, in *In re: Tylenol (Acetaminophen) Mktg*., the court ruled on the admissibility of expert testimony relevant to the standard of care a pharmaceutical company owed to consumers. 2016 WL 4039271, at *10.

And, in *Bevier*, the Minnesota Court of Appeals ruled in the context of a customer's negligence claim against a lending agency. The court there found that certain internal lending policies that were required by federal regulations did not establish a private cause of action because the regulations established "agency policy[,] rather than substantive law." 429 N.W.2d at 288. Thus, the court declined to find that the agency policy created a standard of care that can be relied on by plaintiff. *Id*. In contrast, here, Plaintiffs do not allege that the District's policies were required by federal regulations. Moreover, as *Univ. of St. Thomas* persuasively found, the adherence to a school policy is relevant when considering whether a school breached its duty to a student, given the "unique" relationship between a student and the school. 368 F. Supp. 3d at 1318.

a plausible inference that plaintiff alleged a duty of care, and that the university breached such a duty.  *Id.*  Specifically, the court determined that if the university conducted its "disciplinary process" as set forth in its internal policy, in a negligent manner, it created a foreseeable risk of harm to a student.  *Id.*; *see also Doe v. Univ. of the South*, No. 9-cv-62, 2011 WL 1258104, at *20–21 (E.D. Tenn. Mar. 31, 2011) (applying the "foreseeable risk of harm" duty to a university's implementation of a disciplinary policy); *Shank v. Carleton College*, 232 F. Supp. 3d at 1111 (D. Minn. 2017) (noting that whether such a duty arises "requires a careful consideration of the particular facts of the case.").

Likewise, accepting Plaintiffs' allegations as true here, the Court finds that Plaintiffs plausibly allege that the District's own conduct created a foreseeable risk of injury to Plaintiffs.  As explained above, the Complaint alleges that the District affirmatively sought to restrict and monitor both faculty and its students' use of District-owned devices.[7] (Compl. ¶¶ 53–56.)  Plaintiffs also allege that the District had the responsibility to supervise

---

[7]     The plain language of the District's policy demonstrates that the District undertook to "monitor the online activities of both minors and adults." (Compl. ¶ 53.)  Nonetheless, the District argues that the use of the term "monitor" never reflected a duty "to actively surveil private social-media communications." (Def.'s Mem. at 34.)  To support its argument, the District first cites to a separate policy on the search of student property—not embraced by the pleadings—to suggest that it only had a duty to actively surveil communications if the District had "reasonable suspicion that the search will uncover a violation of law or school district policy." (*Id.* at 35.)  However, as previously discussed, the Court cannot consider, at this stage, a District-policy not specifically embraced by the pleadings.

Second, the District argues that when the provision at-issue is read in the "context" of the entire section, it reflects an intent to employ only "technology measures" that would "block or filter internet access," rather than "actively surveil private social-media communications." (*Id.* at 34.)  However, even if the policy language is ambiguous, as the District's argument at best suggests, the Court cannot reconcile the meaning of the policy language at this stage of the proceedings without a full factual record.

its employees and review Bjerknes' fitness as Assistant Principal. (*Id.* ¶ 219.) Nonetheless, it is alleged that the District failed to investigate suspicions of sexual abuse reported by Doe 1's mother. (*Id.* ¶ 104.) Moreover, Plaintiffs allege that the District failed to take any meaningful action against Bjerknes for prior sexual harassment complaints brought against him. (*Id.* ¶ 71.) And, only three years before Bjerknes' arrest, it is alleged that another teacher in the District sexually abused minors and trafficked child pornography on school devices. (*Id.* ¶¶ 30–34.) This prior incident, combined with the specific complaints against Bjerknes, would plausibly "make future incidents of [sexual assault] foreseeable." *K.L. v. Riverside Med. Ctr.*, 524 N.W.2d 300, 303 (Minn. App. 1994) (stating prior incidents of assault on premises would make future incidents of assault foreseeable).

Regarding the bullying and harassment Plaintiffs faced after Bjerknes' arrest, the Complaint further alleges that the District created policies specifically designed to prevent and remediate such bullying. (*Id*. ¶¶ 36-47, 57, 61, 127-129, 224.) The District's failure to act created a foreseeable risk of harm to its students. *See Matter of Doe v. Saint Paul Conservatory for Performing Artists*, No. 17-cv-5032 (DWF/FLN), 2018 WL 3118294, at *5 (D. Minn. June 25, 2018) (finding that defendant's failure to address plaintiff's complaints about bullying and harassment by other students raised plausible negligence claim in light of defendant's bullying and harassment policy). The Court therefore finds that Plaintiffs plausibly allege that the District owed them a duty to prevent the sexual harassment and bullying they faced after Bjerknes' arrest.

### 2.      Foreseeability

The District argues that it is entitled to dismissal, as a matter of law, because Plaintiffs have not plausibly alleged that Bjerknes' misconduct was reasonably foreseeable. (Def.'s Mem. at 32.)  The Court disagrees.

In the context of negligence claims, "foreseeability means 'a level of probability which would leave a prudent person to take effective precautions.'" *Doe YZ v. Shattuck-St. Mary's Sch.*, 214 F. Supp. 3d 763, 786 (D. Minn. 2016) (quoting *Doe 175 v. Columbia Heights Sch. Dist.*, 873 N.W.2d 352, 359 (Minn. App. 2016)).  As explained above, "[i]n determining whether a danger is foreseeable, courts look at whether the specific danger was objectively reasonable to expect, not simply whether it was within the realm of any conceivable possibility."  *Id.* (quoting *Whiteford by Whiteford v. Yamaha Motor Corp., U.S.A.*, 582 N.W.2d 916, 918 (Minn. 1998)).  "In close cases, the issue of foreseeability may be for jury resolution." *Jasperson v. Anoka-Hennepin Indep. Sch. Dist. No. 11*, No. A06-1904, 2007 WL 3153456, at *4 (Minn. App. Oct. 30, 2007).

Plaintiffs argue that the risk of sexual harassment of students by teachers has long been a recognized danger.  (Pls.' Opp'n at 14; *see*, *e.g.*, Compl. ¶¶ 36-61.)  By way of example, they note that in 1975, Minnesota passed a child protection law that required the reporting of child sex abuse.  (Pls.' Opp'n at 14) (citing *Doe YZ v. Shattuck-St. Mary's Sch.*, 214 F. Supp. 3d 763, 786 (D. Minn. 2016) (denying summary judgment, in part, because record evidence demonstrated that "starting in the mid-1980's onward, sexual abuse of students by adults working in schools was foreseeable.")).  Moreover, Plaintiffs allege that another teacher sexually abused students in the District and trafficked child

pornography before Bjerknes was arrested.  (Compl. ¶¶ 30-34.)  District employees also allegedly received three specific reports concerning Bjerknes' inappropriate sexual behavior with female students, which appear to have occurred prior to the sexual harassment of Plaintiffs.  (*Id.* ¶¶ 71, 234.)  The District also received a report from Doe 1's mother about her daughter's cyber-sexual harassment and her suspicions that the perpetrator was an adult connected to the middle school.  (*Id.* ¶¶ 100–104.)  These reports were allegedly made to District employees with elevated statuses, including the Superintendent, Dean of Students, School Counselor, and Principal of Bemidji Middle School.  (*Id.* ¶¶ 100–04.)

Despite detailing these reports concerning Bjerknes in the Complaint, the District maintains that Plaintiffs have failed to adequately plead that Bjerknes' sexual harassment was objectively foreseeable.  It primarily relies on a report published by the United States Department of Justice ("DOJ"), dated April 2016—a report not embraced by the Complaint—to suggest that "online sextortion" of children is a phenomena that only recently came to light and is "extremely difficult" to uncover.  (Def.'s Reply at 14) (citing Department of Justice, *The National Strategy for Child Exploitation Prevention and Interdiction*, April 2016, available at: https://www.justice.gov/psc/file/842411/download (last accessed July 21, 2020)).  However, as previously discussed, the Court cannot consider this report at this stage of the proceeding.

The District further contends that because Bjerknes' conduct is not comparable to the prior incident of sexual abuse in the District, that incident did not make Bjerknes' abuse foreseeable.  (Def.'s Mem at 32 n. 5; *see also* Def.'s Reply at 15.)  In support, the District

cites to *K.L. v. Riverside Med. Ctr.*, where the Minnesota Court of Appeals affirmed the trial court's finding, on a directed verdict, that a patient's sexual assault at a hospital was not foreseeable. 524 N.W.2d at 302-303. Specifically, the *Riverside* court found the assault not foreseeable because (1) there was no evidence that the hospital knew the perpetrator had been behaving suspiciously on prior occasions; (2) there was no evidence that there had been assaults on patients while in their rooms; and (3) previous reports of trespassers and suspicious persons had not involved assaults upon patients. *Id*. at 303. In finding, on a directed verdict, that the evidence failed to demonstrate that the assault was foreseeable, the Court of Appeals reasoned that "acts such as . . . sexual assault [] will rarely be deemed foreseeable in the absence of prior similar incidents." *Id*. at 302.

The court in *Riverside*, however, assessed the strength of the evidence of foreseeability at the conclusion of a trial on the merits. In contrast, here, the issue is only whether Plaintiffs have alleged sufficient facts to support their allegation that Bjerknes' conduct was foreseeable. A determination of the sufficiency of the evidence as to foreseeability is for another day. Taking all reasonable inferences in Plaintiffs' favor, as the Court must at this stage of the proceeding, the Court finds that Plaintiffs plausibly allege that Bjerknes' sexual harassment was foreseeable.

### 3. Discretionary Immunity

The District asserts that the supervision and retention of Bjerknes are "policy-level decisions" for which it enjoys statutory discretionary immunity. (Def.'s Mem. at 24-25.) It further argues that it enjoys either statutory or common law immunity for its alleged

22

failure to investigate Bjerknes and its decision to defer to the police to investigate the report made by Doe 1's mother.  (*Id*. at 25-29.)

In Minnesota, "every municipality is subject to liability for its torts and those of its officers, employees and agents acting within the scope of their employment or duties whether arising out of a governmental or proprietary function."  Minn. Stat. § 466.02. The parties agree, however, that a municipality, including a school district, is exempt from tort liability for "[a]ny claim based upon the performance or the failure to exercise or perform a discretionary function or duty, whether or not the discretion is abused." ( Def.'s Opp'n at 24; Pls.' Opp'n at 21-24) (citing Minn. Stat. § 466.03, subd. 6))*; see also Doe v. Indep. Sch. Dist. No. 2154*, 2010 WL 3545585, at *6 (Minn. App. 2016)). This statutory discretionary immunity applies where the governmental entity's conduct "was of a policy-making nature involving social, political or economic [] considerations." *Indep. Sch. Dist. No. 2154*, 2010 WL 3545585, at *6 (citing *Nusbaum v. County of Blue Earth*, 422 N.W.2d 713, 722 (Minn. 1988)).

In determining what constitutes a discretionary function or act, there is a distinction between "planning level" conduct and "operational level" conduct.  *Id*. at 719. Planning-level functions "require evaluating such factors as the financial, political, economic, and social effects of a given plan."  *Unzen v. City of Duluth*, 683 N.W.2d 875, 882 (Minn. App. 2004), *rev. denied*, Nos. A04-80, A04-81 (Minn. Oct. 27, 2004). "Operational-level decisions, in contrast, are those actions involving the ordinary, day-

to-day operations of the government." *Id*.  Only planning-level functions are protected by statutory immunity.  *Nusbaum*, 422 N.W.2d at 722.

The general rule is that the party seeking to defend based on immunity has the "burden" to prove that it engaged in planning or policy-making activities.  *Conlin v. City of Saint Paul*, 605 N.W.2d 396, 402 (Minn. 2000) (finding that statutory immunity should be "narrowly construed" and that the party seeking immunity "has the burden of proof") (citing *Angell v. Hennepin County Regional Rail Auth.*, 578 N.W.2d 343, 347 (Minn.1998); *Steinke v. City of Andover*, 525 N.W.2d 173, 175 (Minn.1994)).  As an affirmative defense, defendant has the "burden of demonstrating sufficient facts to show as a matter of law that it is entitled to that defense."  *Doe v. Indep. Sch. Dist. No. 2154*, No. A09-2235, 2010 WL 3545585, at *3 (Minn. App. Sept. 14, 2010) (citing *Rehn v. Fischley,* 557 N.W.2d 328, 333 (Minn. 1997)).  Furthermore, "as a rule, an affirmative defense can only be a basis for a motion to dismiss when the existence of the defense is clearly evident on the face of the complaint."  *Cavan v. Mayer*, No. 18cv-2568 (JRT/BRT), 2020 WL 1227717, at *2 (D. Minn. Mar. 13, 2020) (citing *Noble Sys. Corp. v. Alorica Cent., LLC*, 543 F.3d 978, 983 (8th Cir. 2008)).

Here, the District asserts statutory immunity for Plaintiffs' negligence-based causes of action regarding its alleged negligent supervision, retention and investigation of Bjerknes.  (Def.'s Mem. at 24-29.)  However, the cases relied upon by the District for its defense of statutory immunity are inapposite because they were decided on summary

judgment after considerations of a full record. [8]  (*Id.* at 25) (citing *Fear v. Indep. Sch. Dist.* 911, 634 N.W.2d 204, 212 (Minn. App. 2001); *Irwin v. Carter G. Woodson Inst. for Student Excellence*, No.  A12-0124, 2012 WL 3892204, at *6-7 (Minn. App. Sept. 10, 2012); *Hassan v. City of Minneapolis, Minn*., 489 F.3d 914, 920 (8th Cir. 2007)).  The District's entitlement to discretionary immunity is not clearly evident on the face of the Complaint because it is a fact-based inquiry.[9]

Accordingly, the Court finds that Plaintiffs pled sufficient facts to support a plausible general negligence, negligent retention, and negligent supervision claim and the Court denies the District's motion to dismiss Counts III, IV, and V, respectively.[10]

---

[8]   While the District also relies on one District of Minnesota case that ruled on the issue of statutory immunity in the context of a motion to dismiss, *Lopez v. Minnesota Vikings Football Stadium, LLC*, No. 17-cv-1179 (PAM/TNL), 2018 WL 626529, at *2 (D. Minn. Jan. 30, 2018), the *Lopez* court relied on Minnesota precedent that analyzed a municipality's defense of statutory immunity after consideration of a full record.  *Id.* (citing *Gleason v. Metro. Council Transit Operations*, 563 N.W.2d 309, 320 (Minn. App. 1997), *aff'd in part, rev'd in part on other grounds*, 582 N.W.2d 216 (Minn. 1998) (analyzing discretionary statutory immunity in the context of summary judgment motion)).

[9]   The District alternatively argues that, to the extent any of Plaintiffs' "negligent investigation" claims are not premised on a specific District policy, it is entitled to "common law official immunity" that would "run vicariously" to the District.  (Def.'s Mem. at 28 n. 4) (citing *Anderson v. Anoka Hennepin Indep. Sch. Dist. 11*, 678 N.W.2d 651, 655, 664 (Minn. 2004); *DeLuna v. Mower Cnt*y., 936 F.3d 711, 719 (8th Cir. 2019) (noting that under Minnesota law, "government employers are generally  entitled to vicarious official immunity from lawsuits based on the discretionary acts of their employees."); *Burns v. Gagnon*, 727 S.E.2d 634, 639, 646 (Va. 2012)).  This is also a fact intensive inquiry and entitlement to common law official immunity is not clearly evident on the face of the Complaint.  All of the cases relied upon by the District for this proposition were decided after consideration of a full record.  The Court cannot assess the merits of this defense at this stage of the proceeding.

[10]   Finally, the District contends that there is no viable claim for common law

C.      Count I – Title IX Claim

Plaintiffs next bring a claim under Title IX, which prohibits sex discrimination by recipients of federal education funding.  Specifically, Title IX provides, in relevant part:

> No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance ....

20 U.S.C. § 1681(a).

Under Title IX, a school district may be liable for the sexual harassment of a student if the plaintiff demonstrates (1) a school district official with authority to institute corrective measures, (2) has actual notice of, and (3) is deliberately indifferent to the student's sexual harassment.  *Davis v. Monroe County Board of Educ.*, 526 U.S. 629, 143 L. Ed. 2d 839, 119 S. Ct. 1661 (1999); *Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 304, 141 L. Ed. 2d 277, 118 S. Ct. 1989 (1998).  However, the Supreme Court in *Gebser* emphasized that "unless an official of the school district who at a minimum has authority to institute corrective measures on the district's behalf has actual notice of, and is deliberately indifferent to, the teacher's misconduct. . .[the court] will not hold a school district liable in damages under Title IX for a teacher's sexual harassment of a student

---

negligence based on a failure to train its employees.  (Def.'s Mem. at 24) (citing *Lopez*, 2018 WL 626529, at *4 (finding that "Minnesota law does not recognize a cause of action for negligent training") (quoting *Johnson v. Peterson*, 734 N.W.2d 275, 277 (Minn. App. 2007)).  There is no such cause of action asserted in the Complaint.  While the Court acknowledges that the Complaint contains several references to a failure to train, (Compl. ¶¶ 213, 227), Plaintiffs do not dispute that Minnesota law does not recognize such a common law cause of action.

absent actual notice and deliberate indifference."  *Gebser*, 524 U.S. at 277.

The District primarily contends that it is entitled to dismissal of Plaintiffs' Title IX claim because Plaintiffs have failed to plausibly allege that the District had actual notice of, and was deliberately indifferent to, Bjerknes' misconduct or the peer harassment that followed Bjerknes' arrest.  Moreover, the District maintains that it responded reasonably to Plaintiffs' sexual harassment and that Plaintiffs fail to plausibly allege that the peer harassment they faced was "so severe and pervasive," as to deprive them access to educational opportunities or benefits.

### 1.      Notice of Bjerknes' Misconduct

Plaintiffs first contend that the District violated their Title IX rights by responding with deliberate indifference to (1) the report from Doe 1's mother about "Brett Larson" and his potential connection to the school; and (2) several complaints of sexual harassment by female students against Bjerknes.  Specifically, the Complaint alleges that the District received complaints that Bjerknes looked down a female student's shirt, groped a female student's buttocks, and told a fifth-grade female student that she was "sexy."  (Compl. ¶¶ 71, 234.)

In response, the District contends that the Complaint fails to plausibly allege that the District was aware of Bjerknes' social media abuse.  It further contends that the Complaint only alleges it had notice of one of the three previously alleged sexual harassment complaints against Bjerknes and that that particular complaint was "different in kind" than Bjerknes' predatory behavior online.

The Supreme Court and the Eighth Circuit "have both made clear that, to be held

liable under Title IX for sexual assault, a funding recipient must have actual knowledge of sexual assaults and be deliberately indifferent to those sexual assaults." *See Shank*, 232 F. Supp. 3d at 1108 (citing *Davis*, 526 U.S. at 633 (finding funding recipient must act "with deliberate indifference to known acts of harassment") (further citation omitted)).   A funding recipient, like the District, "cannot be held liable merely because it 'should have known' of sexual assaults." *Id.* (citing *Davis*, 526 U.S. at 642 ("we declined the invitation to impose [Title IX] liability under what amounted to a negligence standard—holding the district liable for its failure to react to teacher-student harassment of which it knew or should have known"); *Ostrander*, 341 F.3d at 751 (abuse allegedly perpetrated by other fraternity members at other premises did not satisfy the "known acts" requirement)).

Here, Plaintiffs allege that (1) Doe 1's mother notified the Counselor and Dean of Students at Bemidji Middle School that its female students were being sexually harassed online; (2) the District knew about previous instances of Bjerknes sexually harassing female students; and (3) the District knew about previous instances of sexual abuse by one other teacher in the District.  (Pls.' Opp'n at 40.)  Yet, despite this knowledge, Plaintiffs allege that the District failed to make necessary changes to its "trainings, educational curricula, and policies" to protect students from sexual abuse.  (Pls.' Opp'n at 42) (citing Compl.¶¶ 15–16.)  The Complaint further alleges that the District failed to take appropriate action against Bjerknes for "touching, peeping, and verbally sexually harassing [female] students at school."  (*Id.*) (citing Compl. ¶ 71.)  Finally, the Complaint alleges that the District failed to investigate the report from Doe 1's mother of cyber sexual harassment and implement its own policy to monitor its internet and device usage.  (*Id.* at 42-43) (citing

28

Compl. ¶¶ 100-104).)

In response, the District argues that the prior complaints against Bjerknes were "different in kind" and accordingly fail to support an allegation that the District had actual notice of his social-media abuse. (Def.'s Mem. at 9). The Court disagrees. Taking all inferences in Plaintiffs' favor, as it must at this stage of the litigation, the Court finds that Plaintiffs have plausibly alleged that these prior complaints were sufficiently similar in substance to alert the District to the possibility of Plaintiffs' sexual abuse on-line.

While the Court finds that *Gebser* makes clear that "actual notice" requires more than a single prior complaint of inappropriate remarks made by a teacher, the actual notice standard does not set the bar so high that a school district is not put on notice until it receives a report of the precise circumstances of sexual abuse. *Gebser*, 524 U.S. at 278. And here, Plaintiffs allege that the District had actual notice of overtly sexual conduct by Bjerknes. (Compl. ¶ 71.)

For example, in *Williams v. Bd of Regents of Univ. Sys. of Ga.*, 477 F.3d 1282, 1288–90, 1294 (11th Cir. 2007), the Eleventh Circuit found that a Title IX plaintiff who suffered a violent sexual assault in a University of Georgia ("UGA") basketball player's dorm room sufficiently alleged "actual notice" to UGA and its Athletic Department to withstand a motion to dismiss. *Id.* at 1294-95. Relevant to the *Williams* court's analysis of "actual notice" was the basketball player's prior sexual harassment of a female store clerk and employees from the player's former university, which were both out-of-state incidents occurring two years before the plaintiff's assault. *Id.* While the court acknowledged that the complaint did not allege "actual notice" of the player's history of

raping female students, the court found that it need not do so.  The Eleventh Circuit determined that plaintiff adequately stated a Title IX claim when she alleged that the University actively recruited the player and failed to sufficiently monitor his behavior despite actual notice of a history of sexual harassment.  *Id.*

In response, the District relies on *Doe v. Flaherty*, 623 F.3d 577, 585-86 (8th Cir. 2010) to argue that Plaintiffs have not plausibly alleged actual knowledge of Bjerknes' social-media abuse here.  *Id.* (finding that a "student's familiar behavior with a teacher or even an 'excessive amount of time' spent with a teacher, without more, does not 'automatically give rise to a reasonable inference of sexual abuse.'") (internal quotation omitted).  In *Flaherty*, however, the Eighth Circuit did not test the sufficiency of the pleadings.  Based on a full evidentiary record, the court reversed the lower court's denial of summary judgment for the school, finding insufficient evidence of actual knowledge of a sexual relationship between a teacher and female student. [11]  *Id.*

---

[11]     The remaining cases that the District cites are inapposite.  *See McDonough v. Anoka Cnty.*, 799 F.3d 931, 946 (8th Cir. 2015) (addressing adequacy of pleadings for violations of the Driver's Privacy Protection Act, not Title IX); *Doe No. 1 v. Boulder Valley Sch. Dist. No. Re-2*, No. 11-CV-02107-PAB-KLM, 2012 WL 4378162, at *5 (D. Colo. Sept. 25, 2012) (dismissing Title IX sexual harassment claim because plaintiff only alleged a single prior complaint of inappropriate remarks made by employee which failed to support school district's constructive knowledge that employee posed a substantial risk of sexual abuse); *Tumminello v. Father Ryan High Sch., Inc.*, 678 F. App'x 281, 286 (6th Cir. 2017) (finding that complaint failed to allege that Catholic Diocese of Nashville had actual knowledge to support Title IX claim because complaint contained no allegations of specific instances of prior abuse reported to the Diocese); *Johnson v. Murray State Univ.*, No. 5:13-CV-156-R, 2014 WL 906129, at *4 (W.D. Ky. Mar. 7, 2014) (dismissing Title IX claim against school district because the complaint contained no allegations that the employee's actions were brought to the "attention" of any school official); *Bello v. Howard Univ.*, 898 F. Supp. 2d 213, 222-225 (D.D.C. 2012) (dismissing Title IX claim because complaint contained only conclusory allegations that university was "on notice" of employee's physical and verbal

The Court therefore finds that the facts alleged support at least an inference that the District had notice of Bjerknes' alleged predatory behavior. That Bjerknes allegedly committed certain acts of sexual harassment in-person does not diminish an inference that such complaints provided actual notice of Bjerknes' sexual abuse on-line, "for it is the risk of such conduct that the Title IX recipient has the duty to deter." *Doe v. Sch. Bd. of Broward County, Fla.*, 604 F.3d 1248, 1258-159 (11th Cir. 2010). "[A]t some point, a supervisory school official knows . . .that a school employee is a substantial risk to sexually abuse children." *Id.* (citing *Escue v. N. Okla. Coll.,* 450 F.3d 1146, 1154 (10th Cir. 2006); *Williams v. Paint Valley Local Sch. Dist.,* 400 F.3d 360, 363 (6th Cir. 2005)). Contrary to the District's assertion, the simple fact that these prior incidents occurred in-person "cannot as a matter of law absolve the District of Title IX liability."[12] *Id.*

The District also contends that Plaintiffs have failed to plausibly allege that it was deliberately indifferent to the sexual harassment reports against Bjerknes. As applied in this context, "the deliberate-indifference standard sets a very high bar for plaintiffs: a school district is not liable unless it responded to acts of harassment in a manner that was clearly unreasonable in light of the known circumstances." *Shank v. Carleton Coll.*, 232 F.

---

assault tendencies).

[12]    While the District also maintains that it had no actual knowledge of Bjerknes' social media abuse based on the report from Doe 1's mother, it primarily relies on Bjerknes' criminal sentencing transcript as support for its position. (Def.'s Mem. at 10.) Specifically, it argues that the District could not have possibly known that Bjerknes was "Brett Larson" because Plaintiffs' parents demonstrated "surprise" that the perpetrator was Bjerknes. (*Id.*) As discussed previously, the Court cannot consider this transcript in this procedural posture as it is not embraced by the Complaint. *Kushner v. Beverly Enters., Inc.*, 317 F.3d 820, 830 (8th Cir. 2003) ("Such disputed papers [such as a government's criminal sentencing memorandum] should not be the subject of judicial notice on a motion to dismiss.").

Supp. 3d at 1108–09.  Victims "do not have the right to make particular remedial demands; so long as the recipient's response was not clearly unreasonable, the recipient will not be held liable." *Id.*  Plaintiffs contend that the Complaint contains allegations that, taken together, support a plausible claim for deliberate indifference.

The Court agrees.  While the District argues that Doe 1's mother never identified "Brett Larson" as Bjerknes, (Def.'s Mem. at 12), it is alleged that she reported that the cyber sexual abuse was committed by an "adult" connected to the school.  (Compl. ¶ 100–104, 234.)  She left her meeting with two school officials, expecting a prompt investigation of her daughter's sexual abuse.  (*See id.* ¶ 102.)  While the District posits that her complaint could have been against any adult member of the Bemidji community generally, (*see* Def.'s Mem. at 11), the Court finds that it can be inferred that Doe's 1 mother requested an investigation by the school because of her belief that the sexual abuse was committed by an employee under its control.  Accordingly, viewing these facts in the light most favorable to Plaintiffs, the Complaint plausibly alleges that the District acted with deliberate indifference.

### 2.    Peer Harassment Claim

Plaintiffs also appear to assert a Title IX hostile-environment-theory of liability against the District for the harassment it is alleged they faced after Bjerknes' arrest.  As noted above, to prevail on this type of claim, plaintiffs must establish that the District acted with deliberate indifference.  *Shank*, 232 F. Supp. 3d at 1108.  Moreover, plaintiffs must establish that the harassment they faced by their peers was "so severe, pervasive, and objectively offensive that it effectively barred [their] access to an educational opportunity

or benefit." *Id.* at 1109 n.1 (citing *Davis*, 526 U.S. at 633, 119 S.Ct. 1661)).  Making this determination entails examining the totality of the circumstances, including: "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with the victims' academic performance." *Hayut v. State Univ. of N.Y.*, 352 F.3d 733, 744 (2d Cir. 2003) (citing *Harris v. Forklift Sys.*, 510 U.S. 17, 22 (1993)).

Here, Plaintiffs allege that almost immediately after Bjerknes' arrest, Doe 1's parents advised the District that her daughter's identity must be kept confidential.  (Compl. ¶ 146.)  Nonetheless, it is alleged that the District failed to protect Plaintiffs' identity, calling them on the loudspeaker to the school office and implying that the victims were in trouble.  (*Id.* ¶¶ 152, 159–161.)  As a result, vicious rumors began to spread at school.  (*Id.* ¶ 128.)  It is alleged that, although the District was requested to immediately address this peer harassment, it ignored the situation, refusing to speak directly with teachers or students about Bjerknes' sexual abuse.  (*Id.* ¶¶ 125, 141, 150, 172.)

By way of example, in response to a complaint by Doe 2's mother regarding this harassment, it is alleged that Principal Hildenbrand said something to the effect that "we need to stop talking about it and it will go away."  (*Id.* ¶ 176.)  Feeling "[u]nsupported in their school environment," Plaintiffs began to experience "severe absenteeism and tardiness."  (*Id.* ¶ 132.)  But, even though their tardiness was spurred by Bjerknes' sexual abuse, Plaintiffs were targeted and punished by District personnel for being late and were not allowed, in some instances, to make up the missed work.  (*Id.* ¶ 151.)  And, in the face of Plaintiffs' suffering grades and attendance, the District continued to financially support

Bjerknes' t-shirt company. (*Id.* ¶¶ 17, 131–36, 151, 177, 181) (noting further that the parents avidly objected to the District's continuing relationship with Bjerknes' company). Because of the hostile environment—caused by the District's purported indifference— Plaintiffs' grades continued to suffer; they also engaged in self-harm and suffered emotional distress. (Compl. ¶¶ 151, 153-154, 177-179, 182-182.) Doe 2 also withdrew from school. (*Id.* ¶ 183.) Plaintiffs argue that these facts, when taken together, plausibly support an inference of a hostile educational environment. *See, e.g., T.C. ex rel S.C. v. Metro. Gov't of Nashville,* 378 F. Supp. 3d 651, 685 (M.D. Tenn. 2019) (noting that "relatively isolated incidents, if sufficiently egregious" can satisfy the standard that a child was subject to severe, pervasive and objectively offensive sexual harassment for purposes of Title IX) (citing *Faragher v. City of Boca Raton*, 524 U.S. 775, 788, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998)).

The Court agrees. In response, the District first argues that Plaintiffs fail to adequately plead that the alleged harassment was motivated by their sex. (Def.'s Mem. at 14-15.) However, taking all reasonable inferences in Plaintiffs' favor, the Court finds that Plaintiffs do sufficiently allege that their peers targeted them because they were females sexually victimized by Bjerknes. (*See*, *e.g*., Compl. ¶¶ 17(a), 173.) Such facts are sufficient, at this stage, to support at least a plausible inference that Plaintiffs were subjected to discrimination on account of their sex.

The District next contends that the Complaint fails to allege actual notice of the identity of the specific individuals who were harassing Plaintiffs. As an initial matter, the risk of peer harassment in this case appears to be an obvious and inevitable danger, given

the sensationalism of an arrest by a teacher for cyber sexting, and the ages of the students. *See, e.g., Metro. Gov't of Nashville,* 378 F. Supp. 3d at 685 (finding risk of peer harassment and sexual harassment "obvious" where sexual images of its students were disseminated, given the "ages of the students" and realities of media and communication technology). Moreover, it is alleged that Doe 1's mother purposefully notified the District to protect her daughter's identity.   (Compl. ¶ 146.)   At this stage of the proceeding, the Complaint plausibly alleges sufficient facts that the District was on notice of the risk of peer harassment.

Finally, the District contends that Plaintiffs have not adequately pleaded "deliberate indifference."   (Def.'s Mem. at 16-17.)   Again, the Court disagrees.   As noted above, Plaintiffs allege that they were made vulnerable to peer harassment by the District's knowing actions and the District's deliberate failure to act.   (*Id.* ¶¶ 17, 128, 131-136, 151, 159–160, 177, 181).   The Complaint contains sufficient allegations that, taken together, support a plausible claim that the District acted with deliberate indifference.

Therefore, viewing these facts in the light most favorable to Plaintiffs, the Court finds that the Complaint pleads sufficient allegations of a hostile educational environment and peer harassment under Title IX.   Accordingly, the Court denies the District's motion to dismiss Plaintiffs' Title IX claim.

### D.   Count II – Section 1983 Claim

Plaintiffs' theories of liability under Section 1983 largely mirror their claims under Title IX.   To state a claim under Section 1983, a plaintiff must allege the violation of a right secured by the Constitution and laws of the United States and must show that the

violation was committed by a person acting under color of law. *Dubose v. Kelly*, 187 F.3d 999, 1002 (8th Cir. 1999); *West v. Atkins*, 487 U.S. 42, 48, 108 S.Ct. 2250, 101 L.Ed.2d 40 (1988). Here, Plaintiffs allege that the District violated their rights to equal protection under the Fourteenth Amendment. Specifically, they argue that the District (1) failed to investigate and act upon complaints of "child abuse and cyberbullying," including but not limited to, terminating Bjerknes; (2) failed to train its employees to "identify child sexual discrimination;" (3) failed to monitor the internet and device usage of students and employees despite express representations to the contrary; and (4) failed to adequately address student-on-student harassment following Bjerknes' arrest. (*See* Pls.' Opp'n at 26) (citing Compl. ¶ 201).)

The District may be found liable under Section 1983 if an official custom or practice causes Plaintiffs to suffer a constitutional harm. *Thelma D. By and Through Delores A. v. Board of Educ. of City of St. Louis*, 934 F.2d 929, 932-933 (8th Cir. 2001) (citing *Monell v. City Dep't of Social Servs.*, 436 U.S. 658, 690–91, 98 S.Ct. 2018, 2035–36, 56 L.Ed.2d 611 (1978)). The existence of a custom or practice may be found in "'persistent and widespread . . . practices . . . [which are] so permanent and well settled as to [have] the force of law.'" *Id.* at 691, 98 S.Ct. at 2036 (citing *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 167–68, 90 S.Ct. 1598, 1613–14, 26 L.Ed.2d 142 (1970)).

"A school district can be liable for civil-rights violations under Section 1983 either for failing to receive, investigate, and act upon complaints of [unconstitutional conduct] or for failing to train its employees to prevent or terminate [unconstitutional conduct]." *Plamp v. Mitchell Sch. Dist. No. 17-2*, 565 F.3d 450, 459 (8th Cir. 2009) (citing *P.H. v.*

*Sch. Dist. of Kan. City, Mo*., 265 F.3d 653, 658 (8th Cir. 2001)).  In support of its motion, the District urges the Court to dismiss Plaintiffs' Section 1983 claim because the Complaint fails to plausibly allege the District had notice of Bjerknes' sexual harassment or peer harassment after Bjerknes' arrest and that it was "deliberately indifferent" to such complaints.  (Def.'s Mem. at 21-22.)  Moreover, the District contends that Plaintiffs do not plausibly plead that Bjerknes' "social-media sexual abuse had anything to do with a failure to train or supervise him."  (*Id*. at 23.)

The Court disagrees.  To adequately plead a Section 1983 "failure-to-act claim," Plaintiffs must allege that (1) there was a "continuing, widespread, persistent pattern of unconstitutional misconduct," (2) the school's "policymaking officials" were deliberately indifferent to or tacitly authorized such conduct after gaining knowledge of such conduct, and (3) Plaintiffs were "injured by acts pursuant to the [school's] custom."  *Plamp*, 565 F.3d at 459 (quoting *Thelma D. v. Bd. of Educ., City of St. Louis*, 934 F.2d 929, 933–34 (8th Cir. 1991)).

Here, Plaintiffs plausibly allege that Bjerknes was engaging in unconstitutional conduct.  *See Plamp*, 565 F.3d at 460 (citing *Wright v. Rolette County*, 417 F.3d 879, 884 (8th Cir. 2005) ("Sexual harassment by state actors violates the Fourteenth Amendment and establishes a section 1983 action.") (quotation and alteration omitted)); *P.H*., 265 F.3d at 658 ("It is well-settled that the Due Process Clause of the Fourteenth Amendment protects the liberty interest of a child in public school from sexual abuse." (quotation omitted)).

While the District appears to concede the plausibility of this allegation, it

nonetheless contends that it may not be liable for Bjerknes' misconduct under a theory of "respondeat superior." (Def.'s Mem. at 20.) In response, Plaintiffs clarify that they do not allege any theory of liability under § 1983 based on respondeat superior. (Pls.' Opp'n at 26 n.14.) Rather, they contend that the District's liability arises by virtue of the knowledge of District officials regarding a continuing, widespread, persistent custom or practice that permits such unconstitutional misconduct by its teachers. (*Id*. at 29-32.)

As noted above, Plaintiffs allege at least three specific instances of Bjerknes' unconstitutional misconduct involving other female students that were known to the District. (Compl. ¶¶ 71, 82, 231.) Doe 1's mother also reported to the Dean of Students and the School Counselor that an adult connected to the school was sexually abusing her daughter and potentially targeting other students. (*Id*. ¶¶ 100-104.) Moreover, Plaintiffs plausibly allege that the District had knowledge of other complaints made against another District teacher only three years prior to Bjerknes' arrest. (*Id*. ¶¶ 31-32.) At this stage of the proceeding, and accepting Plaintiffs' allegations as true, the Court finds that Plaintiffs plausibly allege a "custom, policy, or practice" in their Complaint—namely, that the District deliberately chose to ignore sexual harassment complaints against District teachers. *Sagehorn v. Indep. Sch. Dist. No. 728*, 122 F. Supp. 3d 842, 866-867 (D. Minn. 2015) (finding complaint adequately pleaded liability under § 1983 at pleadings stage "for an unconstitutional custom or usage" when it alleged only two other instances of misconduct) (citing *R.S. ex rel. S.S. v. Minnewaska Area Sch. Dist. No. 2149*, 894 F. Supp. 2d 1128, 1138 (D. Minn. 2012)).

The District further contests a theory of liability under § 1983 based on its alleged

failure to train for the detection and response to "child sexual discrimination" and address student-on-student harassment. Specifically, it appears to argue that (1) the District cannot be liable for student-on-student harassment because students are not state actors; and (2) Plaintiffs do not plausibly plead that Bjerknes' social-media sexual abuse "had anything to do with a failure to train or supervise him." (Def.'s Mem. at 20, 23.)

The Court again disagrees with the District. "To establish its failure to train theory, [Plaintiffs] must show that the [District's] 'failure to train its employees in a relevant respect evidences a deliberate indifference' to the rights of the students." *Thelma D.,* 934 F.2d at 933 (quoting *City of Canton, Ohio v. Harris,* 489 U.S. 378, 389, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989)). First, contrary to the District's assertions, Plaintiffs do not allege that it is vicariously liable for the actions of its students. Rather, Plaintiffs allege that, based on the District's alleged failures to implement its policies regarding sexting and cyber bullying and provide training necessary for teachers to educate students on sexual harassment, the District was deliberately indifferent to the problem of severe and pervasive sexual harassment after Bjerknes' arrest. Plaintiffs allege that this deliberate indifference led to a denial of their equal access to education. The Court finds that Plaintiffs plausibly allege that the District's failure to adequately train District personnel "regarding how to handle student-on-student harassment" plausibly "resulted in the deprivation of [Plaintiffs'] constitutional right to equal protection" in the District's school. *See, e.g.*, *Metro. Gov't of Nashville*, 378 F. Supp. 3d at 685 (M.D. Tenn. 2019) (finding that a school's failure to adequately address student-on-student harassment gives rise to a violation of equal protection).

Second, Plaintiffs' "failure-to train" theory is not based on the District's purported failure to train Bjerknes alone.  Rather, as Plaintiffs argue, they allege a pattern of constitutional violations that put the District on notice that "its employees' responses to recurring sex discrimination were insufficient to protect Plaintiffs' constitutional rights." (Pls.' Opp'n at 33-34.)

The District's motion to dismiss Plaintiffs' § 1983 claim is denied.

**IV.     ORDER**

Based on the foregoing, and all the files, records, and proceedings herein, **IT IS HEREBY ORDERED** that:

1. Defendant's Motion to Dismiss for Failure to State a Claim [Doc. No. 8] is **DENIED.**

Dated:   August 14, 2020

s/Susan Richard Nelson
SUSAN RICHARD NELSON
United States District Judge