# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

| | |
|---|---|
| Jane Doe 1, by and through her parents and natural guardians, Mother Doe 1 and Father Doe 1, and Jane Doe 2, by and through her parent and natural guardian, Mother Doe 2,<br><br>              Plaintiffs,<br><br>v.<br><br>Independent School District 31, d/b/a Bemidji Area Schools,<br><br>              Defendant. | Case No. 20-cv-00226 (SRN/LIB)<br><br>***TEMPORARILY FILED UNDER SEAL***<br><br>**ORDER ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND THE PARTIES' CROSS-MOTIONS TO EXCLUDE EXPERT TESTIMONY** |

Matthew H. Morgan, Melanie April Johnson, Nicole Jean Schladt, and Rebekah L. Bailey, Nichols Kaster PLLP, IDS Center, 80 South 8th Street, Ste. 4700, Minneapolis, MN 55402, for Plaintiffs.

Harrison E. Berg, Jeffrey M. Markowitz, and Sarah E. Bushnell, Arthur Chapman Kettering Smetak & Pikala, 81 South 9th Street, Ste. 500, Minneapolis, MN 55402, for Defendant.

SUSAN RICHARD NELSON, United States District Judge

     This matter is before the Court on the following motions: (1) the Motion for Summary Judgment filed by Defendant Independent School District 31, d/b/a Bemidji Area Schools ("District") [Doc. No. 154]; (2) the District's Motion to Exclude the Expert Opinions of Therapist [Doc. No. 129]; (3) Plaintiffs' Motion to Exclude the Expert Testimony of Defendant's Expert Leslie Hainrihar Chretien [Doc. No. 140]; and (4) the

District's Motion to Exclude the Plaintiffs' Experts John Carney and Dr. Carol Shakeshaft [Doc. No. 148].

For the reasons set forth below, the Court: (1) grants in part and denies in part Defendant's Motion for Summary Judgment; (2) denies the District's Motion to Exclude the Expert Opinions of Therapist; (3) grants in part and denies in part Plaintiffs' Motion to Exclude the Expert Testimony of Leslie Hainrihar Chretien; and (4) denies the District's Motion to Exclude the Expert Opinions of John Carney and Dr. Carol Shakeshaft.

## I.    BACKGROUND

### A. The Parties

The District is a Minnesota public school district that operates multiple elementary schools, Bemidji Middle School ("BMS"), and Bemidji High School ("BHS"), among others, and that receives federal funding. (Rule 26(f) Report and Proposed Scheduling Order (Rule 26(f) Report) [Doc. No. 34] at 3.) During the 2016–2017 school year the District employed roughly 860 people. (Second Hickman Decl. [Doc. No. 223] ¶ 6.)

Plaintiffs Jane Doe 1 ("JD1") and Jane Doe 2 ("JD2") are both minors who attended BMS in the years relevant to this litigation. (Rule 26(f) Report at 2–3; Compl. [Doc. No. 1, Ex. 3] ¶ 22–23.) Mother Doe 1 ("MD1") and Father Doe 1 ("FD1") are JD1's parents and Mother Doe 2 ("MD2") is JD2's mother. (Rule 26(f) Report at 2–3; Compl. ¶ 22–23.)

This case stems from the sexual exploitation of JD1 and JD2 by BMS Assistant Principal Brandon Bjerknes.

## B. Mr. Bjerknes' Sexual Abuse

Mr. Bjerknes began his career with the District as a teacher at Northern Elementary School in 2005. (Second Schladt Decl. [Doc. No. 214], Ex. 32.) A series of promotions led to his employment as Assistant Principal of BMS beginning in 2014. (*See* Second Schladt Decl., Exs. 33, 34.) As Assistant Principal, Mr. Bjerknes' responsibilities included disciplining students and addressing other social and personal issues they raised with him. (Rule 26(f) Report at 4; Third Markowitz Decl. [Doc. No. 157], Ex. 10 (Vaughn Dep. Tr.) at 85:25–88:20; Third Markowitz Decl., Ex. 5 (Hildenbrand Dep. Tr.) at 78:4–80:19.)

### 1. Creation of the Online Persona "Brett Larson"

Shortly after he began as Assistant Principal, in the fall of 2014, Mr. Bjerknes created a fictitious online persona named "Brett Larson." (*See, e.g.*, Second Schladt Decl., Ex. 14 (Police Report DOE0003367–3577)[1] at DOE0003419–21.) As "Brett Larson," Mr. Bjerknes purported to be a 12-to-15-year-old adolescent from Duluth. (*Id.* at DOE0003414; Second Schladt Decl., Ex. 7 (Federal Change of Plea Tr.) at 21:8–24.) Mr. Bjerknes created a Facebook profile, which he used to "friend" 530 Bemidji-area students, as well as two Snapchat accounts. (Federal Change of Plea Tr. at 21:12–15; Police Report DOE0003367–3577 at DOE0003386, DOE0003393.)

---

[1] Both parties filed multiple similarly titled documents, referencing police reports, as exhibits. (*See* Second Schladt Decl., Exs. 14, 15, 16, 18, 19, 20, 21, 22, 23, 24, 25, 27, 28, 36, 45, 46; Third Markowitz Decl., Exs. 17, 22, 30, 31, 32, 33, 34, 35, 36, 37, 45.) For clarity, after the first reference, the Court will refer to these documents as "Police Report" and include their bates number page range, e.g. "Police Report DOE0003367–3577."

Over the course of three years, Mr. Bjerknes used the Brett Larson social media accounts to engage in sexually explicit communications with at least 55 minor children, including 11 BMS students, 10 BHS students, and several other students local to the Bemidji area, JD1 and JD2 among them. (Federal Change of Plea Tr. at 22:11–16; Second Schladt Decl., Ex. 13 (Bemidji Police Department Victim Spreadsheet).) Mr. Bjerknes communicated with some victims for multiple years. (Police Report DOE0003367–3577 at DOE0003392; Second Schladt Decl., Ex. 15 (Police Report DOE0003581–83) at DOE0003583.)

Mr. Bjerknes admitted to knowing several of his victims because of his position as Assistant Principal at BMS, (Second Schladt Decl., Ex. 12 (Beltrami Cnty. Plea Tr.) at 17:7–11, 22:3–6), and he would use information he learned in that capacity to manipulate them. For example, at least one of Mr. Bjerknes' victims had met with him at BMS about being bullied for her sexual and gender orientations before he targeted her. (Second Schladt Decl., Ex. 18 (Police Report DOE0004362).) When he contacted her as "Brett Larson," Mr. Bjerknes stated that he had been bullied for being bisexual and told the victim "[it is] awesome ur trans." (*Id.*) Other lies that Mr. Bjerknes used to garner his victims' sympathy included that his mother had cancer or was deceased, or that his father was in the hospital with cancer, or that he had recently been released from the hospital for cutting himself. (Police Report DOE0003367–3577 at DOE0003414, DOE0003417.)

After gaining his victims' trust, Mr. Bjerknes would transition to inappropriate topics, graphic descriptions of sexual acts he wished to perform, and requests for nude photographs and videos. (*Id.* at DOE0003380.) Messages that Mr. Bjerknes sent to just one

of his victims include: "So I can tie u up and rape u"; "So u would like if I cum in your pussy then go down there and suck it out and eat my own cum from your pussy"; "And I could piss on your face?"; "i want u have to have 2 fingers in and i wanna fuck ur butt from behind." (Police Report DOE0003581–83 at DOE0003583.)

The photos that victims sent to Mr. Bjerknes included images of exposed breasts, exposed buttocks, "legs spread wide open," and objects inserted into the victim's vagina. (Police Report DOE0003367–3577 at DOE0003398–3411.) Victims also sent videos of themselves masturbating. (Second Schladt Decl., Ex. 20 (Police Report DOE0004333–4359) at DOE0004348.) At least one victim complied with his requests out of fear that Mr. Bjerknes would find her if she did not. (*Id.* at DOE0004348.)

Mr. Bjerknes sent his victims pornography as well as photographs of his penis. (Police Report DOE0003367–3577 at DOE0003413.) Although Mr. Bjerknes asked some victims to meet up with him, fortunately none did. (*Id.* at DOE0003372 (asked victim to meet him at a bar), DOE0003413 (asked victim to meet up for sex).)

The results of the administrative subpoenas served after Mr. Bjerknes' arrest showed that he accessed his "Brett Larson" Facebook and Snapchat accounts on his work phone and on Wi-Fi IP addresses associated with BMS. (Police Report DOE0003367–3577 at DOE0003388–89; Walton Dep. Tr. at 72:9–75:6, 80:10–81:24; Second Schladt Decl., Ex. 21 (Police Report DOE0004395–400, 4437–51, 5469) at DOE0004399.) The police determined that Mr. Bjerknes would view his victims' sexually explicit Snapchat photos and videos on his personal phone, use his work phone to record them, and then download them from his work phone onto his personal computer. (Walton Dep. Tr. at 145:4–148:9.)

Sometimes Mr. Bjerknes would view the Snapchats on his work phone and record them with his personal phone. (Police Report DOE0003367–3577 at DOE0003398.) Mr. Bjerknes memorialized at least 29 sexually explicit Snapchats using this process. (*Id*. at DOE0003398–3411.)

### 2. Sexual Abuse of JD1

Mr. Bjerknes reached out to JD1 through Facebook Messenger as Brett Larson when she was a seventh grader, in the 2015–2016 school year. (Third Markowitz Decl., Ex. 3 (JD1 Dep. Tr.) at 36:24–37:17.) JD1 only once interacted with him at school, but Mr. Bjerknes knew that she has difficulty communicating due to several medical diagnoses, including autism and selective mutism, because he helped manage her Individualized Education Program ("IEP") accommodations. (JD1 Dep. Tr. at 24:19–26:4; Third Markowitz Decl., Ex. 1 (FD1 Dep. Tr.) at 36:19–37:2; Third Markowitz Decl., Ex. 2 (MD1 Dep. Tr.) at 18:3–20:6, 20:19–21:10; Second Schladt Decl., Ex. 31 (JD1 IEP); Vaughn Dep. Tr. at 63:14–22.) In fact, in March 2015, Mr. Bjerknes emailed the Director of Special Education seeking speech services for JD1 because "[t]he lady is selective mute and I have never heard her talk." (Second Schladt Decl., Ex. 53.)

MD1 testified that, as a result, Mr. Bjerknes knew JD1's vulnerabilities, that she "was isolated and didn't have a lot of friends[,] [that she] was an easy target." (MD1 Dep. Tr. at 31:15–32:5.) FD1 agreed that Mr. Bjerknes' took advantage of JD1's desire "to have a friend . . . [to have] a boyfriend." (FD1 Dep. Tr. at 38:1–12.)

Mr. Bjerknes used Facebook Messenger and later Snapchat to engage in sexual conversations with JD1 and to request pornographic photos and videos from her. (JD1 Dep.

Tr. at 40:13–16; Second Schladt Decl., Ex. 28.) Sometimes these conversations occurred during the school day. (JD1 Dep. Tr. at 43:20–44:8; Third Markowitz Decl., Ex. 4 (Student 1 ("S1") Dep. Tr.) at 102:22–104:13.) Although she felt uncomfortable with his requests, JD1 complied with them because Mr. Bjerknes would "not tak[e] no for an answer." (JD1 Dep. Tr. at 41:6–17.) JD1 sent Mr. Bjerknes at least eight pornographic videos, including one of her breasts and one of her masturbating. (Police Report DOE0004333–4359 at DOE0004337–4346.)

In their conversations, Mr. Bjerknes referred to JD1 as his girlfriend and stated that he "loved" seeing her body. (Schladt Decl., Ex. 25.) FD1 testified that JD1 believed that Brett Larson was her boyfriend, and JD1's friend, Student 1 ("S1"), also believed that JD1 considered Brett Larson to be her boyfriend. (FD1 Dep. Tr. at 18:13–20; S1 Dep. Tr. at 60:5–10.)

MD1 and FD1 restricted JD1's smartphone use and periodically reviewed its contents. (JD1 Dep. Tr. at 27:23–28:19; MD1 Dep. Tr. at 33:14–34:13, 41:22–42:7, 47:8–19.) During one of these reviews, MD1 discovered JD1's Facebook messages with "Brett Larson." (MD1 Dep. Tr. at 41:22–42:7.) After looking through the messages and the "Brett Larson" Facebook profile, MD1 and FD1 suspected that Larson was an adult. (*Id.* at 42:24–44:8; Third Markowitz Decl., Ex. 30 (Police Report DOE0012069).) FD1 made a police report on September 7 and 8, 2016, initially providing the police with screenshots of some of the communications. (Police Report DOE0012069.)

These screenshots included a message from Mr. Bjerknes asking "does anyone ever read ur stuff or see this? I don't want us to get in trouble!!!!!!" (Police Report

DOE0003367–3577 at DOE0003393.) Additional messages requested photos of JD1's "boob – no hand!" and her "undies;" dared her to "watch a porno clip;" and asked her if she wants to see "dick or fuckin cum or …" and if "we were together, would u let me finger ur pussy?" (*Id.*) The police opened an investigation and, at their request, FD1 turned over JD1's phone on September 8. (Third Markowitz Decl., Ex. 52 (Walton Dep. Tr.) at 21:6–22:1; FD1 Dep. Tr. at 72:10–22.)

The next day, September 9, MD1 and FD1 alerted Andra Vaughn, Dean of Students at BMS, and Travis Zachman, Counselor at BMS, to their discovery during a meeting previously scheduled to discuss JD1's eighth grade classes. (MD1 Dep. Tr. at 51:25–52:15; FD1 Dep. Tr. at 65:14–66:3; Vaughn Dep. Tr. at 12:11–24, 66:23–69:19; Third Markowitz Decl., Ex. 56 (Zachman Dep. Tr.) at 10:9–11:14; Rule 26(f) Report at 4.) The precise content of this meeting is disputed. (*See* Def.'s Mem. at 13 n.8.)

MD1 testified that she told the administrators that JD1 "ha[d] been sexting with what, most likely, is an adult and . . . [that] a ton of the friends were Bemidji Middle Schoolers . . . [and] they really need to look into that or kind of talk to the kids about this so that it doesn't happen again." (MD1 Dep. Tr. at 52:6–15, 56:18–57:2.) FD1 recalled MD1 specifically sharing the name "Brett Larson." (FD1 Dep. Tr. at 67:2–18.) JD1's parents testified that in response, Ms. Vaughn and Mr. Zachman had no questions or comments and merely shook their heads before ending the meeting. (MD1 Dep. Tr. at 59:1–5; FD1 Dep. Tr. at 67:16–18, 293:6–25.) Because the police had JD1's phone, MD1 and FD1 could not show the administrators any screenshots of JD1's conversations. (FD1 Dep.

Tr. at 66:16–18.) FD1 believed Ms. Vaughn and Mr. Zachman would investigate their report and discuss the dangers of texting with female BMS students. (*Id.* at 294:1–12.)

Ms. Vaughn recalled MD1 and MD2 sharing that "their daughter was sexting with another person[,] . . . they thought it could be an adult[,] . . . they had talked to the Bemidji Police Department about it[,] . . . [and] [t]hey thought that there were friends of friends being added." (Vaughn Dep. Tr. at 66:23–67:4.) She did not recall MD1 mentioning that Brett Larson's friends were predominantly students at BMS or asking her to take action. (*Id.* at 70:13–14, 76:2–20.) Ms. Vaughn believed that JD1's parents primarily shared this information with her to explain JD1's behavior and that the police were better equipped to investigate than BMS. (*Id.* at 70:23–72:17, 76:21–24.) Based on their conversation, she did not believe that the person described was associated with the District. (*Id.* at 243:16–244:4.) Consequently, Ms. Vaughn did not investigate or report this information to any other administrator. (*Id.* at 72:18–73:9, 78:4–6, 81:11–15.)

### 3. Sexual Abuse of JD2

Unlike JD1, JD2 frequently interacted with Mr. Bjerknes at BMS. She "constant[ly]" visited his office and viewed him "like a friend." (Third Markowitz Decl., Ex. 14 (JD2 Dep. Tr.) at 60:18–22.) JD2 estimated that in the seventh grade she spent time alone in Mr. Bjerknes' office "probably . . . 20 to 30 times." (*Id.* at 43:21–22.) Mr. Bjerknes would buy JD2 snacks, give her candy, and let her charge her phone. (*Id.* at 39:6–11, 47:8–16, 54:7–17.) Several times, Mr. Bjerknes wrote passes to let JD2 skip class and hang out in his office instead. (*Id.* at 47:17–49:3.) JD2 would vent to Mr. Bjerknes about her problems and thought he cared about her "like a parent." (*Id.* at 49:14–50:8.)

9

"Brett Larson" added JD2 on Snapchat in October or November 2016, when she was in the seventh grade. (*Id.* at 115:19–116:4, 119:15–16.) Their conversations escalated quickly to topics that made JD2 "uncomfortable." (*Id.* at 120:10–11.) Mr. Bjerknes communicated with JD2 "pretty constant[ly]. Even throughout . . . class, he was always the one to reply right away." (*Id.* at 122:7–9, 123:1–4.) JD2 once left her phone charging in Mr. Bjerknes's office, and when she later returned to retrieve it, he commented on the fact that she had received new messages from Brett Larson. (Second Schladt Decl., Ex. 4 (JD2's Answers to Interrogs.) at 7.) At one point, JD2 sought advice from Mr. Bjerknes about the messages from "Brett Larson;" she recalled that, in response, he smiled, rubbed her back, and took a "welcome to the world" attitude. (JD2 Dep. Tr. at 52:24–53:4, 53:23–54:3.)

Over the course of their conversations, Mr. Bjerknes solicited pornographic photographs and videos from JD2 and sent her multiple photographs of his penis. (Police Report DOE0003367–3577 at DOE0003412–13, DOE0003417–18.) His communications with JD2 were "always" sexual. (*Id.* at DOE0003414.) She blocked him at least three times because of his repeated sexual comments, such as stating that he "wanted to put his fingers up there" or "you should give me a blow job." (*Id.* at DOE0003414, DOE0003417.) JD2 communicated on and off with Mr. Bjerknes throughout the fall of 2016 and early winter of 2017. (JD2 Dep. Tr. at 120:15–122:3; Police Report DOE0003367–3577 at DOE0003418.)

### 4. Mr. Bjerknes' General Behavior

Prior to his arrest, many colleagues and students saw Mr. Bjerknes as a "very charismatic person" who was loved by "everybody." (Vaughn Dep. Tr. at 37:24–38:2.)

BMS Principal Drew Hildenbrand described being close "personally and professionally" with Mr. Bjerknes; three of Principal Hildenbrand's children had Mr. Bjerknes as their fifth-grade teacher and later babysat for him. (Hildenbrand Dep. Tr. at 11:8–12, 26:16, 28:5–22.) Principal Hildenbrand and Mr. Bjerknes raised money for members of the community together and socialized at sporting events. (*Id.* at 29:22–30:8.)

Plaintiffs submitted the declaration of Jane Doe 3 ("JD3"), who recalled that when Mr. Bjerknes taught at Northern Elementary School, he "often touched students in a familiar way," for example, rubbing their backs or touching their necks. (Third Markowitz Decl., Ex. 51 (JD3 Decl.) ¶ 5; *see also* JD2 Dep. Tr. at 158:7–158:13 (recalling Mr. Bjerknes' rubbing students' backs).) JD3 recalled two incidents in particular: once, Mr. Bjerknes held onto her buttocks "longer than necessary" while pushing her on the playground swings; another time, in fifth grade, she noticed Mr. Bjerknes staring down her shirt. (*Id.* ¶ 6–7.) He stated "something to the effect of 'leave [the buttons] unbuttoned' or 'keep it open.'" (*Id.* ¶ 7.)

The mother of S1,[2] Parent 1 ("P1"), had an older daughter (Student 2, "S2") whom she recalled was "very close" with Mr. Bjerknes during middle school at BMS. (Third Markowitz Decl., Ex. 57 (P1 Decl.) ¶ 5.) Mr. Bjerknes would call S2 "Care Bear," hug her, and "even drove her home from school." (*Id.*) P1 recalled S2 spending "a lot of time in Mr. Bjerknes' office before, during, and after school." (*Id.*) After S2 passed away during high school, at age 16 in January 2016, Mr. Bjerknes asked P1 if he could be a pallbearer at S2's

---

[2] S1 was the close friend of JD1 during her communications with Mr. Bjerknes. (S1 Dep. Tr. at 11:4–7.)

funeral. (*Id.* ¶ 6–7.) Thinking this was strange, and feeling uncomfortable with Mr. Bjerknes' behavior, P1 spoke with Principal Hildenbrand about her concerns. (*Id.* ¶ 8.) P1 requested that her younger daughter be assigned to an assistant principal other than Mr. Bjerknes because of his "creepy behavior." (*Id.* ¶ 8.)

At BMS, JD1 and S2 were not the only female students to socialize in Mr. Bjerknes' office. (JD3 Decl. ¶ 8–10.) Students would congregate in his office before and after school. (Third Markowitz Decl., Ex. 8 (Hickman Dep. Tr.) at 151:12–152:5; Zachman Dep. Tr. at 20:9–21:18.) During school hours, according to JD3, Mr. Bjerknes called students out of class "for no reason" and gave female students gifts. (JD3 Decl. ¶ 9, 11.) JD3 recalled that he "often made students hug him before they left his office or . . . in order to receive a snack out of his file drawers." (*Id.* ¶ 12.) Dean Vaughn and Principal Hildenbrand both testified that they also kept candy and would allow students to charge phones in their offices. (Vaughn Dep. Tr. at 89:4–90:2; Hildenbrand Dep. Tr. at 81:7–83:21.)

JD2 testified that Dean Vaughn, whose office was next to Mr. Bjerknes', often walked by during the school day and observed female students in Mr. Bjerknes' office. (JD2 Dep. Tr. at 123:16–124:23.) Dean Vaughn testified that, multiple times every day, she observed students meeting with Mr. Bjerknes' in his office, but that she only observed JD2 meeting with him once. (Vaughn Dep. Tr. at 85:25–88:10.) She also testified that she never observed Mr. Bjerknes meeting with students before or after school. (*Id.* at 90:3–91:25.) Principal Hildenbrand testified that he daily observed Mr. Bjerknes meeting with students in his office. (Hildenbrand Dep. Tr. at 78:4–81:6.) He could not recall seeing JD2

there, though he testified that an assistant principal could have meetings with up to 30 students in a single day. (*Id.* at 86:8–21.)

Mr. Bjerknes' personnel record contained no reports of misconduct at the time of his arrest. (First Hickman Decl. [Doc. No. 162] ¶ 10.) Neither District Superintendent James Hess, nor Human Resources Director Jordan Hickman, nor Principal Hildenbrand, nor Dean Vaughn, nor Counselor Zachman recalled hearing any reports of misconduct by Mr. Bjerknes or observing him engage in inappropriate behavior with students. (Hess Dep. Tr. at 12:10–16, 40:16–41:15; Hickman Dep. Tr. at 14:15–18, 150:7–151:2; Hildenbrand Dep. Tr. at 54:23–56:4, 59:6–21; Vaughn Dep. Tr. at 59:19–60:2, 79:23–81:10; Zachman Dep. Tr. at 18:5–14, 26:21–30:5.) Dean Vaughn did testify, however, that staff members voiced frustration to her about Mr. Bjerknes not following the BMS policy of giving students lunch detention when they received more than five tardies. (Vaughn Dep. Tr. at 60:3–61:13.) She could not recall which staff members did so. (*Id.*)

In addition to JD2's testimony that she went to Mr. Bjerknes about "Brett Larson," prior to Mr. Bjerknes' arrest another student reported to her teacher that she was being harassed by "Brett Larson," who was saying nasty things to her. (Second Schladt Decl., Ex. 56 (Wadena Email).) The teacher brought the student to Mr. Bjerknes, who asked her to sign into Facebook to show him the account. (*Id.*) The teacher recalled remarking, "I don't think that's a real account." (*Id.*) The record does not contain Mr. Bjerknes' response.

### C. Investigation and Arrest

Pursuant to the report made by FD1, the police served an administrative subpoena on Facebook requesting all IP addresses associated with the Brett Larson account for the

conversations that took place with JD1 between August 31, 2016 and October 1, 2016. (Third Markowitz Decl., Ex. 32 (Police Report DOE0012076–78) at DOE0012076.) The IP addresses that Facebook provided, and a subsequent administrative subpoena, led the police to Mr. Bjerknes' home address. (*Id.* at DOE0012075–76.)

### 1. Monday, March 20, 2017

The police executed a search warrant of Mr. Bjerknes' home on March 20, 2017. (*Id.* at DOE0012076; Walton Dep. Tr. at 84:13–85:7.) Chief Deputy Jarrett Walton took a statement from Mr. Bjerknes while other police officers seized electronic equipment with internet connectivity, including two iPhones from Mr. Bjerknes' person. (Third Markowitz Decl., Ex. 31; Walton Dep. Tr. at 85:18–89:16; Police Report DOE0003367–3577 at DOE0003373–79.) One of these iPhones was Mr. Bjerknes' District-issued phone; when opened, the police found that it was logged into one of the Brett Larson Snapchat accounts. (Walton Dep. Tr. at 192:23–194:11.)

In his statement, Mr. Bjerknes admitted to creating the Brett Larson social media accounts and to having explicit conversations with JD1. (Police Report DOE0003367–3577 at DOE0003377.) He also admitted to exchanging sexually explicit Snapchat messages and photographs with a 20-year-old woman who babysat for him and with another teacher at BMS. (*Id.* at DOE0003376.)

That night, the sheriff informed Superintendent Hess that police suspected Mr. Bjerknes of having an inappropriate relationship with a BMS student and of possessing child pornography. (Walton Dep. Tr. at 101:9–22; Hickman Dep. Tr. at 127:9–14; Hess Dep. Tr. at 49:4–50:15, 120:6–122:9; Hess Decl. [Doc. No. 161], Ex. H (Hess Handwritten

14

Timeline of Events).) Dr. Hess called HR Director Hickman to share what he had learned. (Hess Dep. Tr. at 50:19–21; Hickman Dep. Tr. at 120:21–121:6.) Mr. Hickman testified that based on their conversation, the police were not initially concerned that Mr. Bjerknes' sexual abuse involved District computers "because the IP addresses went to his home computer, not to the [D]istrict's network." (Hickman Dep. Tr. at 140:21–141:8.)

Next, Dr. Hess called Mr. Bjerknes and told him to report to Dr. Hess' office at 7:00 a.m. the following morning. (Hess Dep. Tr. at 49:24–50:1.) Mr. Bjerknes called Principal Hildenbrand later that night seeking the contact information of an attorney. (Hildenbrand Dep. Tr. at 34:23–35:8.) Though Principal Hildenbrand asked, Mr. Bjerknes would not say what had happened. (*Id.* at 35:9–13.) The two never spoke again. (*Id.* at 34:25.) Principal Hildenbrand's first guess about the allegations against Mr. Bjerknes was that he might have engaged in financial improprieties related to credit cards or gambling based on past "immature" financial decisions he had shared with Principal Hildenbrand. (*Id.* at 56:9–58:23.)

### 2. Tuesday, March 21, 2017

When Mr. Bjerknes arrived at Dr. Hess' office on the morning of March 21, Dr. Hess immediately placed him on paid administrative leave pending investigation and confiscated his badge and keys. (Hess Dep. Tr. at 56:2–57:12; Hess Decl., Ex. K.) Dr. Hess prohibited Mr. Bjerknes from returning to BMS, contacting students, or using school property. (Hess Decl., Ex. K.) After meeting with Mr. Bjerknes, Dr. Hess directed the IT Coordinator, Anthony Andrews, to change Mr. Bjerknes' directory and email account passwords, which Mr. Andrews did within an hour. (First Hickman Decl., Exs. L, AA;

Andrews Decl. ¶ 1.) Dr. Hess notified the school board of Mr. Bjerknes' leave, asking its members to keep the information confidential for the time being. (Hess Decl., Ex. G.)

HR Director Hickman, pursuant to the District's practice when a staff member may be charged with a criminal act, faxed a request to the sheriff's office for information about their investigation. (First Hickman Decl., Ex. E; Hickman Dep. Tr. at 122:4–124:2.) He also sent mandatory reports to the Minnesota Board of Teaching and the Minnesota School Boards Association ("MSBA") about Mr. Bjerknes' investigation and leave. (First Hickman Decl., Exs. F, G; Hickman Dep. Tr. at 127:18–22, 135:2–10.)

Police sought to execute a search warrant of Mr. Bjerknes' office at BMS before school began, but Principal Hildenbrand asked them to wait until the afternoon to prevent raising the students' suspicions. (Hildenbrand Dep. Tr. at 40:12–43:11.) In the same conversation, the police informed Principal Hildenbrand that some of Mr. Bjerknes' victims were BMS students, though they did not share any names. (*Id.* at 44:5–14; Walton Dep. Tr. at 158:4–10.) No person entered Mr. Bjerknes' office until the police executed their search around 3:30–4:45 p.m., during which they seized his District-issued electronic devices. (Hildenbrand Dep. Tr. at 43:17–21, 45:5–14; Third Markowitz Decl., Ex. 22 (Police Report Bemidji021958); Walton Dep. Tr. at 99:14–17.) Police found an "an extraordinary amount of candy" in Mr. Bjerknes' office. (Walton Dep. Tr. at 105:1–12.)

The same day, Chief Deputy Walton discovered a nude photograph of JD2 that Mr. Bjerknes had recorded onto his personal cellphone. (Third Markowitz Decl., Exs. 34 (Police Report DOE0012467), 35 (Police Report DOE0012478–12479).) Chief Deputy

16

Walton interviewed Mr. Bjerknes again, who identified JD2 as a BMS student. (Police Report DOE0012467.)

### 3. Wednesday, March 22, 2017

Based on this information, the police contacted MD2 on March 22 and informed her that "[JD2] had been talking to somebody who was not who they said they were." (Third Markowitz Decl., Ex. 36 (Police Report DOE0012480); Third Markowitz Decl., Ex. 15 (MD2 Dep. Tr.) at 82:6–15.) The police did not share Mr. Bjerknes' identity as a suspect during this conversation. (MD2 Dep. Tr. at 81:11–82:15.) With MD2's consent, the police went directly to BMS to interview JD2. (*Id.* at 84:11–14, 209:21–210:20, 231:16–20; Third Markowitz Decl., Ex. 45 (Police Report DOE0015028–15042) at DOE0015031.)

Police then met MD2 at her home to photograph rooms used by JD2 and to obtain further consent to search JD2's phone, which she gave. (Police Report DOE0012480; MD2 Dep. Tr. at 83:3–23; 210:21–24.) JD2 testified that she was in math class when her teacher received a phone call and announced to the classroom that JD2 needed to go to the office of Officer Hunt, the School Resource Officer.[3] (JD2 Dep. Tr. at 128:15–129:3; Markowitz Ex. 47 (MD2 and JD2 Facebook Messages) at DOE0015361; Rule 26(f) Report at 4.) JD2 did not bring her phone, so either Officer Hunt or a police officer escorted her back to the

---

[3] Although in the Complaint Plaintiffs allege that JD2 was called to the office "over the loud speaker," (Compl. ¶ 159), JD2 testified that her teacher was called over the classroom landline. (JD2 Dep. Tr. at 85:2–13, 128:19–129:3.) JD2 also told her mother in a Facebook message that the teacher was called over the landline. (MD2 and JD2 Facebook Messages at DOE0015361.)

classroom to retrieve it, an experience she described as "really scary" and "embarrassing" because other students could see her with the officer. (JD2 Dep. Tr. at 129:20–130:25.)

### 4. Thursday, March 23, 2017

Police arrested Mr. Bjerknes on March 23. (Third Markowitz Decl., Ex. 58.) Throughout the day, news outlets published stories describing Mr. Bjerknes' arrest for his sexual abuse of students as Brett Larson. (Third Markowitz Decl., Ex. 18; Hess Decl., Ex. F; MD2 Dep. Tr. at 135:18–136:10.) Members of a Facebook group called "Bemidji Chit Chat" posted extensively about the allegations. (Third Markowitz Decl., Ex. 26.)

At BMS, Principal Hildenbrand, Social Worker Pauline Winge, and Counselor Angela Stade interviewed students to try to determine the number of Mr. Bjerknes' sexual abuse victims at the school. (Hildenbrand Dep. Tr. at 108:23–112:23, 116:19–118:7, 120:10–127:21; First Winge Decl. [Doc. No. 169], Ex. K; Hildenbrand Decl., Exs. E, F.) Based on these interviews, the administrators took some students' cell phones out of concern that the students might delete information that would be useful for law enforcement. (Hildenbrand Dep. Tr. at 121:18–123:1; Hildenbrand Decl., Ex. A.)

When JD2 learned Brett Larson's true identity, "[her] whole body went numb" and she sobbed for hours. (JD2 Dep. Tr. at 135:24–136:4.) She described the experience as "the most heartbreaking thing I've ever gone through, that's for sure. True betrayal." (*Id.*) JD1 described feeling surprised to learn that Mr. Bjerknes was Brett Larson. (JD1 Dep. Tr. at 42:9.)

### 5. Friday, March 24, 2017

On Friday morning, Principal Hildenbrand sent the following email to all BMS staff:

Please see the email below from Dr. Hess regarding what can be shared with our students - additionally, please keep this data private. It is our goal to have attempt to have [sic] as regular of a day as possible. If you have a student that needs someone to talk to, please send them to [the relevant staff] . . . We have additional staff in the building today to provide any needed support for our kids, but they should all be filtered through [the relevant staff]. If you, personally, need help working through this, please contact Jennifer and she will work to find you someone to talk to.

Please read the the [sic] bold print in an age appropriate level to the students during first hour[:] . . .

* * *

Dear Bemidji Area School Students, Parents/Guardians, and Staff:

As many of you are already aware, Brandon Bjerknes, Assistant Principal – Bemidji Middle School, has been arrested.

I want you to know that Bemidji Area Schools placed Mr. Bjerknes on administrative leave immediately upon receiving notification from law enforcement that Mr. Bjerknes was under investigation.

While State Data Privacy Laws prohibit me from providing additional information, it is important to note that the matter is being investigated by law enforcement.  Bemidji Area Schools is cooperating with the investigation.  If you or your student has any pertinent information to share, we highly encourage you to contact one of our School Resource Officers.

We will have counselors available today for students who would like to talk to someone.

At this time, we can best support our students by keeping them focused on learning. If you have questions that you think I can answer, please feel free to connect with me.~

Sincerely

Dr. James A. Hess

(Hildenbrand Decl., Ex. M.) Dr. Hess' statement was posted to the District website that afternoon. (First Hickman Decl. ¶ 17; *Id.*, Ex. K.) HR Director Hickman emailed District principals, noting that the "resulting media coverage may have a significant impact on our students and staff" and reminding them of support resources. (*Id.*, Ex. H.)

MD2, accompanied by the parents of a friend of JD2, went to BMS and requested to speak with Principal Hildenbrand about Mr. Bjerknes' sexual abuse. (MD2 Dep. Tr. at

106:17–108:7.) Along with Principal Hildenbrand, HR Director Hickman, Ms. Winge, Ms. Stade, Mr. Zachman, and Officer Hunt met with them for about an hour. (*Id.* at 114:1–21, 120:18–121:12; Hildenbrand Dep. Tr. at 113:8–114:4; Third Markowitz Decl., Ex. 11 (Winge Dep. Tr.) at 21:1–22:5; First Hickman Decl., Ex. I (Hickman Meeting Notes).) The meeting participants agreed on several follow up steps: (1) BMS would connect JD2 with counselors from North Homes' mental health services that day; (2) in order to avoid bullying, JD2 would be allowed to arrive late to and leave early from school, at least for few days; (3) for the same purpose, JD2 and her friends could eat lunch with Ms. Winge and Ms. Stade instead of in the cafeteria; and (4) MD2 would further discuss accessing North Homes' services with Mr. Hickman later that day. (MD2 Dep. Tr. at 115:17–122:17, 128:9–132:9; Third Markowitz Decl., Ex. 19 (District Typed Meeting Notes); Winge Dep. Tr. at 21:1–22:5, 47:23–48:12; Hildenbrand Dep. Tr. at 114:5–115:24; Hickman Meeting Notes; First Winge Decl., Ex. L.) In addition, MD2 testified that the District suggested adjusting the schedules of JD2's friends so that she would have friends in every classroom, which meeting notes produced by the District confirm. (MD2 Dep. Tr. at 119:13–120:9; District Typed Meeting Notes.)

Sometime on March 24, MD2 asked Principal Hildenbrand "how he could let this happen." (JD2's Answers to Interrogs. at 6.) Principal Hildenbrand "told MD2 that the District does not monitor email or Internet." (*Id.*)

Around midday, Principal Hildenbrand emailed all BMS staff that there would be an optional meeting after students went home. (Hildenbrand Dep. Tr. at 139:21–141:3;

Hildenbrand Decl., Ex. L.) In addition, HR Director Hickman emailed the statement posted

that morning to the website to District "Leadership"[4] along with the following message:

> We are looking to provide access for our students, parents and staff: but DO
> NOT feel it appropriate to send anything out via the automated calling
> system, e-mail, text messaging, backpacks, etc. There is a lot of information
> and misinformation being disseminated via media and social media already.
> We don't need to add to the 'noise'.

(Second Schladt Decl., Ex. 57.)

Towards the end of the day, MD1 went to BMS and tried to speak with Principal

Hildenbrand despite not having an appointment. (MD1 Dep. Tr. at 66:11–20.) MD1

recalled being asked by one of the secretaries if her daughter was a victim of Mr. Bjerknes,

to which she answered affirmatively. (*Id.* at 67:8–68:8.) Believing this information would

be relayed to Principal Hildenbrand, MD1 "waited and [] waited." (*Id.* at 66:13–14.) When

she "finally saw Mr. Hildenbrand [she] said [she] wanted to talk to him and he said he was

too busy to talk to [her], and that was the end of it." (*Id.* at 66:17–20.) During their

exchange, MD1 did not tell Principal Hildenbrand that she wanted to discuss Mr. Bjerknes'

sexual abuse of JD1 specifically; rather, she told him that she wanted to discuss "some

serious things." (*Id.* at 67:1–2, 69:5–9.) She assumed that Principal Hildenbrand would

understand the nature of her visit because of its timing the day after Mr. Bjerknes' arrest.

(*Id.* at 66:21–25.) MD1 testified that after that visit, she "didn't go [to BMS] again because

[the District] was not receptive and . . . [she] didn't want to have to go through that again."

(*Id.* at 64:20–24.)

---

[4] The record does not detail who constituted the "Leadership" email group. (Second
Schladt Decl., Ex. 57.)

Separate from the investigation into Mr. Bjerknes' victims, over the course of March 23 and 24 Dean Vaughn interviewed multiple students about a nude photograph of JD2 that her ex-boyfriend, Student 8 ("S8"), had shared with classmates. (Vaughn Dep. Tr. at 114:5–126:5, 163:16–22; Vaughn Decl. [Doc. No. 165], Ex. C; JD2 Dep. Tr. at 106:9–107:11, 108:22–109:1, 109:16–113:14.) JD2 testified that her mother reported this to the school, although she could not recall when exactly the situation began. (JD2 Dep. Tr. at 108:25–110:4, 112:4–8.) JD2 described the experience as "horrible" and "embarrassing," and recalled "girls coming up to me and asking how I shave." (*Id.* at 110:8–18.) On March 24, Dean Vaughn gave S8 an out-of-school suspension for sharing the photograph. (Vaughn Decl. ¶ 7; Vaughn Decl., Ex. F.)

### 6.  March 28, 2017 Meeting with JD1's Parents

After MD1's unsuccessful attempt to meet with Principal Hildenbrand, Superintendent Hess agreed to meet with JD1's parents the next Tuesday for 30 minutes, along with Principal Hildenbrand and the District's head of special education. (FD1 Dep. Tr. at 109:25–110:22; Hess Decl., Exs. D, H; MD1 Dep. Tr. at 72:8–73:2.) At the meeting, FD1 presented a list of concerns related to JD1's IEP, her recent tardies and missing assignments in her science class, keeping her identity as a victim confidential, and facilitating an effective channel of communication with the school to support her. (FD1 Dep. Tr. at 111:1–115:4; MD1 Dep. Tr. at 72:23–75:16; Third Markowitz Decl., Ex. 50 (FD1 Meeting Notes).) FD1 was concerned about confidentiality because "[i]t seems like they were doing some type of investigation pulling kids out of classes, which basically put a target on their back." (Second Schladt Decl., Ex. 8 (Federal Sentencing Hearing Tr.) at

31:4–6.) FD1 also reminded those in attendance that he and MD1 had previously provided notice at the beginning of the year about inappropriate communications between JD1 and an adult. (FD1 Meeting Notes at DOE0015411.)

FD1 recalled that Superintendent Hess "did all the talking" for the administrators, and that Principal Hildenbrand only asked whether JD1's parents would like to know what he was busy with when MD1 attempted to see him. (FD1 Dep. Tr. at 111:12–112:2.) At the end of the scheduled meet time, Principal Hildenbrand and the head of special education left. (*Id.* at 112:7–9.) Superintendent Hess stayed another half hour, acknowledged the legitimacy of FD1's concerns, and instructed JD1's parents to copy him on any emails they sent to BMS. (*Id.* at 112:11–16, 114:24–115:3; MD1 Dep. Tr. at 79:14–19.)

That night, FD1 received an email from JD1's long-term substitute special education teacher stating that she did not have access to some of JD1's science assignments and that JD1 spent her time in study hall drawing. (FD1 Dep. Tr. at 115:14–116:5.) In his response, FD1 reiterated the concerns about JD1's missing assignments that he had expressed in the meeting with the administrators and copied Principal Hildenbrand, Superintendent Hess, and JD1's science teacher Steven Sneide to the email. (*Id.* at 116:6–15.) About a week later, FD1 reviewed JD1's assignments and noticed several were still incomplete. (*Id.* at 116:16–23.) FD1 then wrote another email where "I put down a lot of question marks and [] said, hey, what about these assignments and I CC'ed Dr. Hess. Nothing happened." (*Id.* at 116:19–23.) After sending two to four more emails where "no one really responded," FD1 stopped copying Superintendent Hess. (*Id.* at 116:24–117:6.)

### 7. March 29, 2017 Message to Parents

On Wednesday, March 29, Superintendent Hess contacted the parents of students at BMS and Bemidji High School ("BHS") about Mr. Bjerknes being "charged with internet crimes, that, if true, would violate the trust we had placed in him." (Third Markowitz Decl., Ex. 27 (Hess Mar. 29, 2017 Email); Hess Dep. Tr. at 38:24–40:9, 67:6–68:24.) He encouraged parents to ask their children if they had spoken with "Brett Larson" and, if they had, to contact the sheriff's office. (Hess Mar. 29, 2017 Email.) The message concluded:

> [W]e want to identify all the students who may have been involved and provide assistance wherever it is needed. Our children are our most cherished gifts and we want them to grow and develop into healthy and well-adjusted adults. We will work diligently with you as partners in this vital mission.

(*Id.*)

### D. Environment at BMS After Mr. Bjerknes' Arrest

In the aftermath of Mr. Bjerknes' arrest, S1 testified that "Brett Larson was one of the most common names used around the school." (S1 Dep. Tr. at 177:12–178:17.) Students called each other "Brett Larson" "all the time, all day" and "made an entire joke about [it]." (*Id.*) JD2 testified that students put "posters in the actual middle school of Mr. Bjerknes that said 'free Bjerknes' that would stay up for hours and hours. Like I came in early to school to see that and then as I'm leaving school it would still be up." (JD2 Dep. Tr. at 145:7–12.) At least one poster was placed prominently near the front entrance of BMS. (*Id.* at 145:18–146:10.) In addition, JD2 saw social media posts including "tweets" and "memes" proclaiming similar messages. (*Id.* at 136:10–16.)

Counselor Zachman observed male students calling each other "Brett Larson" and acknowledged that this would be traumatizing for victims to overhear. (Zachman Decl.

[Doc. No. 171] ¶ 11; Zachman Dep. Tr. at 93:19–24.) Even so, Mr. Zachman did not believe this always constituted bullying because "there was no apparent power imbalance and the name calling did not appear to be unwelcome, but rather was part of mutual banter or joking between peers." (Zachman Decl. ¶ 11.) Mr. Zachman would intervene and ask the student being called "Brett Larson" if they needed support. (*Id.*) On two or three occasions, including once when Mr. Zachman was the target, he gave male students lunch detention for calling someone "Brett Larson."[5] (*Id.* ¶ 12.) Counselor Zachman could not recall the names of these students and BMS' lunch detention records do not reveal the reason for the detention. (*Id.* ¶ 13.)

Mr. Zachman could only recall one instance in which he filled out a "bully slip" for a student, identified in the record as Student 52 ("S52"), whom he later learned was being called "Brett Larson" in concert with other bullying behaviors. (*Id.* ¶ 5–10.) In that situation, he filled out the bully slip for an incident that occurred during gym class on April 12, 2017. (*Id.* ¶ 5.) The next day, S52's mother emailed Mr. Zachman and shared that, aside from that particular incident, "kids" were calling S52 "Brett Larson." (*Id.* ¶ 6; Zachman Decl., Ex. A.) Counselor Zachman responded that he was unaware of this and that he appreciated being informed so that he could continue to support S52. (Zachman Decl., Ex. B.) The bully received a one-day in-school suspension for the gym class incident, which he served concurrently with another suspension. (Zachman Decl. ¶ 6; *Id.*, Exs. C, D.)

---

[5] Counselor Zachman explained that students would call staff members "Brett Larson" when they were upset. (Zachman Dep. Tr. at 57:6–9.)

While some students joked about Mr. Bjerknes, others believed that they would be punished for discussing him. (S1 Dep. Tr. at 100:22–101:23.) S1 testified that students "were told by the principals and like the step-in assistant principal and Andra [Vaughn] herself that if we were talking, if we were caught talking about [Mr. Bjerknes' sexual abuse] we would get either lunch detention, in-school suspension or out-of-school suspension." (*Id.* at 101:15–21.) S1 recalled that Principal Hildenbrand made an announcement over the intercom which, while expressing concern for Mr. Bjerknes' victims, emphasized that "it wasn't something that needed to be talked about and there would be consequences for students that were talking about it." (*Id.* at 173:3–10.) S1 recognized that the intent behind this message was likely to protect the victims, but that it "definitely came out more as a threat . . . If [students] were like talking about . . . him, the social media account for Brett Larson, any of the victims, any of their personal experiences . . . it's going to be a problem." (*Id.* at 176:23–177:6, 178:19–179:18, 182:5–13.)

S1 recalled being personally told at least twice to stop talking about Mr. Bjerknes, though she could not recall the precise circumstances. (*Id.* at 164:6–168:17, 180:15–181:21.) Likewise, JD2 testified that she was told not to talk about Mr. Bjerknes' sexual abuse but could not remember how or by whom. (JD2 Dep. Tr. at 138:1–10, 147:4–148:14.) JD3, who attended BHS when Mr. Bjerknes was arrested, felt the District's messaging to students about Mr. Bjerknes' arrest "was horrible. The teachers wouldn't talk about it. They seemed to be in denial. There was no announcement, no meetings, no resources, no apology, nothing. The only announcement made was that students could go to the office if they had more information about Mr. Bjerknes." (JD3 Decl. ¶ 16.) On the whole, S1 felt

that the District "swept [Mr. Bjerknes' sexual abuse] up under the rug pretty quick." (S1 Dep. Tr. at 100:22–23.)

The District removed Mr. Bjerknes' name from his office, BMS letterhead, various signs, and "anything [they] could find." (Vaughn Dep. Tr. at 217:19–220:25.) Dean Vaughn removed his picture from the 2016–2017 yearbook on April 3. (*Id.* at 218:13–15, 220:4–18; Hildenbrand Decl., Ex. 3.) Even with these efforts, Dean Vaughn acknowledged that "things slip through." (Vaughn Dep. Tr. at 218:18–19, 219:8.) For example, in June, a parent emailed about a small plaque with Mr. Bjerknes' name on it amongst other plaques on a wall near an entrance to BMS. (*Id.* at 109:7–113:11.) Counselor Zachman stated that it would be "very traumatic" for Mr. Bjerknes' victims to see his name or picture around the school. (Zachman Dep. Tr. at 63:1–15.)

Counselor Winge provided support to 10 to 12 students in processing Mr. Bjerknes' conduct. (Winge Dep. Tr. at 19:3–20:18, 65:21–66:1.) Five or six of these students needed follow-up meetings, and Ms. Winge referred some students to outside counseling services. (*Id.* at 64:2–65:4, 66:2–67:1.) The District paid for three of these students to attend counseling at North Homes. (First Hickman Decl. ¶ 40.) HR Director Hickman testified that he was aware of four or five victims who attended BMS, and none who attended BHS, based on parent and student self-disclosures. (Hickman Dep. Tr. at 136:19–137:19.)

In January 2018, a former BMS teacher emailed Principal Hildenbrand about the District's actions after Mr. Bjerknes' arrest:

> I also realize—from working at BMS—that there hasn't been any intentional discussion (between adults? adults with kids?) about Brandon's child sexual abuse there and the impact. Having known (or so we thought) and trusted

Brandon in his role makes it all the harder to have a conversation, I know, but I worry that we do more damage by being silent. He's been convicted now; it is no secret. We don't want the learning opportunity to get away …

(Second Schladt Decl., Ex. 61 (Albers Email) at Bemidji014575 (ellipsis in original).)

### E. Mr. Bjerknes' T-Shirt Design Business

Prior to his arrest, Mr. Bjerknes operated a t-shirt design business, Bjerknes Designs, from which the District purchased sports-related merchandise for its schools. (Vaughn Dep. Tr. at 45:16–51:9; Third Markowitz Decl., Ex. 6 (Lutz Dep. Tr.) at 80:12–25.) For example, BMS purchased t-shirts for its basketball tournament and prizes for its curling tournament. (Vaughn Dep. Tr. at 46:16–49:14.) After Mr. Bjerknes' arrest, the District stopped making new contracts with Bjerknes Designs. (*Id.* at 49:14.) However, BMS honored a pre-existing contract for the mock-ups of the 2017 curling prizes because they were manufactured before Mr. Bjerknes' arrest. (*Id.* at 47:16–49:14.) Dean Vaughn estimated that the curling prizes cost $500–600. (*Id.*)

In addition, after Mr. Bjerknes arrest, a parent-run booster club for the Bemidji High School track team chose to honor its contract with Bjerknes Designs for t-shirts that had already been ordered and produced. (Lutz Dep. Tr. at 81:9–84:20; Vaughn Dep. Tr. 51:4–24.) The Bjerknes-produced t-shirts formed a "minimal" part of a larger order mainly comprised of shirts from a different company. (Hess Decl., Ex. E; FD1 Dep. Tr. at 88:7–12.)

JD1's parents learned about the track t-shirts through text messages with friends. (FD1 Dep. Tr. at 91:8–15.) They subsequently asked Superintendent Hess and Troy Hendricks, Activities Director, to disseminate a message to parents about the origins of the

shirts and to offer a refund; FD1 recalled Superintendent Hess agreeing to do so. (*Id.* at

91:16–92:2, 94:6–95:17, 101:13–20.)

An email reflects that on April 24, the track coaches formulated the following

message to share with the student athletes:

> As some of you may be aware, some of our spirit wear was purchased from
> Bjerkness [sic] Designs. The clothing was ordered and purchased prior to the
> allegations against Mr. Bjerkness [sic]. If you feel you do not want to wear
> the t-shirts from Bjerkness [sic] Designs, we will fully refund your money
> when you return the T-shirts to us, no questions asked. We apologize for any
> inconvenience or undue stress this may have caused you or your family. If
> you have any questions, please feel free to talk to Coach Lehman or Coach
> Sneide.

(Third Markowitz Decl., Ex. 21.)

When FD1 did not hear anything further, he followed up with Mr. Hendricks over

the phone. (FD1 Dep. Tr. at 103:19–104:1.) Though FD1 could not recall the dates, he

testified that he called Mr. Hendricks again about a week later, saying he "hadn't heard

anything yet." (*Id.* at 104:2–4.) Mr. Hendricks shared that the track coaches "didn't really

want to let the parents know." (*Id.* at 103:19–104:7.) Email exchanges from May 3 appear

to confirm the track coaches' views. On May 3, Mr. Hendricks emailed Coaches Chris

Lehman and Steven Sneide, stating:

> I received a call 15 minutes ago from [Father Doe 1]. He said he hasn't seen
> anything information yet from the coaches about the attire?? I need to get
> back to him where this is . . . .We don't want to create drama by not
> communicating to the parents if we have not done so.
>     Can you tell me when you sent that out? Last time we talked you and
> Steve were formulating something to be emailed or handed out to the kids.

(Second Schladt Decl., Ex. 62 (ellipsis in original).) Coach Lehman emailed Coach Sneide,

without copying Mr. Hendricks, in response:

> SO SICK OF THE [DOE 1 FAMILY]!!!!!!!!!!!!!!!!!!!!!!!!!! I AM NOT DOING THIS!!! WE NEED TO WRITE SOMETHING BACK TO TROY SAYING WE ARE NOT DOING THIS THEY ALREADY KNOW THE TIMEFRAME OF THE ORDER, NO ONE HAS TURNED IN A SHIRT, THEY HAVEN'T APPOLOGIZES [sic] TO US OR JULIE. "F" THEM!!!

(*Id.*) Coach Lehman drafted a separate email to Mr. Hendricks, which included in relevant part:

> [We] feel that we had already made a statement to the athletes regarding the timeline of when the shirts were ordered and paid for prior to the allegations with Mr. Bjerkness [sic]. NO one has brought their shirts back and asked for a refund. The only one that is still making a big deal with this is the [Doe 1 Family] and you have meet [sic] with [MD1] so she knows the timeline of the t-shirt order. If they want something sent out to the parents it can come from the school district. According to Dr. Hess and Mr. Hickman this is a done deal. We want to move on with this and coach the athletes. We do not have time to deal with this anymore, we made a statement to the team already. We don't have everyone [sic] contact info.

(Second Schladt Decl., Ex. 63.)

Because FD1's older daughter participated in the high school track team, FD1 went one day after practice to express his "disappointment" about the Bjerknes Designs t-shirts, to ask for a refund, and to reiterate his request for a message to parents. (FD1 Dep. Tr. at 87:2–88:14.) In response to FD1's concerns, FD1 recalled Coach Sneide saying, "I'm sorry. We can't really do anything about it. It's already been done. It's already history." (*Id.* at 105:8–12.) He recalled the other coach, Brian Berntsen, interjecting and agreeing with FD1 that they could share a message with parents. (*Id.* at 89:12–22, 105:12–15.) Although he could not recall explicitly informing Coaches Sneide and Bernsten that JD1 was a victim of Mr. Bjerknes, FD1 believed that they knew as much because of FD1's previous communications with Superintendent Hess and Mr. Hendricks. (*Id.* at 90:5–92:22;

96:10–18.) He recalled expressing "something to the fact that this was upsetting to me because of . . . [being] involved [with Mr. Bjerknes' sexual abuse]." (*Id.* at 90:14–19.)

While the record is unclear, it appears that the track coaches eventually sent athletes home with a "slip" to share with their parents, containing either the exact message from April 24 or a substantially similar message. (*See* Pls.' Opp'n at 21 (citing Schladt Decl., Ex. 60 and describing it as going home with students);[6] FD1 Dep. Tr. at 105:16–20, 109:12–17; Lutz Dep. Tr. at 83:11–19 (stating that the activities director prepared and sent out to families a statement along the lines of "'As you may be aware of by now, some of our spirit wear or clothing was purchased from Bjerknes Designs. If you' – 'if you ordered something and no longer want to purchase that and pay for it, you can have your money back.'"); Hess Decl., Ex. E.)

FD1 and MD1 remained "concerned that there was inadequate follow thru [sic]" on disseminating a message to parents, so they met with Superintendent Hess again in early May. (Hess Decl., Ex. E.) Afterward, Superintendent Hess emailed Mr. Hendricks that he expected "that any orders would be canceled and anyone wishing to return their spirit wear would be reimbursed the full purchase amount." (*Id.*) Superintendent Hess further instructed:

> If you or the track coaches have not yet sent out an email or note to the parents Please [sic] do so soon. Parents may feel that wearing garments from Bjerknes might be disrespectful to those who were victimized. We all need to put this behind us as soon as we can.

---

[6] Plaintiffs' Exhibit 60 is an undated, unsigned paragraph with language identical to the April 24 message formulated by the track coaches. (Second Schladt Decl., Ex. 60.)

(*Id.*) Mr. Hendricks responded:

> [K]ids were told all t-shirts ordered from Bjerkness Design [sic] could be
> returned with full reimbursement, no questions asked. Last week the coaches
> gave the athletes a note to take home to parents, as they don't have all
> participants emails, not wanting to miss anyone. This was also explained to
> them by the coaches. They could send out the email to the families they have
> contacts to, but not sure that's going to accomplish anything. The coaches
> are trying to put this behind them as well and last check, no t-shirts were
> turned in.

(*Id.*) Superintendent Hess forwarded this message to JD1's parents on May 8, 2017. (*Id.*)

### E. Mr. Bjerknes' Resignation

HR Director Hickman testified that the District was required to schedule a hearing

for Mr. Bjerknes to discuss the allegations before it could dismiss him. (Hickman Dep. Tr.

at 124:15–21 ("Before you can implement disciplinary action against a public employee,

you need to have a meeting or a hearing with them and their union rep or a representative

. . . to respond to allegations before you can proceed with implementation of the

consequence.").) The District scheduled this meeting for April 13. (First Hickman Decl.,

Ex. Q; Hess Decl., Ex. A.)

On April 12, Mr. Bjerknes' attorney wrote to HR Director Hickman asking to

reschedule because he (the attorney) had a previously scheduled meeting and would be

unable to attend. (First Hickman Decl., Ex. Q.) Additionally, he informed Mr. Hickman

that Mr. Bjerknes "has been instructed not to submit to any interviews at this time." (*Id.*)

HR Director Hickman testified that Mr. Bjerknes' attorney called him to change the date

of the meeting and asked if the District would accept a resignation. (Hickman Dep. Tr. at

124:24–125:5.) Mr. Hickman responded that "we would accept a resignation if it happened

immediately. And he understood that there would be no chance of any future employment irregardless of the criminal case." (*Id.* at 125:9–13.)

Mr. Bjerknes submitted a letter of resignation to Mr. Hickman on Sunday, April 16, which Mr. Hickman forwarded to Superintendent Hess. (First Hickman Decl. Exs. R, S; Hess Decl., Ex. H.) The next morning, Mr. Hickman responded that "[t]he School Board will be asked to accept your letter of resignation at the regular meeting tonight. With submission of this letter, we will not need to meet today as previously scheduled." (First Hickman Decl., Ex. T; Hess Decl., Ex. J.) Superintendent Hess informed the School Board. (First Hickman Decl., Exs. R, S, T; Hess Decl., Ex. J.)

### F. Impact on JD1

JD1 struggled with her mental health before Mr. Bjerknes' sexual abuse. (*See, e.g.*, Second Schladt Decl., Ex. 30 (Medical Record Excerpt DOE0014993).) As a result of the abuse, however, JD1 suffered from trauma, depression, anxiety, and other related mental health diagnoses. (Second Schladt Decl., Ex. 29 (Medical Record Excerpt DOE0014831).) JD1 had a history of engaging in self-harm, specifically cutting herself "every couple weeks," before learning that "Brett Larson" was Mr. Bjerknes. (JD1 Dep. Tr. at 55:7–56:23.) JD1 testified that her cutting increased because of Mr. Bjerknes' sexual abuse. (*Id.* at 55:7–56:23, 93:1–18; *see also* FD1 Dep. Tr. at 177:1–3 ("[H]er cutting incidents increased, her outbursts increased, conflicts increased.").)

One cutting event was so severe that JD1 required stitches. (Second Schladt Decl., Ex. 1 (Therapist Dep. Tr.) at 43:1–4.) The therapist ("Therapist") who completed a crisis assessment, and who continued to treat JD1 after this event, testified that at the hospital

JD1's parents spoke about "the rape that occurred with Brandon Bjerknes and their concerns how symptoms of her mental health had escalated."[7] (*Id.* at 45:12–15.) JD1 testified that Mr. Bjerknes' sexual abuse contributed to at least two suicide attempts that occurred sometime in 2020–2022. (JD1 Dep. Tr. at 137:9–138:16.)

Mr. Bjerknes' sexual abuse affected JD1's ability to trust others, particularly romantic partners. (JD1 Dep. Tr. at 44:9–13, 47:22–48:19, 50:16–21, 93:6–13.) She described several relationships with partners who mistreated or abused her and stated that she did not advocate for herself in these situations because of Mr. Bjerknes' sexual abuse. (*Id.* at 80:7–85:18.) MD1 testified that, at least once after Mr. Bjerknes' arrest, JD1 engaged in sexually explicit online communications with an older male. (MD1 Dep. Tr. at 131:21–132:2.) In 2021, JD1 shared with Therapist that she "was disgusting and she watches videos about serial rapists and killers of women to protect herself to keep safe." (Therapist Dep. Tr. at 182:12–15.)

FD1 testified that Mr. Bjerknes' sexual abuse has affected JD1's relationships with family members and friends as well as her "schooling . . . emotions . . . self-esteem . . . [and] growth." (FD1 Dep. Tr. at 172:16–24.) He testified that it has contributed to her depression, anxiety, and anger. (*Id.* at 176:13–15.) Therapist testified that her "understanding was things like [JD1's] self-harm, reactivity, isolation, fixated interest . . . were heightened in correlation with some timeline having to do with Brandon Bjerknes."

---

[7] Therapist explained that she used the word "rape because that's what I do in my profession when people experience child sexual abuse or child sexual violence because it's just appropriate to use the word rape instead." (Therapist Dep. Tr. at 45:7–11.)

(Therapist Dep. Tr. at 90:1–5.) She testified that "although [JD1] had difficulty in her relationship with her parents ahead of seeing [Therapist], that was exacerbated after [Mr. Bjerknes' sexual abuse]." (*Id.* at 86:22–87:2; *see also* MD1 Dep. Tr. at 135:17–136:13 (describing JD1 becoming more isolated from and secretive towards her parents).)

At BMS, JD1 did not recall her classmates teasing, blaming, or treating her differently for being a victim of Mr. Bjerknes, and she did not share any instances of bullying or teasing with her parents. (JD1 Dep. Tr. at 60:19–61:5; FD1 Dep. Tr. at 124:7–126:8; *see also* MD1 Dep. Tr. at 89:7–91:6.) However, JD1 testified that S1 disclosed her identity as a victim to other students, which upset her. (JD1 Dep. Tr. at 61:20–62:9.)

Throughout the 2016–2017 school year, JD1 was frequently marked tardy and struggled with missing assignments, particularly in her science class, which her parents had discussed with BMS teachers and administrators before Mr. Bjerknes' arrest. (*See, e.g.*, FD1 Meeting Notes at DOE0015410–12; FD1 Dep. Tr. at 128:2–130:18, 131:16–132:18, 134:9–136:16; Vaughn Dep. Tr. at 27:16–29:15.) For example, JD1's parents met with Principal Hildenbrand in December 2016 to discuss why she regularly arrived late to her science class after lunch. (FD1 Dep. Tr. at 119:11–120:20.) JD1's parents believed she might be reluctant to go to the school nurse for a prescribed medication in front of her classmates. (*Id.*) Principal Hildenbrand did not give a conclusive explanation for JD1's tardies. (*Id.* at 121:4–121:17.) FD1's parents subsequently emailed Mr. Sneide, who "didn't explain why [she was late]" but did explain that it was "typically with [S1]." (*Id.* at 121:25–122:4.) JD1 did not share with her parents the reason for her tardiness. (*Id.* at 120:13–15.)

FD1 testified that prior to Mr. Bjerknes' arrest, JD1 once arrived late to school because she did not want to go and refused to get out of the car. (*Id.* at 137:19 – 138:1.) He recalled another morning when JD1 was upset "to the point where she was opening drawers and throwing things on the floor" because she could not find something that she wanted; she arrived late to school as a result. (*Id.* at 138:3–15; MD1 Dep. Tr. at 18:3–19:5.) FD1 believed both incidents were related to Mr. Bjerknes' sexual abuse because "the stress levels were up higher . . . It didn't take quite as much to get someone irritated" after they discovered JD1's Facebook communications with "Brett Larson." (FD1 Dep. Tr. at 138:20–23.)

FD1 testified that after the arrest, JD1's ability to focus and perform well in school decreased and her missing assignments and tardies increased. (*Id.* at 176:6–9, 296:5–297:9.) The record reflects that on March 28, Mr. Sneide marked JD1 tardy for science class because she arrived five minutes late. (Third Markowitz Decl., Exs. 20, 48; Vaughn Decl., Ex. E.) JD1 testified that she was late from walking with S1, who walks slowly and talks to others in the hallway. (JD1 Dep. Tr. at 17:19–18:16.) JD1 also recalled being behind in her science assignments, and that Mr. Sneide would not allow her to partially complete certain science packets. (*Id.* at 15:21–17:11; *see also* Second Schladt Decl. Ex. 3 (JD1's Answers to Interrogs.) at 12 ("Sneide would only accept fully completed assignments.").) JD1 testified that she could not complete the packets because she was struggling with thoughts about Mr. Bjerknes. (JD1 Dep. Tr. at 65:2–23.)

In addition, on March 30, JD1 was "found by a staff member hanging out in the bathroom" instead of attending her fourth hour class and was given an in-school suspension

for April 4. (Vaughn Decl., Ex. G.) On April 6, FD1 emailed Dean Vaughn asking why JD1 was marked absent from her sixth hour class and asking if she met with a truancy officer. (*Id.*, Ex. B.) The record does not contain Dean Vaughn's response.

FD1 "emailed Hildenbrand, Sneide, and/or Vaughn every two or three weeks to complain about the problems in Sneide's class." (JD1's Answers to Interrogs. at 12.) At some point, MD1 and FD1 "met with Hildenbrand in person about Sneide. During that meeting, Hildenbrand told [them] that they were being 'helicopter parents.'" (*Id.*) Principal Hildenbrand did not recall meeting separately with JD1's parents after the arrest apart from the meeting that occurred on March 28 with the other administrators. (Hildenbrand Dep. Tr. at 184:20–22.) He testified that he did not recall JD1's parents asking him to address the tardies that she received after Mr. Bjerknes' arrest and he denied calling them "helicopter parents." (Hildenbrand Dep. Tr. at 185:19–187:3.)

### G. Impact on JD2

JD2's classmates quickly realized that she was one of Mr. Bjerknes' victims. (JD2 Dep. Tr. at 130:5–7.) According to her stepfather ("FD2"), after Mr. Bjerknes' arrest, JD2 described being alienated and blamed by her friends because "they liked [Mr. Bjerknes] and didn't believe he did it." (Third Markowitz Decl., Ex. 16 (FD2 Dep. Tr.) at 37:24–38:2, 44:2–7.) JD2 testified that because students did not know the full story, "everybody thought that I knew it was him and everybody would make fun of me for texting my principal because everybody was under the impression that that's what I was doing." (JD2 Dep. Tr. at 136:23–137:3.)

JD2 described classmates staring at her, whispering about her, and posting on an anonymous messaging application that she "was the reason [the] principal is in prison, like just disrespectful, kind of inferring things too." (*Id.* at 140:14–20, 179:7–15.) Students talked about JD2 "texting, sexting Mr. Bjerknes" and saying "that [JD2 is] into old men and that they thought that's what [she] was going for." (*Id.* at 137:8–25.) In her art class, "students regularly talked about how awful it was that Jane Doe 2 sexted with Bjerknes. They accused Jane Doe 2 of ruining Bjerknes's life, and they asked her if she ever stopped to think about Bjerknes's kids." (JD2's Answers to Interrogs. at 17.) JD2 testified that because she was told not to discuss Mr. Bjerknes' sexual abuse, she did not speak up when other students talked about her. (JD2 Dep. Tr. at 138:1–6.)

JD2 described one incident in which a classmate stated in front of her entire history classroom that she "was talking to [the] principal on purpose sexually." (*Id.* at 139:20–23.) Because the teacher did not respond in any way, JD2 could not confirm that he heard the student's comment. (*Id.* at 140:1–7.) JD2 could not recall whether she reported the student, though she remembered fearing retaliation if she were to do so. (*Id.* at 141:2–10.) Another time, a student "responded to friendly teasing from JD2 by saying 'at least I didn't send a bunch of nude pictures to the principal.'" (JD2's Answers to Interrogs. at 17.) JD2 and MD2 spoke with Principal Hildenbrand about this incident, who said that "he could call the student down to the office to talk, but that that response would make everything worse for JD2." (*Id.*)

JD2 initially took up the proposal of eating lunch in the counselor's office because "eating in the cafeteria was a little scary." (JD2 Dep. Tr. at 148:17–19.) Counselor Stade

acknowledged that JD2 did so "a few times," but admitted that she "didn't really do any counseling of [JD2]." (Second Schladt Decl., Ex. 2 (Stade Dep. Tr.) at 23:12–16; *see also* MD2 Dep. Tr. at 118:15–17.) JD2 recalled that, on the occasions that she did eat in the counselors' offices, she told them about the staring and whispering. (JD2 Dep. Tr. at 171:13–173:1.) The District's proposal to adjust the schedules of JD2's friends so that she would have friends in every classroom was never implemented. (MD2 Dep. Tr. at 119:13–120:9.)

The District allowed JD2 to arrive late to and leave early from school to avoid potential confrontations with other students, although JD2 testified that one teacher would not let her leave early on at least one occasion. (JD1 Dep. Tr. at 151:11–154:3; MD2 Dep. Tr. at 121:18–22.) JD2 believes her mother spoke with administrators about this because she subsequently was able to leave class without being stopped. (JD2 Dep. Tr. at 154:4–12.) MD2 confirmed that she picked up JD2 from school early several days during the spring and that whenever MD2 asked the District to excuse JD2's absences, the District did so. (MD2 Dep. Tr. at 121:18–128:7, 196:10–198:18.) That spring, MD2 "visited [BMS] three or four times a week to meet with Hildenbrand, talk to school counselors, or take Jane Doe 2 out of school early." (JD2's Answers to Interrogs. at 12.)

MD2 testified that, within a month of the arrest, she urged Principal Hildenbrand to hold a school-wide assembly to accurately explain to students the scope of Mr. Bjerknes' sexual abuse and to educate them about social media safety. (MD2 Dep. Tr. at 165:1–10.) MD2 testified that Principal Hildenbrand did not want to hold an assembly because, in his view, "that's not how [the bullying and blaming] is going to go away . . . if we keep talking

about this it's not going to go away or get better." (*Id.* at 164:10–17.) Instead, "Hildenbrand said that MD2 should stop talking about it." (JD2 Answers to Interrogs. at 11–12.)

In the same period, MD2 testified that she reported "at least five" instances of bullying to Principal Hildenbrand. (MD2 Dep. Tr. at 173:25–175:5.) Despite her reports, the bullying continued, which she relayed to Principal Hildenbrand. (*Id.* at 174:18–23.) "[W]hen the bullying would not stop, Hildenbrand told MD2 that they needed to stop talking about it . . . [and] that the only way to make the situation better was to leave it alone." (JD2's Answers to Interrogs. at 17.) Principal Hildenbrand "finally told MD2 to stop coming into the school." (*Id.*) The District's records of bullying incidents for the year 2016–2017 do not reflect any reports of bullying against JD2. (*See* Zachman Decl., Ex. C; Second Schladt Decl., Exs. 64, 65.) MD2 also attempted to reach out to Superintendent Hess following Mr. Bjerknes' arrest but never heard back. (MD2 Dep. Tr. at 221:13–20.)

Social Worker Winge checked in with JD2 three times, all within a month and a half of Mr. Bjerknes' arrest, with each meeting lasting 10–15 minutes. (Winge Dep. Tr. at 22:11–24:9.) Ms. Winge could not recall specifically what JD2 shared with her, but stated that JD2 did not bring up any issues that Ms. Winge felt "needed additional interventions." (*Id.* at 22:21–22.) Ms. Winge shared with Counselors Zachman and Stade, as well as Principal Hildenbrand, that based on these conversations with JD2 she did not have "any further concerns." (*Id.* at 25:5–22.)

JD2 met with a counselor from North Homes a few times at the end of the 2016–2017 school year and in the beginning of the 2017–2018 school year, at the District's expense. (Third Markowitz Decl., Ex. 25; First Hickman Decl., Exs., J, DD, EE; JD2 Dep.

Tr. at 185:2–18; MD2 Dep. Tr. at 130:14–132:9, 236:6–237:8.) JD2 testified that she was in "survival mode" and felt anxious and "very depressed" after Mr. Bjerknes' arrest, which caused her to self-harm by cutting. (JD2 Dep. Tr. at 225:15–24, 239:15–22.) She has struggled to sleep through the night ever since. (*Id.* at 199:16–200:10.)

JD2's stepfather testified that he noticed a "distinct change" after Mr. Bjerknes' arrest: "Things didn't matter to [JD2] as much anymore after that." (FD2 Dep. Tr. at 91:17–92:9.) MD2 testified that JD2 became more "isolated" and "withdrawn," "lost a lot of friends," and "lost trust for people." (MD2 Dep. Tr. at 185:19–24, 223:8–25.) Because of Mr. Bjerknes' sexual abuse, JD2 struggles to trust others in romantic relationships, has "never dated somebody [her] age or younger," and is uncomfortable with the idea of sex. (JD2 Dep. Tr. at 198:19–199:4.)

JD2 testified about an incident in the spring of 2017 when she "bought two large energy drinks and one of my friends mentioned you're going to have heart attack and I was like 'good', just like joking, and she texted my mom." (*Id.* at 224:5–10.) Her friend and MD2 "were both like crying and stuff and I was like, sorry. It's too dark of a joke. But I definitely was at a really dark stage there, but they did take that wrong." (*Id.* at 224:22–225:1.) MD2 recalled that her response to the situation "ended up being an overreaction." (MD2 Dep. Tr. at 146:14–147:11.) JD2's stepfather testified that years later, he learned from MD2's parents that JD2 had considered suicide. (FD2 Dep. Tr. at 47:22–14.)

JD2 testified that, before Mr. Bjerknes' arrest, she "love[d] school" and had many friends. (JD2 Dep. Tr. at 193:1; MD2 Dep. Tr. at 55:7–9.) She participated in extracurricular activities like student council, swimming, and volunteering, and was active

in her church. (JD2 Dep. Tr. at 22:16–25:1; MD2 Dep. Tr. at 55:12–22.) After Mr. Bjerknes' arrest, JD2 described feeling "uncomfortable in the building, uncomfortable around the students." (JD2 Dep. Tr. at 169:17–18.) JD2 felt that "even the teachers didn't know how to act around [her]," that they did not want to talk to her and were even scared to do so. (*Id*. at 169:19–170:4.) JD2 described having "truancy problems" because she "really didn't want to go [to school]." (*Id.* at 193:5–7.) MD2 did not recall ever receiving a truancy notice related to JD2's absences. (MD2 Dep. Tr. at 222:8–13.)

JD2 missed "all kinds" of assignments, and MD2 testified that JD2's grades went from good to "poor." (*Id.* at 222:25–223:4; JD2 Dep. Tr. at 195:8–19.) Later that spring, "[w]hen the District sent out report cards, MD2 noticed that JD2 was failing several classes. MD2 approached Hildenbrand about the things he had previously said regarding [not worrying about] JD2's grades. Hildenbrand responded that he never actually said any of those things." (JD2's Answers to Interrogs. at 12.)

The record reflects that, on April 17, 2017 Principal Hildenbrand emailed JD2's language arts teacher to request a grade adjustment for an assignment on which JD2 had received a 0. (Hildenbrand Decl., Ex. J.) Mr. Hildenbrand noted that "[JD2] would have been in the midst of counseling and 'Brett Larson' issues for at least 20 business days of March." (*Id.*) The teacher adjusted JD2's grade to give her half credit. (Hildenbrand Decl., Ex. K.)

JD2 recalled an incident in high school, during the 2019–2020 school year, when a classmate loudly asked, "remember what happened to you in middle school?" (JD2 Dep. Tr. at 141:25–142:20.) JD2 remembered the class going silent and staring at her because

"everybody heard it." (*Id.*) Describing the impact this had, JD2 said "it's like years after [Mr. Bjerknes' sexual abuse] happened and it's like still haunting me." (*Id.* at 142:17–20.)

She and MD2 reported the incident to BHS Assistant Principal Jill Walter. (Third Markowitz Decl., Ex. 23 (Walter Email).) Ms. Walter said that she would meet with JD2's classmate, but JD2 did not know if any follow up occurred. (*Id.*; JD2 Dep. Tr. at 142:21–144:10; MD2 Dep. Tr. at 175:24–176:7.) After the meeting, MD2 texted MD1 "Jill was great." (Third Markowitz Decl., Ex. 39.) To avoid her classmate and because she was failing that class, JD2 used a "Restorative Room" during that hour for the remainder of the year and focused on her other classes. (Walter Email; JD2 Dep. Tr. at 143:22–24.) JD2 never interacted with that classmate again because "[JD2] completely avoided her ever since." (JD2 Dep. Tr. at 144:14.)

JD2 testified that, after Mr. Bjerknes' arrest, she began to experience anxiety and "big panic attack[s]" during class. (*Id.* at 193:15–194:7.) She testified that "I cannot sit in a classroom comfortably without like starting to sweat and like my heart starting to beat way too fast and like my eyes welling up." (*Id.* at 193:25–194:3.) Mr. Bjerknes' sexual abuse has "screwed up [her] ability to even focus on [school]." (*Id.* at 195:16–17.) JD2 recalled that she "used to be so good at [school] without even trying." (*Id.* at 195:18–19.) Teachers would compliment her about her posture and "about doing everything right." (*Id.* at 200:11–25.) She stated that, "now I can't even pay attention to anything . . . My posture is just crunched and insecure." (*Id.*)

JD2's school-related anxiety "didn't go away," causing her to try online learning before ultimately dropping out of school entirely. (*Id.* at 194:4–19; MD2 Dep. Tr. at

217:22–218:7, 223:10–18; JD2's Answers to Interrogs. at 13.) JD2 left the District "mostly" because of how other students acted in the wake of Mr. Bjerknes' arrest. (MD2 Dep. Tr. at 223:15–18.)

### F. Mr. Bjerknes' Sentencing

Mr. Bjerknes pleaded guilty in September of 2017 to federal charges of Coercion and Enticement of a Minor to Engage in Sexual Activity, in violation of 18 U.S.C. §§ 2422(b) and 2247, and Production of Child Pornography, in violation of 18 U.S.C. §§ 2251(a) and 2251(e). (*See* Federal Change of Plea Hearing Tr. at 3:11–13, 14:22–25, 15:17–19.) He also pleaded guilty to state charges of Engaging in Electronic Communication Relating to or Describing Sexual Conduct with a Child, in violation of Minn. Stat. § 609.352, in October 2017. (*See* Beltrami Cnty. Plea Tr. at 6:22–7:1.) Mr. Bjerknes is currently serving a 25-year prison sentence.[8] (Federal Sentencing Hearing Tr. at 71:2–5.)

### G. Prior Incidents of Abuse in the District

The District had investigated other employees for sexually inappropriate conduct towards students in the years before Mr. Bjerknes' arrest. In 2004, a custodian at BHS was dismissed for watching a female student entering or exiting the locker room showers. (Hess Dep. Tr. at 106:8–107:12; Second Hickman Decl. ¶ 3.)

In the fall of 2008, a first-grader reported that John Wangberg, a teacher at District school J.W. Smith Elementary, had touched her inappropriately. (Second Schladt Decl.,

---

[8] Mr. Bjerknes is serving his federal and state sentences concurrently. (Federal Sentencing Hearing Tr. at 71:6–9.)

Exs. 39, 40; Hickman Dep. Tr. at 24:22–25:10.) The District, the Minnesota Department of Education, and local law enforcement each conducted investigations and concluded that no misconduct had occurred. (Second Schladt Decl., Ex. 39; Hickman Dep. Tr. at 25:5–10; Hess Dep. Tr. at 114:3–4.) Later during the school year, in February 2009, a kindergartner reported that Mr. Wangberg took pictures of her bottom, but the allegations could not be substantiated. (*See* Second Schladt Decl., Ex. 41.)

In March 2011, another kindergartner reported that Mr. Wangberg touched her inappropriately, made her sit on his lap, and showed her photos on his school computer while they were alone in his office. (Second Schladt Decl., Ex. 42 (Wangberg Investigation Notes) at Bemidji012353–54.) Her parents made a police report before informing the District, at which point the District placed Mr. Wangberg on paid administrative leave. (*Id.* at Bemidji012355–56; Hickman Dep. Tr. at 68:6–73:17; Second Schladt Decl., Ex. 44.) Before the police confiscated his school-issued computer, the District searched its files for inappropriate images and found none. (Wangberg Investigation Notes at Bemidji012355; Hickman Dep. Tr. at 76:14–77:4.) A forensic examination later revealed images of "child erotica (young girls in bikinis)" on the computer, none of which were identified as images of children with whom Mr. Wangberg worked. (Second Schladt Decl., Ex. 36 at Bemidji013886.)

Because Mr. Wangberg had given notice of his intention to retire before the parents' report to the police, he retired after being placed on paid administrative leave. (Hickman Dep. Tr. at 82:10–84:5.) After he left the District, throughout 2011 and 2012, several other parents informed the police that Mr. Wangberg engaged in inappropriate behavior and

sexual misconduct with their young children while alone in his office. (*See* Second Schladt Decl., Exs. 36, 45, 46, 47.) These reports included incidents of: blindfolding students and photographing them eating; removing a student's shirt; holding a student by the pelvis over his head; giving a student prizes for allowing him to touch her bottom over her clothes; holding a student upside down and photographing her vagina; and forcing students to try on t-shirts in his office while he remained in the gym with the rest of the class. (Second Schladt Decl., Ex. 36 at Bemidji013860–61, Bemidji013886–7; Second Schladt Decl., Ex. 47 at Bemidji012497.)

In January 2013, Mr. Wangberg was arraigned on several charges of sexual misconduct, but he committed suicide before his proceedings were completed. (Second Schladt Decl., Ex. 38; Second Schladt Decl., Ex. 48 ¶ 4; Lutz Dep. Tr. at 108:24–109:4.) The District settled multiple civil suits related to Mr. Wangberg's conduct. (Second Schladt Decl., Ex. 49; Rule 26(f) Report at 3.)

Also in 2011, a District employee accidentally texted a pornographic photo to a student which they had intended to send to another adult. (Hickman Dep. Tr. at 157:13–20.) The District immediately dismissed the employee. (*Id.* at 158:16–17.) In 2012, a middle-schooler reported that "a teacher was making them feel uncomfortable with unwanted attention." (*Id.* at 158:22–159:19.) The District conducted an investigation, disciplined the employee (though HR Director Hickman could not recall the exact measures), and referred the employee to counseling. (*Id.*)

Shortly before Mr. Bjerknes' arrest, a middle school student reported a bus driver behaving inappropriately towards an eight-year-old student.[9] (*See* Second Schladt Decl., Ex. 51 (Bus Driver Documents); Hickman Dep. Tr. at 160:22–161:12.) The driver's conduct included brushing the student's hair, telling her he loved her, asking her to sit in his lap, and swiping his hand across her chest. (Bus Driver Documents at Bemidji022030.) The same middle school student reported that two years earlier, the bus driver had asked her sister to stay late on the bus, which her mother prohibited. (*Id.*; Stade Dep. Tr. at 80:23–81:23.) Counselor Stade made a mandatory report. (Bus Driver Documents at Bemidji022028–31; Stade Dep. Tr. at 79:15–80:22.) The District placed the bus driver on paid administrative leave, and the bus driver then resigned during the investigation. (Hickman Dep. Tr. at 161:23–162:2; Bus Driver Documents at Bemidji022044–45.)

### H. District's Policies and Trainings

The District maintains non-discrimination, anti-bullying, Internet, and reporting policies based on model policies promulgated by the Minnesota School Boards Association ("MSBA"), and updates them as recommended by the MSBA. (First Hickman Decl. ¶ 3, 5; *Id.*, Exs. A1–A10.; Lutz Dep. Tr. at 184:4–185:1.) In addition, on an annual basis, the

---

[9] Plaintiffs describe the incident occurring in 2016. (*See* Pls.' Opp'n at 11.) However, an email about the report and the Suspected Child Abuse/Neglect Referral Form submitted by Counselor Stade are dated March 2017. (Bus Driver Documents at Bemidji022025–33.) One of the letters from the District to the bus driver is dated April 2016, though the body of the letter references an upcoming meeting in April 2017 and a second letter is also dated 2017. (*Id.* at Bemidji022044–45.) HR Director Hickman initially testified that the report occurred in 2016 and later submitted a declaration stating it occurred in 2017. (Hickman Dep. Tr. at 160:21–22; Second Hickman Decl. ¶ 4.)

District reviews the policies in its student handbooks and its code of conduct. (Lutz Dep. Tr. at 118:2–6; 121:13–122:16, 184:4–185:1.)

After the investigation and retirement of Mr. Wangberg, the District did not review or change its policies outside of its regular annual process. (Hess Dep. Tr. at 117:5–9; Lutz Dep. Tr. at 119:17–24 ("We're doing [wh]at we were doing at the time[:] . . . making sure we have the latest policies in place[,] . . . making sure that our practices are such that we can guaranty [sic] the security and the safety of all of our staff and our students[,] . . .[and] providing education."); Cardenuto Dep. Tr. at 80:9–13.) The District did install additional windows in doors at Mr. Wangberg's former elementary school. (Lutz Dep. Tr. at 110:22–111:17; Cardenuto Dep. Tr. at 80:22–24.) Additionally, the elementary school implemented a practice of keeping doors open when an employee meets alone with a student, though the District could not confirm whether the policy applies District-wide. (Lutz Dep. Tr. at 110:22–111:17, 112:16–23, 113:15–114:1; Cardenuto Dep. Tr. at 80:25–81:5.)

The District's Curriculum Director, Colleen Cardenuto, testified that the District does not conduct a specific training on detecting inappropriate relationships between students and staff, but that the District's mandated reporter training touches on the subject. (Cardenuto Dep. Tr. at 193:5–194:16.) Ms. Cardenuto testified that the District does not provide training or written guidelines about being alone with students, although she expected that "[it] would be a discussion with new teachers" and a discussion held by "most principals" at the beginning of the year. (*Id.* at 199:21–200:4.) However, as needed, the District may assign individual staff members to complete a training on staff-to-student

relationships; this training is not otherwise mandatory. (Hickman Dep. Tr. at 162:20–25 (discussing assigning such training to a staff member who was providing emotional support to a student via text messages in 2018); First Hickman Decl., Ex. D (Sexual Misconduct Staff-to-Student Training Materials); First Hickman Decl., Ex. V ¶ 3.)

Each year during the first week of school, teachers review the BMS Student/Parent Handbook ("Handbook") and relevant policies with their students. (Vaughn Dep. Tr. at 138:10–12; Cardenuto Dep. Tr. at 90:4–6, 103:16–19; First Hickman Decl., Ex. A-3 (Handbook).) The Handbook prohibits sexual harassment and bullying and explains how to report those issues. (Handbook at 24–28, 35–40.) In addition to the review in school, parents are supposed to review the contents of the Handbook with their child and submit a signed slip attesting that they have done so. (Cardenuto Dep. Tr. at 103:19–22; FD1 Dep. Tr. at 53:18–54:9.)

### 1. Internet Acceptable Use Policy

The District's "School Properties - Internet Acceptable Use Policy" ("Internet Policy") sets the "policies and guidelines for access to the school district computer system and acceptable use of the Internet, including electronic communications." (First Hickman Decl., Ex. A-7 (Internet Policy) at Bemidji004286.) Users "are expected to use Internet access . . . to further educational and personal goals consistent with . . . school policies." (*Id.*)

Prohibited uses of the system include: "access[ing], review[ing], upload[ing], download[ing,] stor[ing] . . . receiv[ing], transmit[ting], or distribut[ing]: . . . pornographic, obscene, or sexually explicit material or other visual depictions that are harmful to minors."

(*Id.*) The Internet Policy also prohibits using the District system "to engage in any illegal act or violate any local, state, or federal statute or law." (*Id.* at Bemidji004287.) An employee "may" also violate the Internet Policy by engaging in unacceptable uses "when off school district premises." (*Id.* at Bemidji004288.) Violations of the Internet Policy can lead to disciplinary action for students and employees alike. (*Id.* at Bemidji004288–89.)

Moreover, despite Principal Hildenbrand's statement that the District did not monitor, the Internet Policy states that the District:

> [W]ill monitor the online activities of both minors and adults and employ technology protection measures during any use of such computers by minors and adults. The technology protection measures utilized will block or filter Internet access to any visual depictions that are: 1. Obscene; 2. Child pornography; or 3. Harmful to minors.

 (*Id.* at Bemidji004289.)

The Internet Policy contains a section entitled "LIMITED EXPECTATION OF PRIVACY," which provides that:

> A. . . . Users should expect no privacy in the contents of personal files on the school district system.
> B. Routine maintenance and monitoring of the school district system may lead to a discovery that a user has violated this policy, another school district policy, or the law. . . .
> E. School district employees should be aware that the school district retains the right at any time to investigate or review the contents of their files and email files.

(*Id.* at Bemidji004290; *see also* Lutz Dep. Tr. at 145:24–146:5; First Hickman Decl., Ex. A-9 (Miscellaneous – Expectations of Privacy) ("[C]omputer systems and all other property of the School District may be entered and searched/reviewed by School District personnel at any time, without notice.").)

50

The District's IT Coordinator, Anthony Andrews, explained that "monitor" as used in the Internet Policy means visual monitoring of student and staff device usage by their teachers and supervisors, respectively. (Andrews Dep. Tr. at 71:13–15, 72:24–73:4, 111:12–18, 131:14–132:23.) During Mr. Bjerknes' tenure as Assistant Principal, the District utilized a technology called iBoss to filter and block Internet access to certain websites based on prohibited categories. (*Id.* at 76:5–78:21.) Mr. Andrews testified that the Internet Policy's reference to "technology protection measures" corresponded to the filtering performed by iBoss. (*Id.* at 134:20–135:10.) He testified that the District did not block social media sites from teacher devices. (*Id.* at 119:17–24.)

## 2. Sexual Misconduct Reporting

The District's "Mandated Reporting of Child Neglect or Physical or Sexual Abuse Administrative Procedures" ("Mandated Reporting Policy") is violated when:

> [A]ny school personnel fails to immediately report instances of . . . sexual abuse when the school personnel knows or has reason to believe a child is being . . . sexually abused or has been . . . sexually abused within the preceding three years.

(First Hickman Decl., Ex. A-4 (Mandated Reporting Policy) at Bemidji004472.) The Mandated Reporting Policy does not require the identity of the alleged perpetrator to be included in the report. (*Id.* at Bemidji004475.) When the alleged perpetrator is believed to be a District employee, the District "shall conduct its own investigation independent of [the Minnesota Department of Education] and, if involved, the local welfare or law enforcement agency." (*Id*. at Bemidji004477.)

In addition to the Mandated Reporting Policy, the District's "Title IX Sex Nondiscrimination Policy, Grievance Procedure and Process" ("Title IX Policy") requires "[a]ny employee of the school district who . . . becomes aware of unlawful sex discrimination, including sexual harassment, [to] promptly report the allegations to the Title IX Coordinator without screening or investigating the report or allegations." (Second Schladt Decl., Ex. 66 (Title IX Policy) at Bemidji011435.)

All District staff are required to watch a mandated reporting training before the first day of school each year. (Cardenuto Dep. Tr. at 189:11–19.) In 2016–2017, students were assigned to report abuse to either Dean Vaughn or Mr. Bjerknes according to their last name. (*Id.* at 91:7–20; Handbook at 2, 12, 37.)

When asked about the information JD1's parents reported to Ms. Vaughn and Mr. Zachman in September 2016, Principal Hildenbrand testified that he would have expected them to report this information to either him, the school social worker, or the school resource officer. (Hildenbrand Dep. Tr. at 70:16–71: 20.) The District's current superintendent, Timothy Lutz, testified that if JD1's parents had reported that they suspected "Brett Larson" was an adult connected to BMS, he "would have reported it to my superiors and would have asked for an investigation to take place." (Lutz Dep. Tr. at 13:1–3, 94:11–17.) He also testified that "in Ms. Vaughn's shoes, I would have recognized that . . . [law enforcement] . . . would be the right place to go . . . because the school district wouldn't have the forensic capability of even beginning such a search." (*Id.* at 95:7–12.)

For his part, HR Director Hickman testified, in the context of discussing Mr. Wangberg's abuse, that the District "always conduct[s] an independent investigation" after

a parent makes a report of sexual misconduct by an employee. (Hickman Dep. Tr. at 74:13–
14.) However, he also testified that "if it's already reported to law enforcement, they
wouldn't need a subsequent report from me that was redundant, but I would need to contact
them to request documents and indicate that . . . I may have information that could be
helpful to their investigator." (Hickman Dep. Tr. at 174:2–7.) Additionally, he testified that
if the only information was a "vague statement" that "Brett Larson" was an adult "who was
connected with the middle school, . . . the fact that there was already a report to law
enforcement . . . [means] there wouldn't be any expectation that [Ms. Vaughn] would
contact me or the superintendent or any other district administrator." (*Id.* at 176:21–
177:14.)

### 3. Bullying Policies

The District's "Bullying Prohibition Policy" ("Bullying Policy") prohibits bullying
by individuals and groups while on school premises. (First Hickman Decl., Ex. A-8
(Bullying Policy) at Bemidji004510.) It instructs that, "[n]o teacher, administrator,
volunteer, contractor, or other employee of the school district shall permit, condone, or
tolerate bullying." (*Id.*) Moreover, "[a]pparent permission or consent by a student being
bullied" is immaterial. (*Id.*) The Bullying Policy states that the District will investigate all
complaints of bullying and discipline offenders. (*Id.* at Bemidji004511.)

The Bullying Policy defines bullying as:

intimidating, threatening, abusive or harmful conduct that is objectively
offensive and:
1. an actual or perceived imbalance of power exists between the student
engaging in the prohibited conduct and the target of the prohibited conduct,
and the conduct is repeated or forms a pattern; or

2. materially and substantially interferes with a student's educational opportunities or performance or ability to participate in school functions or activities or receive school benefits, services, or privileges.

(*Id.* at Bemidji004511–12.)

The District conducts a yearly "Bullying Training" for its staff to identify student bullying. (Cardenuto Dep. Tr. at 112:2–22, 189:11–19.) As for student resources, the District places "bully boxes," where students can anonymously report bullying incidents using "bully slips," around BMS, including one in each pod. (*Id.* at 115:10–17; Vaughn Dep. Tr. at 204:16–205:6.) Students are taught in sixth and seventh grade how to use the bully boxes. (Vaughn Dep. Tr. at 138:13–20.) In addition, students may report bullying incidents in person to administrators or anonymously online. (*Id.* at 205:7–206:6; Cardenuto Dep. Tr. at 115:18–21.) The District also provides students with additional trainings and activities according to monthly themes; for example, October is bullying month and February is kindness month. (Cardenuto Dep. Tr. at 142:13–19.)

### 4. Positive Peer Relations Program

Since 2004, BMS has maintained a Positive Peer Relations ("PPR") program, which broadly addresses student character development. (*Id.* at 48:16–20; Winge Dep. Tr. at 11:4–19.) The PPR curriculum is "review[ed] and update[d]" every May and incorporates feedback from student Peer Leaders. (Cardenuto Dep. Tr. at 55:12–13; *see, e.g.*, First Winge Decl., Ex. B (PPR Committee Work Day 2016) at Bemidji005848–49.) The curriculum includes material on bullying, "sexting," and "Internet safety." (Cardenuto Dep. Tr. at 38:25–39:12.) In the 2015–2016 school year, the curriculum included multiple lessons on cyberbullying for each grade level. (First Winge Decl., Ex. A.)

PPR lessons are supposed to occur once monthly, (Cardenuto Dep. Tr. at 142:8–12), though it appears that sometimes teachers do not complete the required lessons. (PPR Committee Work Day 2016 at Bemidji005849 ("Several teachers are not teaching PPR – this will be referred to Mr. Hildenbrand.").)

### 5. NetSmartz Training and D.A.R.E.

Beginning in 2016, the District implemented a program created by the Minnesota Bureau of Criminal Apprehension, NetSmartz, about safe Internet use and information sharing.[10] (Third Markowitz Decl., Ex. 12 (Hunt Dep. Tr.) at 48:14–49:18.) NetSmartz addresses online privacy, how to respond to inappropriate requests, and whom to trust online, among other topics. (*See* Hunt Decl., Ex. B.) NetSmartz encourages students to report anyone who: sends adult photos or videos, discusses adult content, asks for pictures, or asks to meet up. (*Id.* at Bemidji011926.)

Officer Hunt presented NetSmartz to BMS staff in March 2016 as well as to eighth grade students sometime before the end of the school year. (Hunt Dep. Tr. at 49:21–50:20; Hunt Decl. [Doc. No. 164] ¶ 4; Hunt Decl., Exs. A, B.) BMS "rolled out parts of [NetSmartz] over three years" until it was embedded within the PPR curriculum.

---

[10] Officer Hunt testified that he first taught Netsmartz in 2016. (Hunt Dep. Tr. at 49:15–18.) Ms. Cardenuto agreed, though she testified that seventh grade students were given the program in addition to eighth grade students. (Cardenuto Dep. Tr. at 43:17–44:15, 187:6–19.) While Principal Hildenbrand could not confirm at his deposition when the program began, (*see* Hildenbrand Dep. Tr. at 18:23–19:22, 105:19–106:2, 161:14–162:9), he later submitted a declaration that he "do[es] not doubt that [Officer Hunt] is right [about the timing of the first NetSmartz lesson]." (Hildenbrand Decl. [Doc. No. 167] ¶ 10.) An email from Principal Hildenbrand as well as meeting agendas support a 2016 start date. (Hildenbrand Decl., Exs. C, G, H.)

(Hildenbrand Dep. Tr. at 19:20–22.) While Officer Hunt also presented NetSmartz to adult groups in the community, he never presented the program specifically to the families of District students. (Hunt Dep. Tr. at 56:7–18.) FD1 recalled attending a NetSmartz presentation at his church during JD1's eighth grade year, in October 2016. (FD1 Dep. Tr. at 50:14–53:7, 282:10–283:22.)

Officer Hunt also taught Drug Abuse Resistance Education ("D.A.R.E.") programming to sixth grade students. (Hunt Dep. Tr. at 10:24–18; Hunt Decl. ¶ 3.) In 2014–2017, D.A.R.E. lessons included "Making Safe and Responsible Choices," "Resistance Strategies," and "Responding to Peer Pressure." (Hunt Decl. ¶ 3.)

## I. Expert Opinions

### 1. Plaintiffs' Experts

The parties each retained experts during discovery. Plaintiffs retained John Carney and Dr. Carol Shakeshaft. (Second Markowitz Decl. [Doc. No. 151], Exs. 2 (Carney Decl.), 5 (Shakeshaft Report).) Both submitted reports and were deposed by the District. (Carney Decl.; Shakeshaft Report; Second Markowitz Decl., Exs. 1 (Carney Dep. Tr.), 6 (Shakeshaft Dep. Tr.).)

#### a. Mr. Carney

Mr. Carney is a certified digital forensics expert and information technology expert, and the Chief Technology Officer of Carney Forensics. (Carney Decl. ¶ 1–2.) Plaintiffs tasked him with answering two questions:

1. Based on your review of the record in this case, did Bemidji School District implement appropriate technological protection measures to

comply with its Internet and Device Usage Policy during the 2016-2017
school year?

2. Did other technologies exist during the 2016-2017 school year that
Bemidji School District could have used to ensure compliance with their
Internet and Device Usage Policy?

(*Id.* ¶ 5.)

Mr. Carney found that the "District failed to implement appropriate and effective
technology protection measures to comply with its Internet and Device Usage Policy
during the 2016-2017 school year." (*Id.* ¶ 10, 71.) He identified 38 messages sent by Mr.
Bjerknes that were "not blocked or filtered by the District's protection measure even
though several keywords (e.g. naked, tank top, shorty shorts, hotttttt, I LOVE spandex)
should have triggered detection." (*Id.* ¶ 16.)

Additionally, Mr. Carney opined that technologies were available prior to the 2016-
2017 school year that the District could have utilized to comply with its Internet Policy.
(*Id.* ¶ 31, 72.) He found that these technologies have the capacity to block social media
sites and filter encrypted private messages of the type used by Mr. Bjerknes. (*Id.* ¶ 31–70.)

### b. Dr. Shakeshaft

Dr. Carol Shakeshaft has a Ph.D. in Educational Administration and is a professor
in the Department of Educational Leadership at Virginia Commonwealth University.
(Shakeshaft Report at 4.) She researches and writes about educator sexual misconduct and
its prevention. (*Id.*)

Dr. Shakeshaft testified that she expected the District would have taken "some kind
of steps" after Mr. Wangberg's arrest to prevent further instances of employee sexual
abuse. (Shakeshaft Dep. Tr. at 148:6–19.) She opined that the District's inability to prevent

Mr. Bjerknes' sexual abuse "was probably a function of the lack of training which was an obstacle to discerning and reporting the warning signs of predation in the abuser and the abused." (Shakeshaft Report at 73.) Dr. Shakeshaft found that "[t]he most damaging of the omissions of policy by the [District] is the total absence, during the period in question, of any required Board-required training about (1) educator sexual misconduct, (2) the dangers of the Internet or (3) cybercrimes." (*Id.* at 52.)

Dr. Shakeshaft identified a training, "Sexual Misconduct Staff-to-Student," provided to District staff in 2009 and 2016, which she stated should be provided annually. (*Id.* at 55.) She noted that "[the District] provided comprehensive and appropriate training for its 'staff' although that group was undifferentiated. Teachers and administrators have different responsibilities . . . [The District's] training was not sufficiently specific to those various responsibilities." (*Id.* at 59.) She found "no evidence that the [District's training] materials emphasized the impossibility of minors 'consenting' to illegal acts and thus the impossibility of consensual sex with minors." (*Id.* at 52.)

Dr. Shakeshaft also opined that the District inadequately supervised employees:

> Sexual abuse of students is diminished through active supervision of the organization. This includes building sweeps, checking rooms and offices at lunch and before and after school to make sure that an adult is not alone with a child. The conventional features for Bemidji Area Schools include recognizing when an educator is alone with a child, especially behind closed doors. Similarly concerning signals are children who are recruited individually or in groups for protracted, non-instructional time with an educator. The practice is especially significant if the invitations are exclusive [and discriminatory] and if they are reinforced or rewarded with treats or preferential treatment. All of those characteristics were present with Bjerknes, whose office was next door to the office of the principal.

(*Id.* at 66.)

Dr. Shakeshaft found that a lack of adequate training left BMS students "ignorant of the possibility of abuse by a school employee . . . [and] unprotected." (*Id.* at 62.) She opined that the trainings lacked information about the behavioral patterns of perpetrators, including questionable but not criminal grooming behaviors, real-life examples, details about protecting students from retaliation for reporting, or indicators that the District "welcomed, would follow-up, would investigate, and would act on" student's reports. (*Id.* at 60–61.) Dr. Shakeshaft noted that "[n]one of the curriculums, to be taught by educators, enlisted teachers in protecting school students from educator sexual misconduct." (*Id.* at 61.)

Dr. Shakeshaft further opined: "Reporting is a bulwark against adult employee sexual misconduct. The prospect of reporting has a deterrent effect – not sufficient, but important, nonetheless." (*Id.* at 62.) She noted that "[a]n investigation [under Title IX] is to be timely, impartial, thorough, objective, and professional," and that the District's Mandatory Reporting Policy "requires that an employee who knows of inappropriate behavior or possible abuse must still report to district administration," even if the police have already been notified. (*Id.* at 64, 66.)

Finally, Dr. Shakeshaft opined that an institution's obligations following employee sexual abuse include "resol[ving] those instances in accordance with policies, law, rules, regulations, and best practices . . . includ[ing] stopping the abuse, preventing its recurrence, and protecting victims and reporters from retaliation. (*Id.* at 71.) She found that BMS' anti-bullying curriculum was "not sufficient to alert administrators or teachers to the effect of . . . exposing the victims to retaliation from other students." (*Id.* at 73, 77.) Additionally, she

found that the District's policy revisions post-Bjerknes "remain short of an effective and comprehensive campaign to prevent educator sexual abuse of students, including through social media and web resources." (*Id.* at 73.)

### 2. Defendant's Experts

In rebuttal to the Plaintiffs' experts, the District retained Mark Lanterman and Leslie Hainrihar Chretien. (Third Markowitz Decl., Ex. 49 (Lanterman Report); Second Markowitz Decl., Ex. 4 (Supp. Lanterman Report); Johnson Decl. [Doc. No. 143], Ex. A (Chretien Report).)

### a. Mr. Lanterman

Mr. Lanterman is the Chief Technology Officer of Computer Forensic Services, with over thirty years of experience analyzing digital evidence. (Lanterman Report at 2.) He opined that the District's technology for network monitoring in 2016–2017, iBoss, could not have made the contents of Mr. Bjerknes' encrypted Facebook and Snapchat messages viewable to the District. (*Id.* at 9–11.) He also found that, even with such capabilities, the messages Mr. Carney identified as having traversed the District's network are "not subject to any reasonable filter criteria." (*Id.* at 14.) Thus, he ultimately opined that "the District could not reasonably have discovered Bjerknes's criminal conduct by technical means." (*Id.*)

In his supplemental report, Mr. Lanterman disagreed that ContentKeeper, a technology Mr. Carney identified at his deposition, could access and filter the content of Mr. Bjerknes' private, encrypted messages. (Supp. Lanterman Report at 2, 9.) He opined:

> Even assuming that one or more of ContentKeeper's products 1) was used by the District during the 2016–2017 school year, and 2) could provide visibility into private, encrypted communications, the messages at issue here contained words which would have to be programmed or configured as pre-defined "trigger" words or phrases, such that the application would detect their presence and alert district staff.

(*Id.* at 2.)

### b.  Ms. Chretien

The District's second expert, Leslie Hainrihar Chretien, is an educational consultant who worked as a public school educator for 40 years, including serving as a superintendent for three years. (Chretien Report at 3–4.) Ms. Chretien opined that Dr. Shakeshaft did not base her analysis on the guidance materials relevant for educators in a Minnesota public school during the 2016–2017 school year. (*Id.* at 7–13.) Ms. Chretien disagreed with Dr. Shakeshaft that the information JD1's parents provided in September 2016 required Dean Vaughn and Mr. Zachman to make a mandatory report or initiate an internal investigation. (*Id.* at 29–33.)

She found that Minnesota public school districts were not required to enact standalone policies addressing educator sexual misconduct or to train personnel, students, or parents specifically on educator sexual misconduct. (*Id.* at 13–17, 24.) Ms. Chretien stated that the District satisfied its duty to develop and implement anti-bullying, sexual harassment, and violence policies. (*Id.* at 46.)

Ms. Chretien opined that the District adequately trained its employees in protecting the physical, social, and emotional health of their students. (*Id.* at 50.) In particular, Ms. Chretien found that:

"As early as 2008 and continuing through the 2014–15 school year, [the District] provided district-wide professional development that focused on bullying, the effects of bullying on students, and interventions to bullying. As sexting and other cybercrimes became more prevalent among school age students, [the District] and BMS responded by adding professional development and training opportunities on topics such as internet safety, sexual violence, and cybercrimes."

(*Id.* at 50.)

In addition, she opined that the District met its responsibility to filter Internet traffic, to visually monitor student and employee Internet use, and to educate students about Internet safety. (*Id.* at 18–29, 50.) Finally, Ms. Chretien found that BMS "students were provided numerous and regular opportunities to learn about, discuss, and practice skills that could keep them safe." (*Id.* at 42.)

## J.  Procedural Background

Plaintiffs commenced this action on January 13, 2020 in Beltrami County District Court, alleging federal claims under Title IX of the Education Amendments of 1972, 86 Stat. 373, as amended, 20 U.S.C. § 1681 *et seq.* ("Title IX"), and 42 U.S.C. § 1983, the Civil Rights Act of 1871 ("Section 1983"), as well as state law claims of negligence, negligent retention, and negligent supervision. (*See* Compl.) The District immediately removed the lawsuit to federal court in light of Plaintiffs' federal claims. (*See* Notice of Removal [Doc. No. 1].)

The District filed a Motion to Dismiss all of Plaintiffs' claims, which this Court denied on August 14, 2020. [Docs. No. 8 (Motion to Dismiss), 28 (Order Denying Motion to Dismiss).]

The District now moves for summary judgment on all claims, asserting that Plaintiffs cannot prove the necessary elements of actual notice and deliberate indifference for their Title IX and Section 1983 claims. (Def.'s Mem. [Doc. No. 156] at 2.) The District further argues that Plaintiffs cannot prove the injury or foreseeability necessary to establish their negligence claims and that the District is statutorily immune from these claims. (*Id.* at 2.) Plaintiffs contend that there are genuine issues of disputed material fact which preclude summary judgment on each claim. (*See generally* Pls.' Opp'n [Doc. No. 212].)

The parties have also filed cross-motions to exclude certain expert opinions.

The District argues that Plaintiffs did not timely disclose JD1's therapist ("Therapist") as an expert witness in violation of Federal Rule of Civil Procedure 26(a)(2)(C) and that allowing her to testify as one would create unfair prejudice. (Def.'s Mem. to Excl. Therapist [Doc. No. 130] at 1–2; Def.'s Reply to Excl. Therapist [Doc. No. 219] at 11–12.) As to the Plaintiffs' other experts, the District generally argues that Mr. Carney's opinions must be excluded as speculative and unhelpful to the jury, and that Dr. Shakeshaft's opinions must be excluded as outside her expertise, lacking foundation, and stating impermissible legal conclusions. (Def.'s Mem. to Excl. Shakeshaft & Carney [Doc. No. 150] at 1–3; Def.'s Reply to Excl. Shakeshaft & Carney [Doc. No. 225].) Plaintiffs oppose both Motions. (Pls.' Opp'n to Excl. Therapist [Doc. No. 205]; Pls.' Opp'n to Excl. Shakeshaft & Carney [Doc. No. 209].)

Plaintiffs argue that Ms. Chretien's opinions must be excluded as unhelpful to the jury and as stating impermissible legal conclusions. (Pls.' Mem. to Excl. Chretien [Doc.

No. 142] at 9; Pls.' Reply to Excl. Chretien [Doc. No. 227] at 1–2.) The District opposes Plaintiffs' Motion. (Def.'s Opp'n to Excl. Chretien [Doc. No. 207].)

## II.   MOTION FOR SUMMARY JUDGMENT

### A.  Standard of Review

Summary judgment is appropriate if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A fact is 'material' if it may affect the outcome of the lawsuit." *TCF Nat'l Bank v. Mkt. Intelligence, Inc.*, 812 F.3d 701, 707 (8th Cir. 2016). And a factual dispute is "genuine" only if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In evaluating a motion for summary judgment, the Court must view the evidence and any reasonable inferences drawn from the evidence in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

Although the moving party bears the burden of establishing the lack of a genuine issue of fact, the party opposing summary judgment may not "rest on mere allegations or denials but must demonstrate on the record the existence of specific facts which create a genuine issue for trial." *Krenik v. Cnty. of Le Sueur*, 47 F.3d 953, 957 (8th Cir. 1995) (internal quotation marks omitted); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Moreover, summary judgment is properly entered "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case,

and on which that party will bear the burden of proof at trial." *Celotex Corp.*, 477 U.S. at 322.

### B. Count I – Title IX

Plaintiffs allege Title IX violations based on Mr. Bjerknes' sexual abuse and peer harassment that Plaintiffs experienced following his arrest. (Compl. ¶ 184–196; Pls.' Opp'n at 43.) Title IX provides that "[n]o person . . . shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a). Such discrimination includes sexual harassment of students by teachers as well as by peers, and Title IX creates a private right of action for damages on this basis. *Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274 (1998) (recognizing implied private right of action for teacher harassment); *Davis ex rel. LaShonda D. v. Monroe Cnty. Bd. of Educ.*, 526 U.S. 629 (1999) (recognizing implied private right of action for student harassment); *KD v. Douglas Cnty. Sch. Dist. No. 001*, 1 F.4th 591, 597 (8th Cir. 2021).

Plaintiffs bring both "before" and "after" claims. "Before" claims consider a school's actions prior to a known incident of discrimination, while "after" claims "consider the school's response after it learns of an underlying incident to determine whether the school met its obligation to handle the matter without deliberate indifference to its potential discriminatory effect." *T.C. ex rel. S.C. v. Metro. Gov't of Nashville*, 378 F. Supp. 3d 651, 668 (M.D. Tenn. 2019); *see also K.R. ex rel. Proctor v. Duluth Pub. Schs. Acad.*, No. 19-cv-999 (DWF/LIB), 2022 WL 2154970, at *9 n.15 (D. Minn. Mar. 16, 2022) (describing an after claim as "focus[ing] on deliberate indifference after the school attained knowledge

of discrimination"); *Doe v. N. Penn Sch. Dist.*, No. 20-5142, -- F. Supp. 3d --, 2022 WL 10789493, at *5 (E.D. Penn. Oct. 19, 2022) (identifying pre-incident claims, "which involve[] a school's failure to anticipate and prevent a sexual assault [or harassment]," and post-incident claims, "which involve[] the school's failure to respond properly to a sexual assault [or harassment] after it occurred and had been reported").

Plaintiffs' "before" claim concerns the District's actions prior to learning of the allegations against Mr. Bjerknes on March 20, 2017. Their "after" claim addresses the District's response to his behavior and to the peer harassment that occurred following his arrest.

### 1. "Before" Claim

To prevail on a Title IX claim for damages based on a teacher's sexual misconduct, a plaintiff must prove that "an official of the grant recipient with authority to address harassment complaints had actual notice of the teacher's alleged misconduct, and the official's inadequate response amounted to deliberate indifference to the discrimination." *KD*, 1 F.4th at 597–98 (quoting *Cox v. Sugg*, 484 F.3d 1062, 1067 (8th Cir. 2007)). In addition, the "school district's deliberate indifference must either directly cause the abuse to occur or make students vulnerable to such abuse." *Shrum ex rel. Kelly v. Kluck*, 249 F.3d 773, 782 (8th Cir. 2001).

The District argues that it did not have actual notice of Mr. Bjerknes' sexual abuse prior to law enforcement contacting Superintendent Hess on March 20, 2017. (Def.'s Mem. at 35–36.) Therefore, the District submits, it cannot be found to have been deliberately indifferent, as a matter of law, to "that which it did not know." (*Id.* at 36.)

In response, Plaintiffs point to evidence that Mr. Bjerknes behaved inappropriately with students, to a complaint made by a parent that Mr. Bjerknes was "creepy," and to the District's awareness of prior sexual misconduct by other employees. (Pls.' Opp'n at 46–48.) Plaintiffs argue that a reasonable jury could find, based on this evidence, that the District had actual notice of Mr. Bjerknes' sexual abuse and responded with deliberate indifference. (*Id.* at 48–49.)

The Supreme Court has refused to impose Title IX liability based on a constructive notice standard, *i.e.*, what the District "*should have known*." *Davis*, 526 U.S. at 642 (citing *Gebser*, 524 U.S. at 283) (emphasis in original); *P.H. v. Sch. Dist. of Kansas City, Mo.*, 265 F.3d 653, 663 (8th Cir. 2001). Actual notice is not satisfied "by knowledge that something might be happening and could be uncovered by further investigation." *Thomas v. Bd. of Trustees of the Neb. State Colls.*, No. 8:12-cv-412, 2015 WL 4546712, at *13 (D. Neb. July 28, 2015), *aff'd*, 667 F. App'x 560 (8th Cir. 2016) (citing *Doe v. Galster*, 768 F.3d 611, 617–18 (7th Cir. 2014)). Rather, establishing actual notice is "quite onerous." *KD*, 1 F.4th at 598. Courts generally consider the evidence in terms of its seriousness, offensiveness, veracity, and specificity. *A.P. v. William Jewell Coll.*, No. 19-cv-00351 (SRB), 2021 WL 5514013, at *4 (W.D. Mo. Feb. 4, 2021).[11] In the Eighth Circuit, "favoritism towards the student; inordinate time spent with the student; unprofessional conduct towards the student; and vague complaints about the teacher's behavior toward the

---

[11] However, "[i]n performing this analysis, the Court does not make credibility determinations about the evidence—a job solely belonging to the jury—but instead considers the specificity of the evidence and whether it is too vague to give rise to actual knowledge." *William Jewell Coll.*, 2021 WL 5514013, at *4.

student (which do not *expressly* allege sexual abuse of that student) fall short of creating actual notice." *KD*, 1 F.4th at 598 (emphasis in original).

*K.C. v. Mayo* is instructive. 983 F.3d 365 (8th Cir. 2020). K.C. sued her school district under Title IX and Section 1983 for failing to adequately respond to sexual abuse perpetrated by her track and softball coach when she was in the eighth grade. *Id.* at 368–69. She began to spend time with her coach outside of school in the spring of 2013. *Id.* at 366. In June, K.C.'s mother found two letters in which the coach "professed her heartfelt love for K.C.," which her mother reported to K.C.'s principal. *Id.* A few weeks later, K.C.'s mother discovered and shared with the principal text messages demonstrating the coach's "increased anxiety" about K.C. not returning her calls. *Id.* at 367. The principal consulted with the superintendent before prohibiting the coach from having further contact with K.C. *Id.* In September, the coach violated this order by attempting to pick up K.C. from a sleepover, resulting in the superintendent issuing her a Notice of Deficiency. *Id.*

None of this evidence supported a finding of actual notice. *Id.* at 368. For example, the court opined that the two love letters "were at most inappropriate but did not appear to indicate that a physical or sexual relationship existed." *Id.* Instead, the Eighth Circuit held that the school only had "actual notice" of the coach's sexual abuse on October 13, 2014, when K.C.'s mother showed the principal text messages between K.C. and the coach evidencing sexual activity. *Id.* at 369.

Here, Plaintiffs' evidence of actual notice is less suggestive than the specific reports of inappropriate behavior to high-ranking school officials that the *K.C.* court found insufficient. First, Plaintiffs point to Mr. Bjerknes' behavior at school, including hugging

and giving back rubs to students. (Pls.' Opp'n at 46.) While the Court in no way condones such behavior, JD2 testified that other teachers "d[id] that too." (JD2 Dep. Tr. at 158:5–13 (stating that she could not recall specific instances of back-rubbing because "I've had other teachers do that too.").) It appears that the behavior was not unusual enough to give the District actual notice of a sexual interest in students, much less a substantial risk of sexual misconduct.

As for hugging, Plaintiffs cite a case in which the court found that an instance of hugging was sufficient to create a fact question on actual notice, and there, the offending employee also kissed the student and touched her buttocks in the same embrace. *Gordon ex rel. Gordon v. Ottumwa Cmty. Sch. Dist.*, 115 F. Supp. 1077, 1079, 1082 (S.D. Iowa 2000). Importantly, in *Gordon*, the student's parent reported the inappropriate embrace to the principal the same day. *Id.* at 1079. By contrast, here, there is no evidence that students reported Mr. Bjerknes' hugs or back rubs to the District (or other intimate touching) or that District personnel observed such behavior.[12]

---

[12] Plaintiffs cite to additional evidence of inappropriate behavior based on comments made to MD1 by other parents:

> [MD1] also saw a student's mother . . . [who] mentioned that Bjerknes told her that her fifth-grade daughter was "sexy." . . . [MD1's] friend[] who worked at the middle school with Bjerknes told [MD1] that Bjerknes repeatedly asked her to bring her daughter to school dances . . . and that Bjerknes hugged her daughter a lot.

(JD1's Answers to Interrogs. at 16.) These statements are hearsay and therefore, the Court cannot consider them. *See* Fed. R. Evid. 801(c); Fed. R. Civ. P. 56(c).

In her declaration, JD3 stated that Mr. Bjerknes held onto her buttocks "longer than necessary" while pushing her on the playground. (JD3 Decl. ¶ 6.) She also recalled another instance when she caught Mr. Bjerknes looking down her shirt. (*Id.* ¶ 7.) But she did not state that she reported either of these incidents, and there is no way to infer that another school employee witnessed them. (*Id.*) Absent evidence showing that "an official . . . with authority to address harassment" was informed of these incidents, no reasonable jury could conclude that they put the District on notice of future sexual misconduct by Mr. Bjerknes.[13]

---

[13] Plaintiffs highlight another instance of alleged buttocks-grabbing by Mr. Bjerknes that was reported to a District social worker. (Pls.' Opp'n at 46.) This allegation comes from a Facebook post made by a third-party non-witness and is offered for its truth, i.e., that Mr. Bjerknes did in fact grab the student's buttocks and the student's parent reported it. (Third Markowitz Decl., Ex. 26 at DOE0005755.) Plaintiffs assert that the post is corroborated by the police records, citing to the testimony of Chief Deputy Walton. (Pls.' Opp'n at 13.) Under the public records hearsay exception, records or statements of law enforcement officials that set out "factual findings from a legally authorized investigation" are admissible unless "other circumstances indicate a lack of trustworthiness." Fed. R. Evid. 803(8)(c)(iii), 803(8)(B).

Mr. Walton testified that he heard about Mr. Bjerknes "grabbing [some]body's butt" during his investigation but could not recall any of the details, including whether the incident was reported to the District. (Walton Dep. Tr. at 105:16–106:4.) He did not discuss the Facebook post nor refer to a section of the police reports that does. (*Id.*) Such vague testimony does not demonstrate that the post is a "factual finding[] from a legally authorized investigation." Fed. R. Evid. 803(8)(c)(iii). Moreover, his inability to recall any details of buttocks-grabbing suggests that his testimony lacks the "trustworthiness" to corroborate this specific Facebook post. Fed. R. Evid. 803(8)(B).

Even if this post were admissible, however, it would not support a finding of actual notice. Title IX liability arises only if an "appropriate person" has actual notice, and an appropriate person is "one 'who at a minimum has the authority to address the alleged discrimination and to institute corrective measures on the recipient's behalf.'" *Plamp*, 565 F.3d at 456 (quoting *P.H.*, 265 F.3d at 661). The "mere ability to report suspicions of discriminatory conduct" is insufficient, as "each teacher, counselor, administrator, and support-staffer in a school building has the authority, if not the duty, to report." *Id.* at 458–59.

There is no "bright-line rule as to what job titles and positions automatically mark an individual as having sufficient authority or control." *Id.* at 457. However, the Eighth

Nor do students' frequent visits to Mr. Bjerknes' office support a finding of actual notice. Mr. Bjerknes' role as Assistant Principal required meeting alone with students for disciplinary and other matters, and Principal Hildenbrand testified that an assistant principal could have as many as 30 such meetings a day. (Rule 26(f) Report at 4; Vaughn Dep. Tr. at 85:25–88:20; Hildenbrand Dep. Tr. at 86:8–21.) Given his position, these meetings by themselves are insufficient to create actual notice of sexual misconduct.

Although JD2 visited Mr. Bjerknes more than others, "inordinate time spent with [a] student" does not create an inference of sexually inappropriate behavior sufficient for actual notice. *KD*, 1 F.4th at 598; *see also P.H.*, 265 F.3d at 659, 662–3 (finding complaints that "[the abusive teacher] was spending too much time with [the plaintiff], who was excessively absent and tardy, and that it was causing [the plaintiff's] grades to suffer" were insufficient to support actual notice because "[n]one of these complaints . . . voiced any suspicions of sexual abuse."). For example, in *KD*, the principal received complaints from faculty and staff members about a student visiting a teacher alone during class and lunchtime. *KD*, 1 F.4th at 588–89. The Eighth Circuit found this evidence insufficient to

---

Circuit declined to find a school counselor an "appropriate person" without evidence that the counselor "had the power to stop or prevent the harassment from occurring by taking actions such as suspending [the offending teacher] from teaching, curtailing his teaching or other school-related privileges, requiring him to attend sessions or meetings about his behavior, or ensuring that he was under greater supervision." *Id.* at 458.

The Facebook post in this case fails to identify the District social worker who received the parent's report, let alone whether the social worker had the authority to take these actions. (Third Markowitz Decl., Ex. 26 at DOE0005755.) Thus, the post does not clearly establish actual notice by an "appropriate person" and cannot, alone, be a basis for Title IX liability.

support a finding of actual notice of the teacher's sexual abuse because "none of these complaints alleged sexual abuse." *Id.* at 599.

Here, there is no evidence that any District employee complained to Principal Hildenbrand about JD2's visits before, during, or after school. Moreover, JD2 testified that she visited other teachers before school started, and HR Director Hickman confirmed that students visit the offices or classrooms of "lots of faculty" before school starts. (JD2 Dep. Tr. at 33:11–35:16; Hickman Dep. Tr. at 151:12–21.) Similarly, multiple administrators shared Mr. Bjerknes' habit of giving students candy and allowing them to charge their phones in his office. (Vaughn Dep. Tr. at 89:4–90:2; Hildenbrand Dep. Tr. at 81:7–83:21.) Thus, while hindsight may certainly raise concerns about Mr. Bjerknes' behavior, at the time these behaviors were not entirely inconsistent with the practices of other students and employees. Under the case law in this Circuit, absent a complaint "alleg[ing] sexual abuse" during these visits, they do not support a finding of actual notice. *KD*, 1 F.4th at 599.

Plaintiffs also emphasize the declaration of P1, who spoke with Principal Hildenbrand after Mr. Bjerknes asked to be a pallbearer at her daughter S2's funeral. (P1 Decl. ¶ 8.) However, "vague complaints about the teacher's behavior toward the student (which do not *expressly* allege sexual abuse of that student) fall short of creating actual notice." *KD*, 1 F.4th at 598 (emphasis in original); *Gebser*, 524 U.S. at 291 (finding that "a complaint from parents of other students charging only that [the teacher] had made inappropriate comments during class . . . was plainly insufficient to alert the principal to the possibility that [the teacher] was involved in a sexual relationship with a student"); *Plamp v. Mitchell Sch. Dist. No. 17-2*, 565 F.3d 450, 457 (8th Cir. 2009) (finding an

72

anonymous complaint asserting two students were "uncomfortable" in a teacher's class insufficient to support actual notice). P1 declared that Mr. Bjerknes called S2 "Care Bear," hugged her, and drove her home from school, and that P1 told Principal Hildenbrand that she found this behavior "creepy." (P1 Decl. ¶ 5.) This is precisely the type of "vague complaint" that the Eighth Circuit has declared does not create actual notice.[14]

Plaintiffs further argue that the District had actual notice of Mr. Bjerknes' sexual abuse based on the meeting with JD1's parents in September 2016. (Pls.' Opp'n at 46–47.) Taking the facts in the light most favorable to the Plaintiffs, the Court can infer that MD1 told the administrators that JD1 had exchanged sexually explicit messages with "Brett Larson," who was likely an adult and who was friends on social media with many students in the District. (MD1 Dep. Tr. at 52:6–15, 56:18–57:12; FD1 Dep. Tr. at 65:14–24, 67:2–15.) While this report was specific as to the subject of the abuse, it was silent as to the perpetrator.

MD1's statements did not connect "Brett Larson" to any high-ranking employee at BMS and she was unable to show the administrators screenshots of the communications because she had turned JD1's phone over to the police. (MD1 Dep. Tr. at 58:19–22; FD1 Dep. Tr. at 66:19–67:1.) It is true that if administrators had had the opportunity to view the "Brett Larson" Facebook profile, they would have seen 530 friends including BMS students, BHS students, and students at other schools in the area. (Bemidji Police

---

[14] P1 also "believe[s] that [S2] might have been one of Bjerknes's victims." (P1 Decl. ¶ 9.) P1's speculation is insufficient to defeat summary judgment. *See, e.g.*, *Clay v. Credit Bureau Enters., Inc.*, 754 F.3d 535, 541 (8th Cir. 2014); *Beaulieu v. Ludeman*, 690 F.3d 1017, 1024 (8th Cir. 2012).

Department Victim Spreadsheet; Police Report DOE0003367–3577 at DOE0003393.) While there is no doubt that the information shared by JD1's parents was deeply troubling, it was insufficient to place the District on notice that an adult teacher was the abuser.

Finally, Plaintiffs argue that the District's knowledge of sexual misconduct by other District employees before Mr. Bjerknes' sexual abuse supports a finding of actual notice, citing *Simpson v. University of Colorado Boulder*. (Pls.' Opp'n at 47 (citing 500 F.3d 1170 (10th Cir. 2007)).) *Simpson* involved the sexual assault of two University students by high school students visiting the campus as part of the football team's recruiting program. *Simpson*, 500 F.3d 1170. *Simpson*, however, is distinguishable in two important ways. Most notably, the court cautioned that the actual notice standard might not apply because the University's practices, including encouraging football players to show visiting recruits a "good time" and turning a blind eye to the results, essentially amounted to an official policy. *Simpson*, 500 F.3d at 1177–79. Here, as both parties acknowledge, the actual notice standard applies.

In addition, the evidence of actual notice in *Simpson* included multiple reports directly to the head coach of assaults committed by football players and recruits, over at least a decade, as well as a national article in *Sports Illustrated* about similar sexual assaults perpetrated by University football players. *Id.* at 1180–83. Top University officials and the football coaching staff attempted to address this problem in the years leading up to the plaintiffs' assaults, apparently to no avail. *Id.* In this case, the previous instances of sexual misconduct occurred at different schools within the District and involved in-person conduct different in kind from Mr. Bjerknes' secret social media exploitation.

In sum, Plaintiffs have not presented evidence that the District received actual notice of sexual misconduct by Mr. Bjerknes, as that term is defined in this Circuit, sufficient to create a genuine issue of disputed material fact under Title IX.[15] Because no reasonable jury could find that the District had actual notice of Mr. Bjerknes' sexual abuse prior to the disclosure by law enforcement, the Court need not address Plaintiffs' arguments as to the District's alleged deliberate indifference prior to the disclosure. Accordingly, the Court grants summary judgment to the District on Plaintiffs' Title IX "before" claim.

## 2. "After" Claim

Plaintiffs' remaining Title IX claim challenges the District's response after it learned of Mr. Bjerknes' sexual abuse. With respect to this claim, fact issues preclude summary judgment.

As noted above, for the District to be liable under Title IX for its response to Mr. Bjerknes' sexual abuse, it must be "(1) deliberately indifferent (2) to known acts of discrimination (3) which occur under its control." *Shrum*, 249 F.3d at 782. The standard

---

[15] Plaintiffs note that three people reported receiving inappropriate messages from "Brett Larson" to Mr. Bjerknes himself. (Pls.' Opp'n at 47.) However, "[w]here a school district's liability rests on actual notice principles . . . the knowledge of the wrongdoer himself is not pertinent to the analysis." *Gebser*, 524 U.S. at 291. *See also Salazar v. S. San Antonio Indep. Sch. Dist.*, 953 F.3d 273, 284–85 (5th Cir. 2017) ("Title IX does not impose liability upon a [District] when only the perpetrator had actual knowledge of his sexual harassment of a student, even if the perpetrator was authorized by the recipient to institute corrective measures on the district's behalf in response to sexual harassment by others."); *M.S. ex rel. Hall v. Susquehanna Twp. Sch. Dist.*, 969 F.3d 120, 127 (3d Cir. 2020) ("[F]or a school district to have actual knowledge, a report must be made to an appropriate person who is not the perpetrator."); *Doe II v. Savannah-Chatham Cnty. Pub. Sch. System*, No. 21-13023, 2022 WL 3041276, at *4 n.4 (11th Cir. Aug. 2, 2022) (quoting *Gebser*, 524 U.S. at 291).

for Title IX liability based on peer harassment mirrors that for teacher harassment. *Shank v. Carleton Coll.*, 993 F.3d 567, 573 (8th Cir. 2021) (enumerating identical elements).

Deliberate indifference is a "stringent standard of fault that cannot be predicated on mere negligence." *Id.* "An institution is deliberately indifferent when its response to the harassment or lack thereof is clearly unreasonable in light of the known circumstances." *Id.* (citing *Davis*, 526 U.S. at 648). Courts consider the "time it took the district to respond to complaints, the level of response, the effort expended to respond to the allegations, and the efficacy of the response." *Nissen v. Cedar Falls Cmty. Sch. Dist.*, No. 20-cv-2098 (CJW/MAR), 2022 WL 873612, at *9 (N.D. Iowa Mar. 23, 2022).

Moreover, in the context of peer harassment, school administrators enjoy "flexibility" and "courts should refrain from second-guessing the[ir] disciplinary decisions." *Davis*, 526 U.S. at 648. "Victims of peer harassment do not have a Title IX right to make particular remedial demands." *Maher v. Iowa State Univ.*, 915 F.3d 1210, 1213 (8th Cir. 2019) (quoting *Davis*, 526 U.S. at 648). Still, a school's response to peer harassment may be deliberately indifferent when it "ignored the many signals that greater, more directed action was needed." *Nissen*, 2022 WL 873612, at *11 (quoting *Zeno v. Pine Plains Cent. Sch. Dist.*, 702 F.3d 655, 671 (2d Cir. 2012)).

In addition, Plaintiffs must show that the discrimination was "so severe, pervasive, and objectively offensive that it can be said to deprive the victim[] of access to the educational opportunities or benefits provided by the school." *K.T. v. Culver-Stockton Coll.*, 865 F.3d 1054, 1057 (8th Cir. 2017) (quoting *Davis*, 536 U.S. at 650). "Damages are not available for simple acts of teasing and name-calling among school children." *Davis*,

526 U.S. at 652. Rather, the behavior must be "serious enough to have the systemic effect of denying the victim equal access to an educational program or activity." *Id.*

The District argues that it was not deliberately indifferent upon learning of the allegations against Mr. Bjerknes because it immediately placed him on leave and removed his access to District property and technology. (Def.'s Mem. at 37.) The District further asserts that it informed BMS students of the arrest, offered support to his victims, and removed references to Mr. Bjerknes from school property. (*Id.*) Regarding peer harassment, the District argues that Plaintiffs cannot demonstrate that JD1 experienced peer harassment or that JD2 experienced sufficiently severe harassment. (Def.'s Mem. at 38–40; Def.'s Reply at 3.) Alternatively, the District contends that it had insufficient notice of JD2's harassment. (Def.'s Mem. at 39; Def.'s Reply at 3.)

For their part, Plaintiffs argue that the District allowed Mr. Bjerknes to resign instead of terminating him and did not conduct its own investigation into the allegations against him. (Pls.' Opp'n at 50.) They contend that the District "outed victims, silenced conversations, refused to quash rumors, and failed to prevent misinformation." (*Id.*) Plaintiffs also argue that the District's unreliable communications with MD1 and JD1 and failure to make accommodations for JD1's academic struggles support a finding of deliberate indifference. (*Id.* at 51.) Finally, Plaintiffs assert that the District ignored or dismissed ongoing problems with peer harassment, despite multiple reports to administrators by JD2 and MD2. (*Id.* at 52–54.)

The Court finds particularly troubling the District's attempt to evade responsibility for failing to protect JD2's identity as a victim. (*See* Def.'s Reply at 3 ("That was not the

District or its decisions. That was the police, with MD2's consent.").) JD2 was pulled out of class on March 21 for her police interview and escorted back to class by an officer, in view of other students, to retrieve her phone. (JD2 Dep. Tr. at 128:15–130:25; MD2 and JD2 Facebook Messages at DOE0015361.) Although JD2 could not recall whether Officer Hunt or a police detective escorted her, the District certainly had the ability to avoid this public display and still facilitate the interview. In fact, the very same day, Principal Hildenbrand convinced the police to delay their search of Mr. Bjerknes' office to avoid raising students' suspicions. (Hildenbrand Dep. Tr. at 40:12–43:11.) The District does not explain why it could not similarly briefly delay JD2's police interview.

As for JD1's missed assignments and tardies in her science class, it is true that the record shows that these problems began before Mr. Bjerknes' arrest. (FD1 Meeting Notes; FD1 Dep. Tr. at 128:2–130:18, 131:16–132:18, 134:9–136:16; Vaughn Dep. Tr. at 27:16–29:15.) Still, after the arrest, it appears that the District did not communicate with Mr. Sneide, JD1's science teacher, about making accommodations in light of her status as a victim. (*See, e.g.*, Hildenbrand Dep. Tr. at 184:5–185:18.) And when JD1's parents attempted to bring these issues to the District's attention, the District inconsistently responded to their communications. (FD1 Dep. Tr. at 112:11–117:6.)

The District's management of JD2's police interview and response to JD1's academic struggles form only one small part of the totality of the evidence. The Court considers these actions in context with Plaintiffs' evidence of peer harassment.

The District appears to acknowledge that students such as JD1 and JD2 may suffer severe peer harassment as the result of being victims of Mr. Bjerknes' crime. At the

brainstorming meeting with JD2's parents on the Friday following the arrest, the District agreed to allow JD2 to arrive late to and leave early from school and invited her to eat lunch away from the cafeteria, measures specifically devised to avoid bullying. (MD2 Dep. Tr. at 115:17–122:17, 128:9–132:9; District Typed Meeting Notes; Winge Dep. Tr. at 21:1–22:5, 47:23–48:12; Hildenbrand Dep. Tr. at 114:5–115:24; Hickman Meeting Notes; First Winge Decl., Ex. L.) Similarly, JD1's parents met with the District within a week of Mr. Bjerknes' arrest and discussed their concerns about protecting her identity because they did not want to "put a target on [her] back." (FD1 Meeting Notes; Federal Sentencing Hearing Tr. at 31:4–6.)

In addition, the District was also aware that JD2 faced severe and ongoing peer harassment because her ex-boyfriend had shared a nude photograph of her with her classmates. (JD2 Dep. Tr. at 106:9–107:11, 108:22–109:1, 109:16–113:14.) Although this situation began before Mr. Bjerknes' arrest, Dean Vaughn's investigation notes are dated "March 23/24, 2017," showing that the fallout continued contemporaneously with it. (Vaughn Decl., Ex. C at Bemidji011894.) Moreover, these notes reveal that at least one student connected the photo to JD2's communications with Mr. Bjerknes when making disparaging remarks to others about JD2. (*Id.* at Bemidji011896–97.) This evidence demonstrates that the District knew that JD2 was already being targeted by her classmates at the time of Mr. Bjerknes' arrest. The photo investigation and the District's meetings with the Plaintiffs' parents are more than sufficient to raise a question of material fact as to the District's actual notice of peer harassment.

And whether the District's failure to adequately respond to the peer harassment constitutes deliberate indifference is a question for the jury. First, despite the agreement from the brainstorming meeting, at least one of JD2's teachers initially would not let her leave class early. (JD1 Dep. Tr. at 151:11–154:3; MD2 Dep. Tr. at 121:18–22.) Moreover, the few times that JD2 ate lunch in Counselor Stade's office, Counselor Stade "didn't really do any counseling of [JD2]," even though JD2 told Counselor Stade that her classmates were staring and whispering about her in connection with Mr. Bjerknes. (Stade Dep. Tr. at 23:12–16; JD2 Dep. Tr. at 171:13–173:1; *see also* MD2 Dep. Tr. at 118:15–17.) In the same Friday brainstorming meeting, the District also suggested that it would adjust the class schedules of JD2's friends to afford her extra protection from bullying, though the District never followed through. (MD2 Dep. Tr. at 119:13–120:9.)

Moreover, the record reflects that talk of Mr. Bjerknes' sexual abuse was pervasive among students in the wake of his arrest. Students constantly referred to and joked about Mr. Bjerknes. (S1 Dep. Tr. at 177:12–178:1.) Unidentified students placed posters that said "free Bjerknes" prominently near the entrance of the building, where JD2 observed them. (JD2 Dep. Tr. at 145:7–12.) According to JD2, these posters were not removed for hours. (*Id.*) There is no evidence that the District made any effort to discipline those who created these posters or to proactively convey to students the harm they created.

Additionally, a reasonable factfinder could find that the District tolerated instances of Bjerknes-related bullying, which supports a finding of deliberate indifference. *See N. Penn Sch. Dist.*, 2022 WL 10789493, at *9 (finding a fact question on deliberate indifference when a school downplayed reports of sexual harassment by categorizing them

as less serious misconduct); *Doe v. Fairfax Cnty. Sch. Bd.*, 1 F.4th 257, 272 (4th Cir. 2021), *cert. denied*, 143 S. Ct. 442 (2022) ("[I]mproperly trivializ[ing] and dismiss[ing]" reports of student harassment without investigation supports a finding of deliberate indifference). Students called each other, and occasionally faculty, "Brett Larson," which Counselor Zachman observed. (Zachman Decl. ¶ 11.)

Mr. Zachman stated that he did not always discipline students for this behavior, because when "there was no apparent power imbalance and the name calling did not appear to be unwelcome, but rather was part of mutual banter or joking between peers," he did not interpret it as bullying. (*Id.* ¶ 11–12.) However, the District's Bullying Policy contains two definitions of "bullying," one which references a power imbalance and another which describes conduct that "materially and substantially interferes with a student's educational opportunities or performance or ability to participate in school functions or activities or receive school benefits, services, or privileges." (Bullying Policy at Bemidji004511–12.) Mr. Zachman appears to have permitted this behavior, despite his admission that witnessing it would be traumatic to Mr. Bjerknes' victims. (Zachman Dep. Tr. at 93:19–24). Thus, a reasonable factfinder could find that Mr. Zachman was deliberately indifferent to bullying in his presence.

Finally, JD2's educational experience suffered in this atmosphere. JD2 was alienated and blamed by her friends and other students, who viewed her as "the reason [their] principal is in prison." (JD2 Dep. Tr. at 179:13–14; FD2 Dep. Tr. at 37:24–38:2, 44:2–7.) JD2 previously loved school, was a good student, and was involved in many extracurriculars; after Mr. Bjerknes' arrest, she experienced anxiety in class, missed

assignments, and suffered a drop in her grades. (JD2 Dep. Tr. at 193:5–194:7, 195:8–19; MD2 Dep. Tr. at 222:25–223:4.) Most significantly, JD2's school-related anxiety and desire to avoid her classmates never diminished, causing her to try online learning before dropping out. (JD2 Dep. Tr. at 194:4–19; MD2 Dep. Tr. at 223:10–18; JD2's Answers to Interrogs. at 13.)

The District argues that the record only contains two discrete, specific instances of harassment against JD2, and equates her experience with the "teasing and name-calling among schoolchildren" that the Supreme Court emphasized cannot constitute a valid claim for damages under Title IX. (Def.'s Mem. at 39 (quoting *Davis*, 526 U.S. at 651–52).) The first occurred shortly after the arrest, when a peer stated to JD2's entire history classroom that she "was talking to [the] principal on purpose sexually." (JD2 Dep. Tr. at 139:20–23.) The District argues that because the teacher did not respond in any way, JD2 could not confirm that he heard the student's comment. (*Id.* at 140:1–7.) Nor, the District argues, could JD2 recall whether she reported the student. (*Id.* at 141:2–10.) The second incident occurred in high school: a classmate loudly asked, "remember what happened to you in middle school?" (*Id.* at 141:25–142:20.) JD2 remembered the class going silent and staring at her. (*Id.*) She and MD2 reported the incident to BHS Assistant Principal Jill Walter, who said she would meet with JD2's classmate. (JD2 Dep. Tr. at 142:21–144:10; MD2 Dep. Tr. at 175:24–176:7; Walter Email.) The record does not reveal that any follow up occurred. (Walter Email; JD2 Dep. Tr. at 143:22–144:14.)

However, the record is not so limited. JD2 and MD2 testified that they urged the District several times to address the bullying. For example, MD2 testified that, within a

month of Mr. Bjerknes' arrest, she asked Principal Hildenbrand to hold an assembly to explain to students the significant harm caused by Mr. Bjerknes' conduct and to educate them about social media safety. (MD2 Dep. Tr. at 165:1–10.) Principal Hildenbrand explained his refusal to hold an assembly thus: "that's not how [the bullying and blaming] is going to go away . . . if we keep talking about this it's not going to go away or get better." (*Id.* at 164:10–17.) Another educator later emailed Principal Hildenbrand that BMS' lack of intentional discussion could "do more damage" than having a hard conversation about Mr. Bjerknes' sexual abuse. (Albers Email at Bemidji014575.) A reasonable jury could find that Mr. Hildenbrand's actions were deliberate and indifferent to the harm suffered by Mr. Bjerknes' victims.

Also within a month of the arrest, MD2 testified that she reported "at least five" instances of bullying to Principal Hildenbrand. (MD2 Dep. Tr. at 173:25–175:5.) The bullying continued, which MD2 testified that she shared with Principal Hildenbrand. (*Id.* at 174:18–23.) The District's records of bullying incidents for the year 2016–2017 do not reflect any reports of bullying against JD2. (*See* Zachman Decl., Ex. C; Second Schladt Decl., Exs. 64, 65.) A reasonable jury could find that the District's continued refusal to hold an assembly despite these reports "ignored the many signals that greater, more direct action was needed," *Nissen*, 2022 WL 873612, at *11, and amounted to deliberate indifference.

On the whole, the record demonstrates that JD2 and MD2 repeatedly urged BMS to act to address ongoing bullying by JD2's peers. JD2 was already in a highly vulnerable state at the time of Mr. Bjerknes' arrest. *See Nissen*, 2022 WL 873612, at *12 (finding that

school's knowledge of child's history of anxiety prior to incident of sexual assault contributed to the unreasonableness of the school's response to the assault). This pervasive peer harassment caused JD2 to leave the District and secondary education altogether. This evidence is sufficient to raise a fact issue as to whether "the [District]'s shortcoming in [addressing the peer harassment] deprived [JD2] of the educational opportunities or benefits to which she was entitled." *Shank*, 993 F.3d at 576.

Furthermore, the Court is not convinced by the District's argument that there is no material fact issue in dispute as to whether JD1 experienced harassment. (Def.'s Mem. at 38; Def.'s Reply at 3.) True, JD1 testified that her classmates did not tease, blame, or treat her differently for being a victim of Mr. Bjerknes' sexual abuse, and her parents did not recall her sharing instances of bullying with them. (JD1 Dep. Tr. at 60:19–61:5; FD1 Dep. Tr. at 124:7–126:8; *see also* MD1 Dep. Tr. at 89:7–91:6.) But FD1 noted that their communication was not very good at the time. (FD1 Dep. Tr. at 124:7–126:8; *see also* MD1 Dep. Tr. at 89:7–91:6.) Significantly, JD1 struggles to communicate about stressful topics due to her medical diagnoses. (FD1 Dep Tr. at 22:19–23:17, 36:21–37:2.) Her father specifically testified that it is difficult for her to be "very vocal" in the context of her deposition and this lawsuit. (FD1 Dep. Tr. at 162:6–25, 164:5–16; *see also* Therapist Dep. Tr. at 131:22–132:1 (describing how JD1 would "shut down and sometimes not show up for appointments" after her therapist brought up this lawsuit).) JD1 was a particularly vulnerable victim—a fact which the District knew from managing her IEP. *See Nissen*, 2022 WL 873612, at *12.

Additionally, despite JD1's parents urging the District to protect her identity as a victim, JD1's "friend" S1 disclosed her status to other students. (JD1 Dep. Tr. at 61:20–62:9.) This upset JD1. (*Id.* at 61:20–62:9.) The record contains no evidence that the District disciplined S1, despite S1's testimony that she was told twice to stop talking about Mr. Bjerknes. (S1 Dep. Tr. at 164:6–168:17, 180:15–181:21.) S1's disclosure operated in the context of students constantly referring to and joking about Brett Larson and Mr. Bjerknes' sexual abuse. (*Id.* at 177:12–178:1.)

In light of all the circumstances—JD1's vulnerability, her parents' request for confidentiality, S1's disclosure, and the general atmosphere of pervasive Bjerknes-related harassment—there is sufficient evidence for JD1's peer harassment claim to survive summary judgment.

Accordingly, the Court denies summary judgment to the District on Plaintiffs' Title IX peer harassment claim.

### C. Count II – Section 1983

Plaintiffs next allege that the District is liable under Section 1983 for violating their Fourteenth Amendment right to Equal Protection. (Compl. ¶ 197–204.) First, they assert that the District maintained a custom or policy of inaction in the face of employee sexual misconduct. (*Id.* ¶ 201.) Second, they assert that the District failed to adequately supervise or train its employees to detect Mr. Bjerknes' sexual abuse and to address the peer harassment that occurred in the wake of his arrest. (*Id.*)

### 1. Custom, Policy or Practice of Inaction

A defendant can be liable under Section 1983 "when execution of [its] policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the [plaintiff's] injury." *Monell v. N.Y. City Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978); *see also Atkinson v. City of Mountain View*, 709 F.3d 1201, 1214 (8th Cir. 2013). In order to survive summary judgment on a failure-to-act claim, Plaintiffs must present evidence that "(1) there was a 'continuing, widespread, persistent pattern of unconstitutional misconduct,' (2) the school's 'policymaking officials' were deliberately indifferent to or tacitly authorized such conduct after gaining knowledge of such conduct, and (3) [Plaintiffs] 'w[ere] injured by acts pursuant to the [school's] custom.'" *Plamp*, 562 F.3d at 459 (quoting *Thelma D. v. Bd. of Educ., City of St. Louis*, 934 F.2d 929, 933–34 (8th Cir. 1991)); *Parrish v. Luckie*, 963 F.2d 201, 204 (8th Cir. 1992) ("To establish a [District's] liability based on its failure to prevent misconduct by employees, the plaintiff must show that [District] officials had knowledge of prior incidents of [employee] misconduct and deliberately failed to take remedial action.").

When a plaintiff alleges Title IX and Section 1983 claims based on the same conduct, the actual notice analysis is the same for both statutes. *Doe v. Flaherty*, 623 F.3d 577, 584 (8th Cir. 2010) (holding that under Section 1983, as under Title IX, "an official in these circumstances must have 'actual notice' of the alleged 'sexual harassment' or 'sexual abuse.'" (quoting *Cox v. Sugg*, 484 F.3d 1062, 1067 (8th Cir. 2007))). This approach prevents a Section 1983 "constitutional action against [an] institution's Title IX policymakers" from "trump[ing] the Supreme Court's careful crafting of the implied

statutory damage action under Title IX." *Cox*, 484 F.3d at 1067. Although the Eighth

Circuit has contemplated in dicta that a distinction may exist between the deliberate

indifference analysis under each statute, it has not explicitly held as much. *See id.* at 725

n.2.[16] Thus, deliberate indifference under Section 1983, like under Title IX, is a "stringent

standard of fault." *Doe v. Dardanelle Sch. Dist.*, 928 F.3d 722, 725 (8th Cir. 2019).

The District argues that there is insufficient evidence that it acted with deliberate

indifference in the face of employee sexual misconduct that occurred prior to Mr.

Bjerknes.[17] (Def.'s Reply at 5.) Plaintiffs' brief on summary judgment does not address

their *Monell* claim on the merits. (Pls.' Opp'n at 54–55.)

---

[16] The court opined:

> [W]e do not address whether the district court should have separately
> considered whether [the defendant] was deliberately indifferent to
> unconstitutional conduct and the rights of students under [plaintiff's] § 1983
> claim and to student-on-student harassment under her Title IX claim.
> *Compare Plamp v. Mitchell School Dist. No. 17-2*, 565 F.3d 450, 459, 461
> (8th Cir. 2009) (requiring deliberate indifference to or tacit authorization of
> unconstitutional misconduct for § 1983 failure-to-act claims and deliberate
> indifference to the rights of students for § 1983 failure-to-train claims), *with*
> *Davis ex rel. LaShonda D. v. Monroe Cty. Bd. of Educ.*, 526 U.S. 629, 633,
> 119 S.Ct. 1661, 143 L.Ed.2d 839 (1999) (requiring "deliberate indifference
> to known acts of harassment in . . . programs or activities" for Title IX
> student-on-student harassment claims).

*Dardanelle Sch. Dist.*, 928 F.3d at 725 n.2. *See also Cox*, 484 F.3d at 1066 (stating that
deliberate indifference under Section 1983 requires proof of "reckless disregard of a risk
of constitutional harm.").

[17] The District makes two additional arguments, neither of which succeed. It argues
that Plaintiffs failed to plead a failure-to-act violation in their Complaint, (Def.'s Mem. at
41 n.18), but the Court has already recognized that Plaintiffs adequately pleaded this theory
in its Order denying the District's Motion to Dismiss. (Order Denying Motion to Dismiss
at 36–37.) As for the District's argument that "unconstitutional sexual harassment under

The record reflects that the District took responsive actions whenever it received a sexual misconduct report. It dismissed the locker-room observer; immediately dismissed the employee who accidentally texted an inappropriate photo; investigated and disciplined the employee who gave a student unwanted attention; investigated the initial complaints against Mr. Wangberg in coordination with the Minnesota Department of Education and law enforcement, and placed him on leave as soon as new allegations were substantiated; and made a mandatory report against the bus driver before placing him on leave. (Second Hickman Decl. ¶ 3; Hickman Dep. Tr. at 25:5–10, 82:10–84:5, 157:13–162:2; Hess Dep. Tr. at 114:3–4; Stade Dep. Tr. at 79:15–81:23; Second Schladt Decl., Exs. 39, 44, 51.) In the wake of Mr. Wangberg's arrest, the District continued to annually review and update its policies according to the suggestions of the MSBA; added windows to several classrooms at his elementary school; and created an open-door policy at the school. (Hess Dep. Tr. at 117:5–9; Lutz Dep. Tr. at 110:22–114:1, 119:17–24; Cardenuto Dep. Tr. at 80:9–81:5.)

Nothing in the record suggests that the District habitually "discouraged, ignored, or covered up" these reports of sexual misconduct or that employees "recognized they could act with impunity." *Luckie*, 963 F.3d at 205 (affirming jury verdict based on sufficient evidence of ignoring prior police misconduct to demonstrate a custom of inaction under Section 1983); *see also Mick v. Raines*, 883 F.3d 1075, 1079–80 (8th Cir. 2019) (finding

Section 1983 must be of employees," (Def.'s Reply at 5), numerous cases affirm that schools can be liable under Section 1983 for sexual misconduct perpetrated against students. *See, e.g.*, *Plamp*, 565 F.3d; *Shrum*, 249 F.3d at 778; *Doe v. Fort Zumwalt R-II*, 920 F.3d 1184, 1189 (8th Cir. 2019).

three affidavits alleging unconstitutional conduct insufficient to establish a "genuine issue of material fact regarding whether there was a widespread custom or practice of unconstitutional misconduct, *known to* and *unaddressed by* policymaking officials.") (emphasis added). Each time the District received a report of sexual misconduct, it investigated and disciplined the accused employee.

As for Mr. Bjerknes, his personnel record contained no complaints of misconduct—sexual or otherwise—at the time of his arrest. (First Hickman Decl. ¶ 10.) Moreover, every District employee asked stated that they had never received a report of misconduct or observed him behaving inappropriately. (Hess Dep. Tr. at 12:10–16, 40:16–41:15; Hickman Dep. Tr. at 14:15–18, 150:7–151:2; Hildenbrand Dep. Tr. at 54:23–56:4, 59:6–21; Vaughn Dep. Tr. at 79:23–81:10; Zachman Dep. Tr. at 18:5–14, 26:21–30:5.) Plaintiffs have not provided admissible evidence to the contrary. *Cf. Harris v. City of Pagedale*, 821 F.2d 499, 504–05 (8th Cir. 1987) (finding sufficient evidence of deliberate indifference where city officials acknowledged previous complaints of sexual misconduct against multiple officers, including the officer who assaulted plaintiff, prior to the assault). Without "notice of an ongoing pattern of sexual abuse by [Mr. Bjerknes,] the [District] may not be found to have been deliberately indifferent to or to have tacitly authorized conduct of which it was unaware." *P.H.*, 265 F.3d at 659.

In sum, Plaintiffs' evidence is insufficient for a reasonable juror to find that the District "deliberately failed to take remedial action" when it learned of employee sexual misconduct. *Luckie*, 963 F.3d at 204. Plaintiffs have thus failed to create a genuine issue of disputed material fact as to the District's deliberate indifference to employee

misconduct. Accordingly, the Court grants the District summary judgment on Plaintiffs'
Section 1983 claim based on a custom or policy of inaction.

### 2. Failure to Train or Supervise

For their remaining Section 1983 claims, Plaintiffs argue that the District failed to
adequately supervise and train its employees to (1) detect sexual abuse and (2) address peer
harassment. (Pls.' Opp'n at 55–58.)

For a failure-to-train-or-supervise theory, Plaintiffs must show that the District's
"'failure to train its employees in a relevant respect evidences a deliberate indifference' to
the rights of the students." *Plamp*, 562 F.3d at 461 (quoting *Thelma D.*, 934 F.2d at 933).[18]
Moreover, the Plaintiffs must show, in one of two ways, that the District had "notice that
its procedures were inadequate and likely to result in a violation of constitutional rights."
*Id.* at 462 (quoting *Thelma D.*, 934 F.2d at 934). First, Plaintiffs could show that the failure
to train employees "is so likely to result in a violation of constitutional rights that the need
for training is patently obvious." *Thelma D.*, 934 F.2d at 934; *Doe v. Fort Zumwalt R-II
Sch. Dist.*, 920 F.3d 1184, 1189 (8th Cir. 2019). Alternatively, Plaintiffs could show that
"a pattern of constitutional violations . . . put the [District] on notice that its employees'
responses to a regularly recurring situation are insufficient to protect the constitutional
rights of its [students]." *Thelma D.*, 934 F.2d at 935; *Fort Zumwalt*, 920 F.3d at 1189.

"Rigorous standards of culpability and causation must be applied to ensure that the
[District] is not held liable solely for the actions of its employee[s]." *Fort Zumwalt*, 920

---

[18] Claims for failure to train and failure to supervise are subject to the same analysis
under Section 1983. *Atkinson*, 709 F.3d at 1216.

F.3d at 1189 (quoting *S.M. v. Lincoln Cnty.*, 874 F.3d 581, 585 (8th Cir. 2017)). Thus, the

District's "failure to supervise or train must be the moving force [behind] the constitutional

violation." *Id.* (quoting *Canton*, 489 U.S. at 389); *see also Frischknecht v. Reeds Spring R-*

*IV Sch. Dist.*, No. 3:20-cv-05084 (RK), 2020 WL 7395143, at *3 (W.D. Mo. Dec. 16, 2020)

("[T]he deficiency in the training procedures [must] actually cause[] the [student's]

injuries." (citing *Parrish v. Ball*, 594 F.3d 993, 997 (8th Cir. 2010))).

### a.  Detection of Sexual Abuse

The District argues that Plaintiffs cannot establish that it had notice of inadequate

procedures because the risk of Mr. Bjerknes' sexual abuse was not obvious and because

the prior employee sexual misconduct is too dissimilar to constitute a pattern. (Def.'s Mem.

at 44–46.) Plaintiffs respond that the prior employee sexual misconduct is sufficient to

support a finding of actual notice. (Pls.' Opp'n at 56.)

First, having policies in place to address sexual misconduct precludes a finding of

actual notice under the "obviousness" category. *See Thelma D.*, 934 F.2d at 934 ("[W]e

need not decide whether the need to develop policies and employee training programs

addressing child abuse falls into this first notice category [of obviousness] because . . . the

record clearly indicates that the Board has developed and implemented policies and

procedures for handling complaints of sexual abuse."). The record contains numerous

District policies, in place before and during Mr. Bjerknes' sexual abuse, that address sexual

misconduct and the use of District technology and property for improper purposes. (*See*

*generally* First Hickman Decl., Exs. A1–A10, including Handbook, Internet Policy,

Mandated Reporting Policy, Title IX Policy.) Nor can a failure to properly implement or

train employees on the existing policies be a basis for finding "actual notice" based on "obviousness." *See Plamp*, 562 F.3d at 462 ("[E]vidence that personnel never received training specifically addressing teacher-on-student harassment . . . would, at most, raise a question about whether the [District's policies] w[ere] negligently administered, but it is not alone a sufficient basis upon which to find liability for failure to train.").

Second, to establish actual notice based on a pattern of prior misconduct by other employees, the Eighth Circuit requires "more than general allegations of a wide variety of sexual misconduct." *McGuire v. Cooper*, 952 F.3d 918, 923 (8th Cir. 2020). Prior instances of misconduct must be "similar in kind" or "sufficiently egregious in nature." *Id.* For example, in *McGuire v. Cooper*, the court found that reports of police officers

> trading cigarettes for a detainee's display of her breasts; licking a minor stepdaughter's nipples during horseplay; asking deeply personal and inappropriate questions to members of the public; engaging in verbal sexual harassment; having consensual sexual contact at the office; and abusing work hours to conduct personal business or ask women out on a date

were insufficient to "put a supervising official on notice that a deputy might use his position and authority to separate a woman from her boyfriend at the park and coerce her to engage in sexual contact with him." *Id.* (quotations omitted).

Likewise here, the prior acts of misconduct that Plaintiffs highlight constitute a "wide variety" of inappropriate behavior. *Id.* The incidents include a custodian observing a high school student in the locker room showers, Mr. Wangberg's abuse, a report of "unwanted attention," an employee accidentally texting a sexually explicit photo to a student, and a bus driver making inappropriate comments to, and engaging in inappropriate

physical contact with, two students.[19] (Pls.' Opp'n at 9–11). None of these incidents involved using a fictitious social media persona to sexually exploit students.

Only Mr. Wangberg's sexual abuse intentionally involved digital technology—using a camera to photograph students eating various foods, and once to photograph a student's vagina, and storing "child erotica" on his District laptop—though most of the allegations concerned inappropriate touching. (*See* Wangberg Investigation Notes; Second Schladt Decl. Exs. 36, 45, 46, 47.) In any case, Mr. Wangberg committed his abuses in person, did not use social media, and the images of "child erotica" stored on the District computer were not images of District students. (Second Schladt Decl., Ex. 36 at Bemidji013886.) While Mr. Wangberg exploited the privacy of his office to abuse his students, there is no evidence that Mr. Bjerknes engaged in physical sexual contact when alone with students in his office. (Wangberg Investigation Notes at Bemidji012353; Second Schladt Decl., Exs. 36, 45, 46, 47.) Mr. Wangberg's method of abuse is not sufficiently "similar in kind" to Mr. Bjerknes' sexual abuse to constitute a pattern of misconduct under the law. *McGuire*, 952 F.3d at 923.

The Court notes that one student reported that Mr. Wangberg photographed her vagina. (Second Schladt Decl., Ex. 36 at Bemidji013887.) Although this deplorable

---

[19] Plaintiffs also point to a 2018 report that a teacher had too close a relationship with a student as well as to FD1's testimony about a "pretty significant rumor" spread by "some influential people" that a high school teacher impregnated a foreign exchange student. (Pls.' Opp'n at 12 (citing Hickman Dep. Tr. at 162:4–17 and FD1 Dep. Tr. at 149:13–150:23.) As the former report occurred after Mr. Bjerknes' arrest, it has no bearing on whether the District had actual notice of a pattern of constitutional violations *prior* to learning of Mr. Bjerknes' conduct. The latter is plainly unsubstantiated hearsay. Fed. R. Evid. 801(c); Fed. R. Civ. P. 56(c).

incident is factually "similar in kind" to Mr. Bjerknes' sexual abuse, it doesn't establish a pattern to sexually exploit students under the law. *Brewington v. Keener*, 902 F.3d 796, 802 (8th Cir. 2018) (holding that "a single incident cannot serve as notice for a pattern of misconduct" to support a failure-to-train claim). Additionally, this report was never made to the District directly—it was made to the police after the District placed Mr. Wangberg on leave. (Second Schladt Decl., Ex. 36 at Bemidji013887.)

The record does not contain evidence of a genuine issue of disputed material fact as to the District's actual notice of a pattern of unconstitutional conduct, therefore the Court need not reach the remaining elements of Plaintiffs' claim. Accordingly, the Court grants summary judgment to the District on Plaintiffs' Section 1983 failure-to-train claim regarding the District's employee training to detect sex abuse.

### b. Addressing Peer Harassment

The District first argues that it cannot be liable for failing to train its employees to address peer harassment because "the students who allegedly bullied were not state actors." (Def.'s Mem. at 42–43; Def.'s Reply at 5.) The District relies on two cases, *D.R. ex rel. L.R. v. Middle Bucks Area Vocational Tech. Sch.*, 972 F.2d 1364 (3d Cir. 1992) and *Dorothy J. v. Little Rock Sch. Dist.*, 794 F. Supp 1405, *aff'd* 7 F.3d 729 (8th Cir. 1993), to support this assertion. Both address a school's liability under Section 1983 for failing to protect students from physical sexual assaults by other students in violation of the Due Process Clause. *D.R.*, 972 F.2d at 1367–78; *Dorothy J.*, 7 F.3d at 731–34.

Plaintiffs here do not assert a failure-to-protect theory under the Due Process Clause; rather, they assert liability under the Equal Protection Clause for failure to train

employees to adequately address and manage peer-to-peer harassment. (Pls.' Opp'n at 57, 59.) The Court already recognized as much in its Order denying Defendant's Motion to Dismiss, (Order Denying Motion to Dismiss at 39), and other courts recognize the viability of such a theory. *See Stiles ex rel. D.S. v. Grainger Cnty., Tenn.*, 819 F.3d 834, 851–52 (6th Cir. 2016); *DiStiso v. Cook*, 691 F.3d 226, 241 (2d Cir. 2012); *T.C.*, 387 F. Supp. 3d. at 684–87; *Davis v. Carmel Clay Schs.*, 570 F. App'x 602, 607–08 (7th Cir. 2014).

The District's remaining argument on this theory amounts to a single sentence: "But section 1983 liability attaches only when the supervisor 'directly participates in a constitutional violation or if a failure to properly supervise and train the offending employee caused a deprivation of constitutional rights.'" (Def.'s Reply at 5 (quoting *Tlamka v. Serrell*, 244 F.3d 628, 635 (8th Cir. 2001)).) The import of this sentence is a matter of conjecture, given that it merely quotes the failure-to-train standard from a case analyzing the adequacy of prison medical care under the Eighth Amendment. *Tlamka*, 244 F.3d at 632–35. The District has not connected this authority to evidence in this record and the Court will not speculate as to what the District intends it to show. (Def.'s Reply at 5.)

On a motion for summary judgment, it is the District's burden to prove a lack of a genuine issue of material fact in dispute. Fed. R. Civ. P. 56. The Court finds that the District has not met its burden and, accordingly, denies summary judgment on Plaintiffs' Section 1983 failure-to-train claim regarding peer harassment.

### D. Negligence, Negligent Supervision, Negligent Retention – Counts III-V

Plaintiffs' final three claims assert negligence, negligent supervision, and negligent retention. (Compl. ¶ 205–240; Pls.' Opp'n at 35–36.) The District makes three arguments

to support summary judgment on these claims: (1) Plaintiffs have not suffered sufficient physical injury; (2) statutory immunity bars the claims; and (3) Mr. Bjerknes' conduct was not foreseeable. (Def.'s Mem. at 46–52; Def.'s Reply at 6–8.)

### 1. Negligence

Negligence requires Plaintiffs to provide evidence: "(1) [of] the existence of a duty of care, (2) [of] a breach of that duty, (3) [of] an injury, and (4) [that] the breach of that duty [is] the proximate cause of the injury." *Fenrich v. Blake Sch.*, 920 N.W.2d 195, 201 (Minn. 2018). Plaintiffs allege that the District's negligence in failing to take appropriate precautions to prevent Mr. Bjerknes' sexual abuse and the subsequent peer harassment caused them "emotional distress, fear, anxiety and trauma," (Compl. ¶ 217), which led to self-harm (cutting and suicide attempts) and physical symptoms of anxiety. (Pls.' Opp'n at 40–41.)

In response, the District argues that Plaintiffs' self-harm and other physical manifestations of anxiety do not constitute an adequate injury for a negligence claim. (Def.'s Mem. at 47–49; Def.'s Reply at 6.) It contends that Plaintiffs' claim is more appropriately understood as seeking recovery for negligent infliction of emotional distress ("NIED"). (Def.'s Mem. at 47–49.) Even then, the District asserts that Plaintiffs cannot satisfy the NIED zone-of-danger requirement. (Def.'s Mem. at 49.)

The Minnesota Supreme Court has explained that emotional distress damages are only available in torts cases under three circumstances:

> First, a plaintiff who suffers a physical injury as a result of another's negligence may recover for the accompanying mental anguish. Second, a plaintiff may recover for negligent infliction of emotional distress when

physical symptoms arise after and because of emotional distress, if the plaintiff was actually exposed to physical harm as a result of the negligence of another (the "zone-of-danger" rule). Finally, a plaintiff may recover emotional distress damages when there has been a direct invasion of the plaintiff's rights such as that constituting slander, libel, malicious prosecution, seduction, or other like willful, wanton, or malicious conduct.

*Lickteig v. Alderson, Ondov, Leonard & Sween, P.A.*, 556 N.W.2d 557, 560 (Minn. 1996) (citations and quotations omitted); *see also Langeland v. Farmers State Bank of Trimont*, 319 N.W.2d 26, 31 (Minn. 1982) ("In cases in which physical symptoms occur subsequent to and because of the plaintiff's emotional disturbance, many jurisdictions, including this one, require the plaintiff to have been in some personal physical danger caused by the defendant's negligence before awarding damages for emotional distress."); *Gross v. Prestige Parking & Valet LLC*, No. A20-1635, 2021 WL 3136492, at *3 (Minn. Ct. App. July 26, 2021) ("Unless the person claiming emotional-distress damages suffered a contemporaneous physical injury, the zone-of-danger standard applies.")

Here, there are no allegations, and there is no evidence, that Mr. Bjerknes, any BMS students, or any District personnel directly physically injured the Plaintiffs. (*See generally* Compl.; Pls.' Opp'n at 21–22, 27–28, 40–41.) Rather, Plaintiffs' injuries fall into the second category described in *Lickteig*: their self-harm, including cutting and suicide attempts, and physical manifestations of anxiety, including sweaty palms, increased heart rate, and sleeplessness, "ar[o]se after and because of" their emotional distress, fear, anxiety, and trauma from Mr. Bjerknes' sexual abuse and the subsequent peer harassment. 556

N.W.2d at 560. Thus, Plaintiffs must satisfy the zone-of-danger standard to recover for their injuries. [20]

Under the zone-of-danger standard, a plaintiff must prove that she: "(1) was within the zone of danger of physical impact created by the defendant's negligence; (2) reasonably feared for her own safety; and (3) consequently suffered severe emotional distress with attendant physical manifestations." *Engler v. Ill. Farmers Ins. Co.*, 706 N.W.2d 764, 767 (Minn. 2005) (quotations omitted). Demonstrating a "zone of danger" requires more than a merely theoretical risk of harm:

> The zone of danger is limited to actual physical danger caused by the defendant's negligence. In other words, a plaintiff presents a valid claim when she experiences a reasonable anxiety, with physical symptoms, from being in a situation where it was abundantly clear that plaintiff was in grave personal peril for some specifically defined period of time. Fortune smiled and the imminent calamity did not occur. Due to concerns about unintended and unreasonable results, we have deliberately limited the zone of danger to the threat of personal physical danger.

*Wall v. Fairview Hosp. & Healthcare Servs.*, 584 N.W.2d 395, 408 (Minn. 1998) (citations and quotations omitted).

---

[20] Although Plaintiffs insist that they do not allege NIED, (Pls.' Opp'n at 40), Plaintiffs rely on two NIED cases to demonstrate the sufficiency of their injuries. (Pls.' Opp'n at 40 (citing *Miskovich v. Indep. Sch. Dist. 318*, 226 F. Supp. 2d 990 (D. Minn. 2002) and *Quill v. Trans World Airlines, Inc.*, 361 N.W.2d 438 (Minn. App. 1985)).) Moreover, other courts have analyzed physical manifestations of emotional distress using the NIED framework even where the plaintiff alleged general negligence. *See Shank v. Carleton Coll.*, 2019 WL 3974091, at *18 (D. Minn. Aug. 22, 2019) ("Carleton's allegedly negligent response to the rapes caused Shank to suffer emotional injuries, but it did not inflict or risk inflicting any physical injuries." (quoting *Shank v. Carleton Coll.*, 232 F. Supp. 3d 1100, 1111 (D. Minn. 2017))); *Gross*, 2021 WL 3136492, at *3 (holding that the district court did not err by applying the zone-of-danger analysis).

Plaintiffs argue that they were "clearly in the zone of danger as the targets of Bjerknes's abuse and the District's accompanying failures," (Pls.' Mem. at 41 n.8), but the record contains no evidence that they were threatened with personal physical danger. JD1 did not regularly interact with Mr. Bjerknes. (JD1 Dep. Tr. at 60:19–61:5; MD1 Dep. Tr. at 18:3–20:6.) JD2 frequently spent time with him, but there is no evidence that Mr. Bjerknes did more than rub her back or hug her. *See Costilla v. State*, 571 N.W.2d 587, 589, 596–97 (Minn. Ct. App. 1997) (denying NIED claim where plaintiff alleged sexual harassment including "inappropriate comments, touching, grabbing, attempted kissing, and solicitations" for lack of physical injury); *A.B. ex rel. C.D. v. Vineland Bd. of Educ.*, No. 17-11509 (RBK/KMW), 2018 WL 3141831, at *1–3, 9 (D. N.J. June 27, 2018) (finding that plaintiff who exchanged thousands of sexually explicit emails and texts with her teacher, and once kissed him on the cheek, could not sustain an NIED claim because she "simply wasn't within any conceivable zone of danger"). In addition, both Plaintiffs testified that they were never physically harmed by or afraid of being physically harmed by Mr. Bjerknes. (JD1 Dep. Tr. at 53:8–13; JD2 Dep. Tr. at 158:23–25, 206:14–18.). This testimony undermines the assertion that Mr. Bjerknes, or the District's alleged failure to take appropriate precautions, placed Plaintiffs in a zone of danger which threatened "personal physical danger." *Wall*, 584 N.W.2d at 408.

Plaintiffs rely on two NIED cases to demonstrate the adequacy of their injuries, both of which are distinguishable from the facts here. (Pls.' Opp'n at 40–41.) In *Miskovich*, the plaintiffs suffered physical manifestations of emotional distress after being erroneously physically detained, in some cases at gun point, by police officers during an active shooter

training. *Miskovich v. Indep. Sch. Dist. 318*, 226 F. Supp. 2d 990, 1007–10 (D. Minn. 2002). The plaintiff in *Quill* suffered physical manifestations of emotional distress after being a passenger on an airplane that nearly crashed. *Quill v. Trans World Airlines, Inc.*, 361 N.W.2d 438, 440, 443 (Minn. Ct. App. 1985) ("There can be few experiences as terrifying as being pinned to a seat by gravity forces as an airplane twists and screams toward earth at just under the speed of sound."). While Plaintiffs may share some similar physical manifestations of emotional distress with the plaintiffs in these cases, they lack the corresponding risk of "imminent calamity" evident from drawn weapons and falling planes. *Wall*, 584 N.W.2d at 408.

Thus, Plaintiffs' evidence of self-harm and other physical manifestations of emotional distress is legally insufficient to show the direct physical injury required for a negligence claim. Nor is there sufficient evidence raising a genuine issue of disputed material fact as to whether Plaintiffs were in a zone of danger of physical impact from the District's actions. Because the Plaintiffs' lack of adequate injury is dispositive to their negligence claim, the Court need not address the District's additional arguments as to foreseeability and statutory immunity. The Court therefore grants summary judgment to the District on Plaintiffs' negligence claim.[21]

---

[21] The Court is deeply concerned that Minnesota's common law negligence framework currently precludes recovery for injuries suffered under these circumstances. Courts have long recognized the unique trauma inflicted upon victims of child pornography. *See, e.g.*, *New York v. Ferber*, 458 U.S. 747, 757 (1982) (declining to protect child pornography under the First Amendment in part because, "virtually all of the States and the United States have passed legislation proscribing the production of or otherwise combating 'child pornography.' The legislative judgment, as well as the judgment found in the relevant literature, is that the use of children as subjects of pornographic materials is

### 2. Negligent Supervision and Negligent Retention

The District similarly challenges the sufficiency of Plaintiffs' claim for injuries from alleged negligent supervision and negligent retention. (Def.'s Mem. at 48.)

Negligent retention occurs when, "during the course of employment, the employer becomes aware or should have become aware of problems with an employee that indicated his unfitness, and the employer fails to take further action such as investigating, discharge, or reassignment." *M.L. v. Magnuson*, 531 N.W.2d 849, 857 (Minn. Ct. App. 1995). For negligent supervision, a plaintiff must prove "(1) the employee's conduct was foreseeable; and (2) the employer failed to exercise ordinary care when supervising the employee." *Doe 175 ex rel. Doe 175 v. Columbia Heights Sch. Dist.*, 873 N.W.2d 352, 358 (Minn. Ct. App. 2016).

Like general negligence, these claims require a physical injury or threat of physical injury, including when they are based on sexual harassment. *Bruchas v. Preventive Care,*

_____

harmful to the physiological, emotional, and mental health of the child."); *State v. Mauer*, 741 N.W.2d 107, 110 (Minn. 2007) (noting the "state's compelling interest in protecting the physical and psychological well-being of children" as a basis for prohibiting possession of child pornography) (quotation omitted).

Moreover, the Minnesota Supreme Court has previously found that injury is coextensive with certain forms of criminal sexual contact. *See Blackowiak v. Kemp*, 546 N.W.2d 1, 3 (Minn. 1996) (finding that "concepts of sexual abuse and injury within the meaning of [Minnesota's delayed discovery statute] are essentially one and the same, not separable—as a matter of law, one is 'injured' if one is sexually abused."); *W.J.L. v. Bugge*, 573 N.W.2d 677 (Minn. 1998) (citing *Blackowiak*, 546 N.W.2d at 3 and stating that personal injury is "implicit in the act[s] of sexual abuse" to which the delayed discovery statute applies, described in Minn. Stat. §§ 609.342–609.345).

Due to the rise of social media and the ubiquity of cellphones among children, child pornography is more easily produced and disseminated than ever before. The Court is concerned that the common law does not appear to recognize injury as inherent to the type of sexual exploitation suffered by Plaintiffs here.

*Inc.*, 553 N.W.2d 440, 443 (Minn. App. 1996); *Thompson v. Olsten Kimberly Quality-Care, Inc.*, 980 F. Supp. 1035, 1040–41 (D. Minn. 1997); *Grozdanich v. Leisure Hills Health Ctr., Inc.*, 25 F. Supp. 2d 953, 980 (D. Minn. 1998); *Radcliffe v. Securian Fin. Grp., Inc.*, 906 F. Supp. 2d 874, 895 (D. Minn. 2012); *Landy v. Upper Lake Foods, Inc.*, Nos. C3-97-1670, C7-97-1252, C8-97-1826, 1998 WL 219786, at *4 (Minn. Ct. App. 1998); *Williams v. Mesabi Reg. Med. Cen., Inc.*, No. C0-98-2169, 1999 WL 618851, at *9–10 (Minn. Ct. App. 1999) (Lansing, J. concurrence in part and dissent in part); *Langehaug v. Mary T., Inc.*, No. C4-98-1445, 1999 WL 31182, at *4 (Minn. Ct. App. 1999); *Arvidson v. MidWestOne Bank*, No. 19-cv-2336 (PJS/HB), 2021 WL 1215825, at *1 (D. Minn. Mar. 31, 2021).

Physical manifestations of emotional distress are insufficient to demonstrate injury without evidence that the offending employee had violent tendencies. *See Yunker v. Honeywell, Inc.*, 496 N.W.2d 419, 422 (Minn. Ct. App. 1993) (stating that negligent retention imposes liability "when the employer knew or should have known that the employee was violent or aggressive and might engage in injurious conduct."). For example, in *Johnson v. Peterson*, the plaintiff sued an insurance company for negligently supervising an agent who induced him to transfer money to her. 734 N.W.2d 275, 276 (Minn. App. 2007). The plaintiff alleged that he "developed medical complications including heart problems and anxiety disorders" due to the stress and anxiety of this event. *Id.* The court dismissed the complaint for inadequate injury because the plaintiff "did not allege that [the offending employee] was 'violent or aggressive and might engage in injurious conduct' . . . [and] emotional distress is not a physical injury." *Id.* at 278.

Here, as described above, neither Mr. Bjerknes nor the other students at BMS committed physical acts against the Plaintiffs which resulted in injury. Moreover, there is no evidence that Mr. Bjerknes or any students were "violent or aggressive" sufficient to demonstrate a threat of physical injury merely from being near them. *Johnson*, 734 N.W.2d at 277.

Therefore, as with their negligence claim, Plaintiffs' evidence of self-harm and physical manifestations of their emotional distress fails to raise a genuine issue of disputed material fact as to the injury or threat of injury required for negligent supervision and negligent retention. And as with their negligence claim, absent an adequate injury, the Court need not consider the District's arguments on statutory immunity and foreseeability. Accordingly, the Court grants summary judgment to the District on Plaintiffs' negligent supervision and negligent retention claims.

## III.   MOTIONS TO EXCLUDE EXPERT TESTIMONY

### A. *Daubert* Motions

The District moves to exclude the opinions of Plaintiffs' experts Dr. Shakeshaft and Mr. Carney. (Def.'s Mem. to Excl. Shakeshaft & Carney.) Plaintiffs move to exclude the opinions of the District's expert Ms. Chretien. (Pls.' Mem. to Excl. Chretien.)

Under Federal Rule of Evidence 702, proposed expert testimony must satisfy three prerequisites to be admitted. *Lauzon v. Senco Prods., Inc.*, 270 F.3d 681, 686 (8th Cir. 2001). "First, evidence based on scientific, technical, or other specialized knowledge must be useful to the finder of fact in deciding the ultimate issue of fact." *Id.* "Second, the proposed witness must be qualified to assist the finder of fact." *Id.* "Third, the proposed

evidence must be reliable or trustworthy in an evidentiary sense, so that, if the finder of fact accepts it as true, it provides the assistance the finder of fact requires." *Id.* (internal quotation marks and citation omitted).

These requirements reflect the Supreme Court's analysis in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, in which the Court emphasized the district court's gatekeeping obligation to make certain that all testimony admitted under Rule 702 "is not only relevant, but reliable." 509 U.S. 579, 589 (1993); *see also Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 149 (1999) (extending *Daubert* to technical and other specialized expert testimony). Under *Daubert*, the cornerstone for admissibility is assistance to the trier of fact. *See Larson v. Kempker*, 414 F.3d 936, 940–41 (8th Cir. 2005).

Under this standard, proponents must demonstrate by a preponderance of evidence that the expert's opinion is reliable. *Lauzon*, 270 F.3d at 686. Courts generally support "an attempt to liberalize the rules governing the admission of expert testimony," and favor admissibility over exclusion. *See id.* (internal quotation marks and citation omitted); *Daubert*, 509 U.S. at 596 ("Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence."). Doubts regarding the usefulness of an expert's testimony should be resolved in favor of admissibility, *United States v. Finch*, 630 F.3d 1057, 1062 (8th Cir. 2011), and gaps in an expert witness's qualifications or knowledge generally go to the weight of the testimony and not its admissibility, *Robinson v. GEICO Gen. Ins. Co.*, 447 F.3d 1096, 1100 (8th Cir. 2006).

104

### 1.  Dr. Shakeshaft

The District first argues that Dr. Shakeshaft, Plaintiffs' expert in educator sexual misconduct, exceeds her expertise in opining on the District's Internet filtering and monitoring. (Def.'s Mem. to Excl. Shakeshaft & Carney at 2; Def.'s Reply to Excl. Shakeshaft & Carney at 1–2.) Second, the District contends that Dr. Shakeshaft's opinions on the relevant standard of care lack foundation. (Def.'s Mem. to Excl. Shakeshaft & Carney at 24–30; Def.'s Reply to Excl. Shakeshaft & Carney at 5–6.) Third, the District asserts that certain opinions state impermissible legal conclusions. (Def.'s Mem. to Excl. Shakeshaft & Carney at 31; Def.'s Reply to Excl. Shakeshaft & Carney at 6–7.) Finally, the District argues that Dr. Shakeshaft's opinion that the District violated its own policies is unhelpful to the jury. (Def.'s Mem. to Excl. Shakeshaft & Carney at 32.)

In response, Plaintiffs argue that, as an "educator of educators," Dr. Shakeshaft is qualified to testify about the supervision of employees, including as it relates to compliance with technology monitoring. (Pls.' Opp'n to Excl. Shakeshaft & Carney at 17.) Next, Plaintiffs contend that Dr. Shakeshaft's opinions are based upon reliable sources and academic methods. (*Id.* at 18–23.) Plaintiffs further assert that Dr. Shakeshaft's testimony will help the jury understand the applicable standards and expectations for an institution addressing educator sexual misconduct, including those which derive from the District's policies. (*Id.* at 18–20.)

The Court declines to exclude Dr. Shakeshaft's testimony on the basis that she is unqualified to opine on technology measures related to staff supervision. Dr. Shakeshaft has researched, written, and lectured on the topic of educator sexual misconduct for 43

years. (Shakeshaft Report at 4.) As part of this work, she evaluates the policies and practices of schools for their effectiveness in preventing educator sexual misconduct. (*Id.*) Here, Dr. Shakeshaft's opinions related to the Children's Internet Protection Act ("CIPA"), the organization E-Rate Central, and the District's Internet Policy concern the effectiveness of the District's staff supervision to prevent sexual misconduct. (*Id.* at 67–70.) Dr. Shakeshaft does not need the knowledge of a technology expert to evaluate the adequacy of the District's staff supervision policies. Any gaps in her expertise on technological infrastructure go to the weight of her testimony, not its admissibility. *Robinson*, 447 F.3d at 1100.

Similarly, the Court will not exclude Dr. Shakeshaft's testimony for lack of foundation. While the District takes issue with the federal guidance, academic resources, and District-provided documents that Dr. Shakeshaft used to develop her opinions, other courts have recognized her methodology as reliable. *See, e.g.*, *R.P. v. Santa Fe Pub. Schs.*, No. 1:18-cv-01051 (KWR/KK), 2021 WL 1200599, at *6 (D. N.M. Mar. 30, 2021). The District further argues that Dr. Shakeshaft does not "tether [her opinions] to the relevant time or state." (Def.'s Reply to Excl. Shakeshaft & Carney at 6.) However, as the Court made clear during the hearing on this Motion, the geographic scope of the standard of care is national, not local. (Aug. 3, 2022 Hearing Tr. [Doc. No. 240] at 120:6–121:14.) And while Dr. Shakeshaft relied upon a paper summarizing the standard of care published in 2018, the paper synthesized numerous sources published prior to 2017 and Dr. Shakeshaft cited to those sources. (*See* Shakeshaft Report at 41, n.166.)

In addition, the District contends that Dr. Shakeshaft's opinions regarding Dean Vaughn's failure to report the information provided by JD1's parents in September 2016 must be excluded as unfounded or legally conclusory. (Def.'s Mem. to Excl. Shakeshaft & Carney at 29–31; Def.'s Reply to Excl. Shakeshaft & Carney at 6–7.) As to the first contention, Dr. Shakeshaft reviewed the District's own Mandated Reporting Policy, which states that employees must investigate and make a report. (Mandated Reporting Policy at Bemidji004474–75, Bemidji004477.) Dr. Shakeshaft's decades of experience evaluating institutional best practices provides her with further foundation to opine as such.

As to the second contention, "expert testimony on legal matters is not admissible" because "[m]atters of law are for the trial judge." *S. Pine Helicopters, Inc. v. Phoenix Aviation Managers, Inc.*, 320 F.3d 838, 841 (8th Cir. 2003) (citing *United States v. Klaphake*, 64 F.3d 435, 438–39 (8th Cir. 1995)). Dr. Shakeshaft does not directly opine in her report that Dean Vaughn's actions violated Title IX or any Minnesota mandatory reporting statute. (*See generally* Shakeshaft Report at 62–65.) To the extent that she suggested it at her deposition, Dr. Shakeshaft will not be permitted to share this legal conclusion with the jury. *See Doe YZ v. Shattuck-St. Mary's Sch.*, 214 F. Supp. 3d 763, 781 (D. Minn. 2016) ("[Dr. Shakeshaft's] testimony may not extend to whether [the District] or any of its employees actually violated Minnesota's mandatory reporting statute, because that would be an inadmissible legal conclusion.").

Likewise, Dr. Shakeshaft will not be permitted to testify that the District "violated the procedures specified in the *Every Student Succeeds Act* of 2015" by accepting Mr. Bjerknes' resignation. (Shakeshaft Report at 54.) "Whether a legal standard has been met

is for the Court—and the Court alone—to decide, not an expert." *Hoekman v. Educ. Minn.*, 335 F.R.D. 219, 237 (D. Minn. 2020) (citing *Peterson v. City of Plymouth*, 60 F.3d 469, 475 (8th Cir. 1995)).

Lastly, the Court finds that Dr. Shakeshaft's opinions on the District's compliance with its own policies may be helpful to the trier of fact. The Court errs on the side of inclusion, *Finch*, 630 F.3d at 1062, and this litigation involves the evaluation of and compliance with numerous policies by various administrators and educators.

Accordingly, the Court grants in part and denies in part the District's motion to exclude Dr. Shakeshaft's opinions.

### 2. Mr. Carney

Mr. Carney's expert report addresses the technological measures employed by the District to comply with its Internet Policy in 2016–2017 and the existence of other technologies that the District could have used to achieve compliance. (Carney Report ¶ 5 (identifying the two questions that Plaintiffs tasked Mr. Carney with answering)). The District argues that Mr. Carney's opinions should be excluded because they are speculative and unhelpful to the jury.

Mr. Carney's report is only relevant to Plaintiffs' claims that challenge the District's failure to discover Mr. Bjerknes' social media abuse prior to his arrest: the Title IX "before" claim, the Section 1983 claim based on failure-to-act and failure-to-train teachers, and the negligence claims. Based on the Court's summary judgment ruling, Mr. Carney's testimony as to those claims is now moot. *See, e.g.*, *Mahaska Bottling Co., Inc. v. PepsiCo, Inc.*, 441 F. Supp. 3d 745, 750, 754 (S.D. Iowa 2019) (excluding as moot portions of

experts' testimony that related to claims dismissed on summary judgment). Therefore, the District's motion to exclude Mr. Carney's expert testimony regarding technology measures is denied as moot.

### 3. Ms. Chretien

Plaintiffs move to exclude the opinions of the District's expert on educational administration, Ms. Chretien. Plaintiffs argue first that Ms. Chretien's opinions are unhelpful to the jury because they conflate the standard of care with the duty of care and because her analysis of the District's policies is cumulative. (Pls.' Mem. to Excl. Chretien at 9–11; Pls.' Reply to Excl. Chretien at 9–10.) Second, Plaintiffs contend that Ms. Chretien's opinions improperly state legal conclusions. (Pls.' Mem. to Excl. Chretien at 12–15; Pls.' Reply to Excl. Chretien at 2–9.)

In response, the District asserts that Ms. Chretien's testimony will help the jury by explaining the sources that inform an educator's standard of care and by rebutting the opinions of Dr. Shakeshaft. (Def.'s Opp'n to Excl. Chretien at 3–8, 12.) Additionally, the District argues that Ms. Chretien does not state impermissible legal conclusions, but rather reviews the federal and state laws and guidance relevant to ascertaining the standard of care in the highly regulated environment of education. (*Id.* at 8–11.)

The Court declines to exclude Ms. Chretien's opinions as unhelpful to the jury. Again, the Court errs on the side of inclusion when evaluating assistance to the trier of fact. *Finch*, 630 F.3d at 1062. Plaintiffs' argument that Ms. Chretien's testimony will be cumulative because "the jury will hear Defendant's employees testify to [its] policies" rings hollow, given that Plaintiffs' own expert intends to testify about the District's

109

compliance with its policies and Ms. Chretien was hired to rebut Dr. Shakeshaft. (Pls.'
Mem. to Excl. Chretien at 11.) Like Dr. Shakeshaft's testimony, Ms. Chretien's perspective
as an educator and school administrator may help the jury understand the sufficiency of the
District's policies.

In addition, the Court does not find that Ms. Chretien's reliance on Minnesota law
confuses the standard of care with the duty of care. Ms. Chretien relied upon numerous
sources to formulate her opinion, stating that the standard of care must be determined from
multiple federal and state statutes, federal and state education department policies and
guidance documents, and professional organization standards and guidance documents,
among others. (Chretien Report at 6–7.) She also drew upon her professional experience
as an educator to explain how District employees would understand their responsibilities.
(*See, e.g.*, Chretien Report at 7, 18, 26, 36.) To the extent that Ms. Chretien relied upon
different sources to develop the standard of care than Dr. Shakeshaft, "[i]t is up to the jury,
not this Court, to weigh the credibility of these dueling experts." *Refrigeration Supplies,
Inc. v. Acadia Ins. Co.*, 507 F. Supp. 3d 1096, 1104 (E.D. Mo. 2020); *see also Johnson v.
Mead Johnson & Co., LLC*, 754 F.3d 557, 562 (8th Cir. 2014) (admonishing district courts
"not to weigh or assess the correctness of competing expert opinions"). The Court finds on
balance that Ms. Chretien's testimony may be helpful to the jury.

Next, the Court finds that, with one exception, Ms. Chretien's opinions do not state
improper legal conclusions. The Court agrees with Plaintiffs that Ms. Chretien's discussion
of Minn. Stat. § 626.556—for example, her analysis of the statutory definition of
"report"—constitutes legal interpretation, a function reserved solely for the Court.

(Chretien Report at 29–31.) Ms. Chretien will not be permitted to instruct the jury on the meaning of any Minnesota statutes.

However, the remainder of Ms. Chretien's report does not usurp the role of the Court. As stated above, Ms. Chretien generally referenced sources of law that, based on her own experience as an educator, District personnel would consult to determine the standard of care. Her testimony can assess whether the District met this standard of care without opining on an ultimate issue of law. *See, e.g.*, *Scalia v. Reliance Tr. Co.*, No. 17-cv-4540, 2021 WL 795270, at *21 (D. Minn. Mar. 2, 2021) ("For example, an expert may testify about the duty of prudence, the applicable standard of care, and how a party's conduct measured up to the standard of care, but . . . [not] on the ultimate question of whether the party violated [a statute].") Plaintiffs are free to level objections, vigorously cross examine Ms. Chretien, and request jury instructions to attack her testimony. *Daubert*, 509 U.S. at 596.

Accordingly, the Court grants in part and denies in part Plaintiffs' motion to exclude Dr. Chretien's testimony.

### B.  District's Motion to Exclude Therapist's Expert Testimony

The District's final motion concerns Plaintiffs' intent to elicit expert testimony from Jane Doe 1's former therapist ("Therapist"). Plaintiffs first disclosed Therapist as a "pertinent treating physician" on September 25, 2020. (First Schladt Decl. [Doc. No. 206] ¶ 2.) In December 2020, Plaintiffs began production of Therapist's mental health records, ultimately producing hundreds of documents to the District. (*Id.* ¶ 4.) Plaintiffs' deadline to disclose expert witnesses was September 15, 2021, and they did not disclose Therapist

as an expert at that time.[22] (Order to Modify Expert Disclosure Deadlines [Doc. No. 57];

First Schladt Decl. ¶ 5.)

During a hearing regarding an Independent Medical Examination ("IME") of JD1,

in direct response to questions by the Court, Plaintiffs confirmed that they had not disclosed

Therapist as an expert. (First Markowitz Decl., Ex. 6 (Oct. 19, 2021 IME Hearing Tr.) at

14:2–16:16.) The Court noted Plaintiffs' apparent indecision on whether to do so in its

Order granting the District's Motion to Compel the IME. (Order Compelling IME [Doc.

No. 94] at 11 (observing that, according to Plaintiffs' representations at the IME hearing,

"[T]herapist remains a potential trial expert witness under Fed. R. Civ. P. 26(a)(2)(C).").)

Continuing with their initial plan, Plaintiffs disclosed Therapist as a fact witness as

part of their First Supplemental 26(a)(1) Disclosures on January 5, 2022. (First Markowitz

Decl., Ex. 5 at 6). Their disclosure stated:

> [Therapist] has knowledge of Jane Doe 1's mental health diagnosis,
> treatment, and history, including treatment at Sanford Behavioral Health,
> Upper Mississippi, as well as Our Healing Ground.

(*Id.*)

Dr. Mary Mullenbach conducted JD1's IME on March 31. (First Markowitz Decl.

¶ 4.) The District served Dr. Mullenbach's IME report on Plaintiffs on May 6 and Plaintiffs

deposed Dr. Mullenbach on May 19. (*Id.* ¶ 4–5.)

The District deposed Therapist on May 20, during which she twice confirmed that

she was not retained as an expert. (Therapist Dep. Tr. at 144:2–7, 190:15–17.) Therapist's

---

[22] Although other discovery deadlines were subsequently amended, Plaintiffs'
expert disclosure deadline remained unchanged. [Doc. No. 113.]

testimony generally covered her history treating JD1 and JD1's symptoms of emotional

distress and trauma. (*See generally* Therapist Dep. Tr.) In addition, Therapist discussed her

opinions that JD1 suffers from trauma, in particular post-traumatic stress disorder

("PTSD"), stemming from Mr. Bjerknes' sexual abuse. (*See, e.g.*, *id.* at 24:17–25:12,

68:20–69:16, 100:11–102:15, 179:5–182:22, 251:22–253:13.) At several points, the

District's counsel specifically asked Therapist about her bases for these opinions. (*See, e.g.*,

*id.* at 48:14–19, 72:4–73:22, 85:2–87:10, 92:8–18, 108:8–111:4, 187:19–188:2.)

On May 31, Plaintiffs sent the District the following letter:

> Defendant chose to depose [Therapist], Jane Doe 1's former therapist, on May 20, 2022. Through the course of [Therapist's] deposition, Defendant went beyond the scope of her knowledge as a fact witness and repeatedly elicited testimony regarding [Therapist's] professional opinions on Jane Doe 1's mental health, diagnoses, Jane Doe 1's interactions with Brandon Bjerknes, trauma causes and manifestations, and other related issues in this case.
> Given this, in the event this case proceeds to trial, Plaintiffs intend to question [Therapist] at trial regarding her professional opinions in similar fashion. Defendant's questioning on May 20 opened the door to allow [Therapist] to provide expert testimony at trial pursuant to Fed. R. Civ. P. 26(a)(2)(C).

(First Markowitz Decl., Ex. 1 (Pls.' May 31, 2022 Letter).) The District attempted to

dissuade the Plaintiffs from this course of action, conferring via telephone and email. (First

Markowitz Decl., Exs. 4, 5, 7.) Plaintiffs remained steadfast and the District now moves to

exclude Therapist's expert testimony. [Doc. No. 130.]

The District argues that Plaintiffs' letter is an untimely and inadequate attempt at an

expert disclosure under Federal Rule of Civil Procedure 26(a)(2)(C). (Def.'s Mem. to Excl.

Therapist at 1–2.) It contends that Federal Rule of Civil Procedure 16(b)(4) and Minnesota

Local Rule 16.3 require Plaintiffs to move for an extension of the disclosure deadlines and demonstrate good cause before additional experts may be disclosed. (*Id.* at 2, 13–15; Def.'s Reply to Excl. Therapist at 1–6.) Thus, the District asserts that, lacking a substantial justification and causing harm to the District, Therapist's testimony must be excluded under Federal Rule of Civil Procedure 37(c)(1). (Def.'s Mem. to Excl. Therapist at 15–17; Def.'s Reply to Excl. Therapist at 6–12.) Alternatively, the District requests that the Court issue a new scheduling order that: 1) requires Plaintiffs to serve Rule 26(a)(2)(C) disclosures for Therapist; 2) allows Dr. Mullenbach to serve a rebuttal report; 3) allows the District to depose Therapist in her capacity as an expert; and 4) requires Plaintiffs to pay the District's fees for these tasks. (Def.'s Reply to Excl. Therapist at 2.)

Plaintiffs respond that, as an initial matter, this is an evidentiary dispute more appropriately resolved as a motion *in limine* prior to trial, and accordingly Plaintiffs request that the Court defer ruling. (Pls.' Opp'n to Excl. Therapist at 2–3.) On the merits, Plaintiffs contend that their decision to disclose Therapist as an expert is substantially justified by the District's elicitation of expert testimony during Therapist's deposition. (*Id.* at 11–12.) Further, they argue that the disclosure is harmless because Plaintiffs have identified the relevant facts and opinions on which Therapist will testify, the District has Therapist's medical records of her treatment of JD1, deposed Therapist, and conducted its own IME of JD1 to rebut Therapist's opinions. (*Id.* at 13–14.) Plaintiffs request that the Court decline to exclude Therapist's testimony and to allow them to file additional Rule 26(a)(2)(C) disclosures. (*Id.* at 17.) In the alternative, Plaintiffs request that the Court allow Therapist to testify solely as a fact witness. (*Id.* at 19–20.)

114

Non-retained expert witnesses are "subject to less stringent disclosure requirements than a retained expert." *Gruttemeyer v. Transit Auth. of Omaha*, 31 F.4th 638, 644 (8th Cir. 2022). Parties must disclose "the identity of non-retained experts who may testify at trial and disclose 'the subject matter on which the witness is expected to present' expert opinion testimony and 'a summary of the facts and opinions to which the witness is expected to testify.'" *Vanderberg v. Petco Animal Supplies Stores, Inc.*, 906 F.3d 698, 702 (8th Cir. 2018) (quoting Fed. R. Civ. P. 26(a)(2)(C)).

The application of the disclosure requirements is more complicated when, as is the case here, the disputed witness is a treating physician. As one court has observed, "Treating physicians are both fact witnesses and, by virtue of their education, training and experience, experts. In the ordinary course of treating and advising a patient they often must form opinions about the patient's medical condition and future needs." *Crabbs v. Wal-Mart Stores, Inc.*, No. 4:09-cv-00519 (RAW), 2011 WL 499141, at *2 (S.D. Iowa Feb. 4, 2011). The Eighth Circuit has found that treating providers may be considered non-retained experts subject to the disclosure requirements of Fed. R. Civ. P. 26(a)(2)(C), in cases involving opinion testimony on matters outside the course of treatment, such as causation. *Vanderberg*, 906 F.3d at 701 (affirming the exclusion of testimony from treating orthopedic surgeon who disclosed as fact witness, but whose testimony would include causation for truck driver's injury); *Brooks v. Union Pac. Ry. Co.*, 620 F.3d 896 (8th Cir. 2010) (affirming exclusion of expert opinion testimony from treating physician who would opine on causation of plaintiff's injury).

However, depending on the nature of the testimony, expert disclosure of a treating provider may be unnecessary if the provider's testimony is confined to the provider's observations, treatment, and diagnosis of the plaintiff. *Gruttemeyer*, 31 F. 4th at 644. In *Gruttemeyer*, the Eighth Circuit affirmed the district court's admission of the testimony of a treating provider, who was designated only as a fact witness and not disclosed as an expert witness under Rule 26(a)(2), because the provider "testified as a treating practitioner only," and his testimony did not venture "outside the realm of treatment such as causation of a condition." *Id.* As the district court observed in the underlying motion in limine decision in *Gruttemeyer*, "Generally, a treating physician is not considered an expert witness if he or she testifies about observations based on personal knowledge, including the treatment of the party." *Gruttemeyer v. Transit Auth. of Omaha*, No. 8:18-cv-70, 2020 WL 974004, at *2 (D. Neb. Feb. 28, 2020).

Arguing that certain of Therapist's opinions exceed the scope of her observations, treatment, and diagnosis of JD1, the District focuses on two opinions it maintains should be excluded: 1) Therapist's diagnosis of JD1 as suffering from PTSD; and 2) Therapist's opinion that JD1's trauma generally, and PTSD specifically, are causally related to Mr. Bjerknes' sexual abuse. (Def.'s Reply to Excl. Therapist at 4–5, 8, 10–11; Aug. 3, 2022 Hearing Tr. at 76:14–19, 79:4–80:11, 87:5–9, 88:17–89:25.)

However, the Court notes that the District repeatedly solicited Therapist's professional opinions inclusive of these topics during her deposition. (*See, e.g.*, Therapist Dep. Tr. at 84:2–12 ("Q: Do you think that Jane Doe I was suffering from trauma in connection with Brandon Bjerknes? A. Yes. Q: . . . What was the reason you had for

thinking that Jane Doe I was at that time suffering from trauma from that Brandon Bjerknes?"); *id.* at 185:17–186:1 ("Q:. . . [D]o you believe Jane Doe I was experiencing emotional distress as a result of what Brandon Bjerknes did? A: Yes. Q: . . . [W]hat do you believe are the ways that Jane Doe I demonstrated emotional distress stemming from what Brandon Bjerknes did?").) And Plaintiffs do not plan to examine Therapist beyond the opinions she gave at her deposition, which, again, were solicited by the District. (Pls.' May 31, 2022 Letter; Pls.' Opp'n to Excl. Therapist at 9; Aug. 3, 2022 Hearing Tr. at 88:12–14.) The District can respond to this limited testimony through objections and probing cross-examination.

In addition, Plaintiffs produced Therapist's medical records that reference JD1's trauma and Therapist's association of JD1's struggles with Mr. Bjerknes' sexual abuse. (*See, e.g.*, Therapist's Records at DOE0014902, DOE0014905, DOE0014907, DOE0014961.)[23]

Furthermore, the District is not entirely without rebuttal evidence. Dr. Mullenbach reviewed Therapist's medical records prior to conducting the IME. (Mullenbach Decl. [Doc. No. 221] ¶ 4.) And Dr. Mullenbach understandably maintains that she would have conducted the IME differently had she been aware of Therapist's opinion that JD1 suffers from PTSD caused by Mr. Bjerknes' sexual abuse. (*Id.* ¶ 5.) For example, Dr. Mullenbach

---

[23] To avoid Plaintiffs filing hundreds of additional documents subject to sealing, the Court conducted an *in camera* review of Therapist's medical records. (*See* Parties' Aug. 17, 2022 Letter [Doc. No. 265] at 2.) The Court avoids quoting from these records to preserve confidentiality and instead references particular documents by their bates number for the clarity of the parties.

notes that she would have administered an assessment to explore the specific criteria for PTSD. (*Id.* ¶ 5–6.)

After reviewing Therapist's records, the Court did not find a specific diagnosis of PTSD among Therapist's session notes and treatment plans for JD1; rather, Therapist diagnosed JD1 with other mental health disorders related to anxiety, depression, and autism. (*See, e.g.*, Therapist's Records at DOE0001223–1241, DOE0001249–0001275 (diagnostic assessments and treatment plans).) Accordingly, in fairness to the District, Therapist will not be permitted to offer her opinion that JD1 suffers from PTSD at trial. However, Therapist's opinion that JD1's trauma is causally related to Mr. Bjerknes' sexual abuse is an opinion expressed in the medical records, offered in the course of her care and treatment of JD1. It will be permitted at trial. As JD1's treating therapist for multiple years following Mr. Bjerknes' sexual abuse, Therapist's testimony is highly probative to establishing her emotional distress.

In addition, the Court declines to allow an additional IME Report by Dr. Mullenbach or a supplemental deposition of Therapist. The fair result is to require Plaintiffs to file an additional disclosure stating, in detail and with specificity, Therapist's expert opinions that they intend to introduce at trial. These opinions, however, must be consistent with her diagnosis, care and treatment of JD1 and may not exceed the bounds of the medical records produced to the District. Accordingly, the Court grants in part and denies in part the District's Motion to Exclude Therapist's Expert Testimony.

## IV.   CONCLUSION

Based on the submissions and the entire file and proceedings herein, **IT IS HEREBY ORDERED** that:

1. Defendant's Motion for Summary Judgment [Doc. No. 154] is **GRANTED** as to Plaintiffs' negligence, negligent retention, and negligent supervision claims. Defendant's Motion for Summary Judgment is **GRANTED in part** and **DENIED in part** as to Plaintiffs' Title IX and Section 1983 claims.

2. Defendant's Motion to Exclude the Expert Opinions of Therapist [Doc. No. 129] is **DENIED**.

3. Plaintiffs' Motion to Exclude the Expert Testimony of Leslie Hainrihar Chretien [Doc. No. 140] is **GRANTED in part** and **DENIED in part**.

4. Defendant's Motion to Exclude the Expert Opinions of John Carney and Dr. Carol Shakeshaft [Doc. No. 148] is **DENIED**.

5. This Order is temporarily filed under seal.  Within seven (7) days of the date of this Order, the parties are **ORDERED** to show cause as to why the Order should remain under seal, and if so, which portions of the Order should remain sealed and for how long.  To that end, the parties must file (under seal) a joint brief, no longer than five (5) pages, and/or a proposed Redacted Order, if they would like portions to remain under seal.


**IT IS SO ORDERED.**

Dated: January 11, 2023

s/ Susan Richard Nelson
SUSAN RICHARD NELSON
United States District Judge